IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COXCOM, INC.,

               Plaintiff,

    v.

REMBRANDT TECHNOLOGIES, L.P.,

               Defendant.

C.A. No. 06-721-GMS

**PLAINTIFF COXCOM, INC.'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS, AND ITS OPENING BRIEF IN
SUPPORT OF ITS MOTION TO ENJOIN DEFENDANT FROM
<u>PROCEEDING WITH THE TEXAS ACTION</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
Leslie A. Polizoti (#4299)
1201 N. Market Street
PO Box 1347
Wilmington, DE  19897-1347
(302) 658-9200
rsmith@mnat.com
  *Attorneys for Plaintiff CoxCom, Inc.*

OF COUNSEL:

Mitchell G. Stockwell
R. Scott Griffin
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA  30309
(404) 815-6500

Tonya R. Deem
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400
(336) 607-7485

February 16, 2007

TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING ............................................................ 1

SUMMARY OF THE ARGUMENT ............................................................................... 2

STATEMENT OF THE FACTS ..................................................................................... 2

      A.     The Parties ..................................................................................... 2

      B.     The Cable Industry ......................................................................... 4

      C.     Rembrandt's History Of Litigation Against CoxCom And
           Other Cable Service Providers ....................................................... 4

ARGUMENT ............................................................................................................... 6

  I.     THE COURT SHOULD DENY REMBRANDT'S MOTION TO
        DISMISS. ............................................................................................ 6

      A.     The Supreme Court Has Articulated the Controlling
           Standard for Determining Existence of Justiciable
           "Controversies" in Patent Cases. .................................................... 7

      B.     Applying Both The Supreme Court's Standard And The
           Narrower Federal Circuit Test Confirms The Existence Of
           Jurisdiction In This Case. ............................................................... 9

         1.     There Is A Controversy Between Rembrandt And
               CoxCom As To Whether CoxCom's Products And
               Services Infringe Rembrandt's Patent Rights. ....................... 10

         2.     The Controversy Is Real And Not Hypothetical. ................... 11

            a.     Rembrandt's Business Of Raising Millions Of
                   Dollars, Acquiring And Suing On Patents
                   Evidences A Real And Actual Controversy. ............... 12

            b.     Rembrandt's Steady Progress In Suing Other Cable
                   Service Providers Confirmed That The Controversy
                   Is Real And Not Hypothetical. ................................. 14

      C.     This Court Should Not Decline Jurisdiction. ................................. 18

  II.    REMBRANDT SHOULD BE ENJOINED FROM PROCEEDING
        WITH THE TEXAS ACTION. .............................................................. 19

CONCLUSION ......................................................................................................... 22

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,
    300 U.S. 227 (1937)      7, 8

*Angiodynamics, Inc. v. Diomed Holdings, Inc.*,
    No. 06-02-GMS, 2006 WL 2583107, at *1 (D. Del. Sept. 7, 2006)      6, 12, 14

*Apotex, Inc. v. Pfizer, Inc.*, 385 F. Supp. 2d 187 (S.D.N.Y. 2005)      14

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
    846 F.2d 731 (Fed. Cir. 1988)      11, 14

*Bamdad Mechanic Co., Ltd. v. United Tech. Corp.*,
    109 F.R.D. 128 (D. Del. 1985)      21

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
    508 U.S. 83 (1993)      7, 8, 9, 10

*Consac Indus. v. Nutramax Labs.*,
    No. 97-CV-1155(SJ), 1998 WL 229255, at *3
    (E.D.N.Y. Mar. 31, 1998)      15

*Cosden Oil & Chem. Co. v. Foster Grant Co., Inc.*,
    432 F. Supp. 956 (D. Del. 1977), *aff'd w/o op.*, 577 F.2d 725
    (3d Cir. 1978)      21

*Crosley Corp. v. Hazeltine Corp.*,
    122 F.2d 925 (3d Cir. 1941)      19, 20

*Crosley Corp. v. Westinghouse Elec. & Mfg. Co.*,
    130 F.2d 474 (3d Cir. 1942)      20

*DaimlerChrysler Corp. v. U.S.*,
    361 F.3d 1378 (Fed. Cir. 2004)      9

*Digital Packet Licensing v. AT&T*,
    No. 4:04-CV-548-Y; 4:05-CV-224-Y, 2006 WL 462442
    (N.D. Tex. Feb. 27, 2006)      8, 14

*eBay Inc. v. MercExchange, L.L.C.*,
    126 S. Ct. 1837 (2006)      13

*EEOC v. University of Pennsylvania*,
    850 F.2d 969 (3d Cir. 1988), *aff'd on other grounds*, 493 U.S. 182
    (1990)      20

*EMC Corp. v. Norand Corp.*,
    89 F.3d 807 (Fed. Cir. 1996)      18

*Fairplay Electric Cars, LLC v. Textron Innovations, Inc.*,
    431 F. Supp. 2d 491 (D. Del. 2006)      12

*Genentech, Inc. v. Eli Lily & Co.*,
    998 F.3d 931 (Fed. Cir. 1993)      18, 20

*Ins. Co. of the West v. U.S.*,
    243 F.3d 1367 (Fed. Cir. 2001)      9

*Kewanee Oil Co. v. M&T Chem., Inc.*,
    315 F. Supp. 652 (D. Del. 1970)      21

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*,
    312 U.S. 270 (1941)      7, 8

*Matshushita Battery Indus. Co. v. Energy Conversion Devices*, 1996 U.S.
    Dist. LEXIS 8153 (D. Del. Apr. 23, 1996)      21

*MedImmune v. Genentech, Inc.*,
    549 U.S. ___, 127 S. Ct. 764 (2007)      passim

*Nippon Electric Glass Co. v. Sheldon*,
    489 F. Supp. 119 (S.D.N.Y. 1980)      14

*Peregrine Surgical, Ltd. v. Synergetics, USA, Inc.*,
    No. 06-2237, 2006 WL 3857492 (E.D. Pa. Dec. 29, 2006)      11

*Positec USA Inc. v. Milwaukee Electric Tool*,
    C.A. No. 05-890 GMS, 2006 WL 2726728 (D. Del.
    Sept. 25, 2006)      10

*Public Affairs Assocs., Inc. v. Rickover*,
    369 U.S. 111 (1962)      18

*Rohm & Haas Co. v. Brotech Corp.*,
    770 F. Supp. 928 (D. Del. 1991)      21

*Shell Oil Co. v. Amoco Corp.*,
    970 F.2d 885 (Fed. Cir. 1992)      8

*Sirius Satellite Research, Inc. v. Acacia Research Corp.*,
    No. 05 Civ 7495(PAC), 2006 WL 238999 (S.D.N.Y. Jan. 30,
    2006)      13

*Smith v. McIver*,
    22 U.S. (9 Wheat.) 532 (1824)     19

*Smithkline Beech Am Corp. v. Zenith Goldline Pharm.*, No. Civ.A.00-CV-
    1393, 2000 WL 963165 (E.D. Pa. Jun. 28, 2000)     10, 11

*Southern Construction Co. v. Pickard*,
    371 U.S. 57 (1962)     21

*Stone Container Corp. v. U.S.*,
    229 F.3d 1345 (Fed. Cir. 2000)     9

*Teva Pharm., Inc. v. Pfizer, Inc.*,
    395 F.3d 1324 (Fed. Cir. 2005)     8, 12

*Triangle Conduit & Cable Co. v. National Electric Products Corp.*,
    125 F.2d 1008 (3d Cir. 1942)     20

*USA Video Tech. Corp. v. Time Warner Cable, Inc., et al.*,
    No. 2:06-CV-239-RHC     3

*West Interactive Corp. v. First Data Resources, Inc.*,
    972 F.2d 1295 (Fed. Cir. 1992)     12, 13

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)     18

<u>Rules</u>

Fed. R. Civ. P. 12(b)(1)     6

Fed. R. Civ. P. 13(a)     21

## TABLE OF ABBREVIATIONS

| Full Name | Abbreviation |
|---|---|
| CoxCom, Inc. | CoxCom |
| Rembrandt Technologies, Inc. | Rembrandt |
| Time Warner Cable, Inc. | Time Warner |
| Charter Communications, Inc. | Charter Communications |
| Cablevision Systems Corporation | Cablevision |
| Comcast Corporation | Comcast |
| Rembrandt I Patents: | Rembrandt I Patents: |
| U.S. Patent No. 5,243,627 | '627 Patent |
| U.S. Patent No. 5,852,631 | '631 Patent |
| U.S. Patent No. 5,719,858 | '858 Patent |
| U.S. Patent No. 4,937,819 | '819 Patent |
| Litigation initiated by Rembrandt in 2005 and 2005 against cable service providers involving the '627, '631, '858, and '819 patents. | Rembrandt I litigation |
| Rembrandt II Patents: | Rembrandt II Patents: |
| U.S. Patent No. 5,008,903 | '903 Patent |
| U.S. Patent No. 5,710,761 | '761 Patent |
| U.S. Patent No. 5,778,234 | '234 Patent |
| U.S. Patent No. 6,131,159 | '159 Patent |
| U.S. Patent No. 6,950,444 | '444 Patent |
| Litigation initiated by Rembrandt in 2006 against cable service providers involving the '903, '761, '234, '159, and '444 patents. | Rembrandt II litigation |

## NATURE AND STAGE OF THE PROCEEDING

On November 30, 2006, at 4:33 p.m. EST, CoxCom, a Delaware corporation, filed this action against Rembrandt, a New Jersey limited partnership with its principal place of business in Bala Cynwyd, Pennsylvania, seeking a declaratory judgment of invalidity of the '903 Patent and non-infringement with respect to CoxCom's high speed internet products and services (D.I. 1).

Four hours later, at 7:41 p.m. CST, Rembrandt filed an action in the Eastern District of Texas against CoxCom, asserting that CoxCom's high speed internet products and services infringe four Rembrandt patents -- the '761 Patent, the '234 Patent, the '159 Patent, and the '444 Patent (the "Texas action").[1] This was the second lawsuit filed by Rembrandt against CoxCom, and part of a second wave of patent litigation initiated by Rembrandt against a discreet group of cable service providers, including CoxCom. The next day, Rembrandt filed an amended complaint in the Texas action -- to add the '903 patent.[2]

On January 26, 2007, CoxCom moved to dismiss the Texas action for lack of subject matter and personal jurisdiction, or in the alternative, to transfer the Texas action to this Court.

Rembrandt has moved to dismiss this declaratory judgment action for lack of subject matter jurisdiction (D.I. 8). This is CoxCom's Answering Brief in Opposition to

---

[1]     Attached hereto as Exhibit 1 is a true and correct copy of Rembrandt's Complaint filed in the Texas action.

[2]     Attached hereto as Exhibit 2 is a true and correct copy of Rembrandt's Amended Complaint filed in the Texas action.

Rembrandt's Motion to Dismiss, and its Opening Brief in Support of its Motion to Enjoin Rembrandt from Proceeding With The Texas Action.

## SUMMARY OF THE ARGUMENT

1.     The Court should deny Rembrandt's motion to dismiss for lack of subject matter jurisdiction.  A case or controversy exists between CoxCom and Rembrandt as to whether CoxCom infringes Rembrandt's patents by providing high-speed internet products and services through the use of DOCSIS-compliant equipment.  Indeed, Rembrandt confirmed the existence of that controversy by suing CoxCom for patent infringement just hours after CoxCom filed this declaratory judgment action.  Rembrandt has also sued other cable service providers for patent infringement in connection with their use of DOCSIS-compliant equipment in providing the same or similar high-speed internet services as CoxCom.

2.     This is the first-filed action between the parties concerning whether CoxCom's use of DOCSIS-compliant equipment in providing high-speed internet products and services infringes Rembrandt's patents.  Under well-established authority, the Court must enjoin a second-filed action between the same parties involving the same patents and the same accused products.  The Court should enjoin Rembrandt from proceeding with the Texas action against CoxCom.

## STATEMENT OF THE FACTS

A.     The Parties

Plaintiff CoxCom is a Delaware corporation with its principal place of business in Atlanta, Georgia (D.I. 1 ¶ 1).  CoxCom is a cable service provider that offers various services to subscribers, including high-speed internet access (*id.* ¶ 6).

Although CoxCom historically provided internet service in Texas, several years ago (before Rembrandt bought the rights to the patents at issue here), CoxCom made a strategic business decision to exit the Texas market. As a result, CoxCom does no business, owns no assets, keeps no records, and has no employees in Texas. CoxCom does not own or operate any cable systems in Texas, does not provide any high speed internet products and services in Texas, and does not derive any revenues from Texas. Indeed, in another patent infringement action involving video on demand services, the Eastern District of Texas recently held, after the plaintiff had an opportunity to take jurisdictional discovery, that CoxCom did not have minimum contacts with Texas sufficient to support the exercise of personal jurisdiction, and transferred the case to the District of Delaware.[3]

Defendant Rembrandt is a New Jersey limited partnership with its principal place of business in Bala Cynwyd, Pennsylvania (D.I. 1 ¶ 2). Rembrandt is a non-practicing entity ("NPE") -- a firm that invests in patents for the purpose of litigating patent infringement and obtaining royalties and licenses, but does not practice the patents (*id.* ¶¶ 7, 9). According to its website, Rembrandt "shoulders the legal, financial, and business risks associated with pursuing patent pirates and provides the capital and expertise required to litigate complex patent infringements" (*id.* ¶ 8, Ex. A). To pursue such patent infringement litigation, Rembrandt maintains a "staff of in-house professionals and outside consultants" that "includes scientists, inventors, financial analysts, lawyers, and researchers who are expert at identifying the validity and market value of patents and Intellectual Property (IP), and securing revenue for these inventors and companies as well as Rembrandt's investors" (*id.*). In fact, Rembrandt

---

[3]     *See USA Video Tech. Corp. v. Time Warner Cable, Inc., et al.*, No. 2:06-CV-239-RHC (attached hereto as Exhibit 3).

distinguishes itself from other NPEs by emphasizing its willingness and "ability to pursue patent infringement" (*id.*).  In this regard, Rembrandt claims to have raised $150 million "to acquire patents and litigate patent infringement" (*id.*).

B.     The Cable Industry

The cable industry is highly competitive and involves a number of companies, such as Time Warner, Comcast, Charter Communications and Cablevision, that offer the same sorts of services that CoxCom offers to its subscribers (D.I. 1 ¶ 15).  Because the research and development associated with the equipment necessary to provide a robust, fully-functional cable system is expensive, standards have been adopted by CoxCom and other cable service providers (*id.*).  For example, CableLabs, a nonprofit research and development consortium of which CoxCom is a member (*see* Exhibit 4), has helped to develop specifications that describe the operational parameters of cable modems and related equipment known as the Data Over Cable Service Interface Specifications ("DOCSIS") (D.I. 1 ¶ 16).[4]  DOCSIS allows cable companies like CoxCom, Time Warner, Comcast, Charter Communications and Cablevision to use the same equipment vendors and provide substantially the same, interoperable services because the cable modems and other equipment offered by such vendors are DOCSIS-compliant (D.I. 1 ¶ 17).

C.     Rembrandt's History Of Litigation Against CoxCom And
        Other Cable Service Providers

Pursuing its business model of acquiring patents and litigating patent infringement, Rembrandt has filed several lawsuits against a discreet group of cable service providers, including CoxCom, Time Warner, Charter Communications, Cablevision, and

---

[4]     Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the CableLabs' website, www.Cablelabs.com.

Comcast, alleging infringement of patents related to cable and internet services. CoxCom, after having been sued once by Rembrandt on a separate group of patents not at issue here (the Rembrandt I litigation), learned that Rembrandt was initiating a second wave of lawsuits against the same group of cable service providers. Specifically, on September 13, 2006, Rembrandt sued Time Warner, alleging that Time Warner's high speed internet products and services infringe the patent at issue here -- the '903 Patent (D.I. 1, Ex. C). On October 13, 2006, Rembrandt sued Cablevision, alleging that Cablevision's high speed internet products and services infringe, *inter alia*, the '903 Patent (D.I. 1, Ex. E). The '903 Patent, entitled "Adaptive transmit pre-emphasis for digital modem computed for noise spectrum," relates to an apparatus for determining a frequency-dependent signal-to-noise ratio in a communications network so as to allow proper equalization in a transmit pre-emphasis mode (D.I. 1, Ex. D, col. 1, ll. 8-11). As such, DOCSIS-compliant equipment allegedly infringes the '903 Patent.[5]

CoxCom could read the writing on the wall. Rembrandt sued Time Warner and Cablevision for patent infringement based on their providing high speed internet products and services through the use of DOCSIS-compliant equipment. Because CoxCom provides substantially the same services using the same equipment and standards as Time Warner and Cablevision, it was just a matter of time before Rembrandt asserted the same patents against CoxCom. Therefore, CoxCom initiated an investigation of Rembrandt and its patents and filed

---

[5]     While Rembrandt's complaints do not specifically reference DOCSIS, it is clear that DOCSIS-compliant cable modems and related equipment are the accused products as they are apparatuses that determine the signal-to-noise ratio. In fact, Rembrandt recently confirmed this in its Joint Status Report filed in the Cablevision action pending before this Court. *See* Exhibit 5 at 3 ("Rembrandt alleges that DOCSIS-complaint equipment infringes the . . . '903 Patent.").

this action on November 30, 2006, seeking a declaratory judgment that the '903 Patent is invalid, unenforceable, or not infringed (D.I. 1).[6]  Just hours after CoxCom filed this declaratory judgment action, Rembrandt filed a complaint in the Eastern District of Texas against CoxCom for infringement of the Rembrandt II patents.[7]  *See* Exhibit 1.  The next day, before the declaratory judgment complaint was served (*see* D.I. 5), Rembrandt amended the Texas action to assert a claim for infringement of the '903 Patent (*see* Exhibit 2 ¶¶ 8-12),[8] confirming that there was a real and concrete controversy between the parties as to whether CoxCom's products and services infringe Rembrandt's patent rights.

<u>ARGUMENT</u>

I.    THE COURT SHOULD DENY REMBRANDT'S MOTION TO DISMISS.

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the jurisdiction of the Court to address the merits of the complaint.  *See Angiodynamics, Inc. v. Diomed Holdings, Inc.*, C.A. No. 06-02-GMS, 2006 WL 2583107, at *1 (D. Del. Sept. 7, 2006).[9]  If the jurisdictional facts are not in dispute, as they are not in this case, the Court must consider the allegations in the Complaint to be true and draw all reasonable inferences in Plaintiff's favor.  *Id.*

---

[6]    Rembrandt's complaint about CoxCom's alleged delay in filing this declaratory judgment is unwarranted.  CoxCom had an obligation to investigate Rembrandt's patent rights before initiating any action.

[7]    The complaint included Charter as an additional defendant.  On the same day but in a separate complaint, Rembrandt also sued Comcast, thereby, rounding out its Rembrandt II suits against the cable service providers.  *See* 2:06CV506 TJW (E.D. Tex.).

[8]    Rembrandt amended its complaint to assert infringement of the '903 Patent against both CoxCom and Charter.  On the same day, Rembrandt also amended its complaint against Comcast to include the '903 Patent.

[9]    Unreported cases are attached hereto as Exhibits 6A-6H for the Court's convenience.

A.    The Supreme Court Has Articulated the Controlling
Standard for Determining Existence of Justiciable
"Controversies" in Patent Cases.

A party seeking a declaratory judgment bears the burden of establishing the

existence of an actual case or controversy within the meaning of the Declaratory Judgment Act.

*See Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993); *see* 28 U.S.C. § 2201(a).

Although the Supreme Court has "not draw[n] the brightest of lines between those declaratory-

judgment actions that satisfy the case-or-controversy requirement and those that do not," the

Court has made clear that the issue is "'whether the facts alleged, under all the circumstances,

show that there is a substantial controversy, between parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"

*MedImmune v. Genentech, Inc.*, 549 U.S. ___, 127 S. Ct. 764, 771 (2007) (quoting *Maryland*

*Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  A "controversy" must be

one that is appropriate for judicial determination.  *See Aetna Life Ins. Co. of Hartford, Conn. v.*

*Haworth*, 300 U.S. 227, 240 (1937).

A justiciable controversy is thus distinguishable from a difference
or dispute of a hypothetical or abstract character; from one that is
academic or moot.  The controversy must be definite and concrete,
touching the legal relations of parties having adverse legal
interests.  It must be a real and substantial controversy admitting of
specific relief through a decree of a conclusive character, as
distinguished from an opinion advising what the law would be
upon a hypothetical state of facts.

*Id.* at 240-41 (citations omitted).  Because "the difference between an abstract question and a

'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree," there

is no precise test for determining whether there is such a controversy.  *Maryland Casualty Co.*,

312 U.S. at 273.  Instead, "the question in each case is whether the facts alleged, *under all the*

*circumstances*, show that there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (emphasis added).

Eschewing reliance on these controlling standards, Rembrandt relies heavily on the pre-*MedImmune* "reasonable apprehension of imminent suit" test articulated by the Federal Circuit in *Teva Pharm., Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir. 2005). The *Teva* test requires:

> (1)    an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and
>
> (2)    present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken by the declaratory judgment plaintiff with the intent to conduct such activity.

*Id.* at 1330. This test focuses on whether the patentee's conduct demonstrates an intent to enforce its patents through litigation. *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992). In applying the test, courts consider many factors including, *inter alia*, the litigation history of the parties and the defendant's history of suing similar parties on the same patent or similar technology. *Digital Packet Licensing v. AT&T*, No. 4:04-CV-548-Y; 4:05-CV-224-Y, 2006 WL 462442, at * 4-5 (N.D. Tex. Feb. 27, 2006).

*MedImmune*, however, advised that the Federal Circuit's test was narrower than, and contradicted, controlling Supreme Court precedent. 127 S. Ct. at 774 n.11 (noting that Federal Circuit's requirement of reasonable apprehension of imminent suit contradicts precedent that, on multiple occasions, has found that the declaratory judgment plaintiff had no fear of suit -- imminent or otherwise); *see Maryland Casualty Co.*, 312 U.S. at 273 (declaratory judgment jurisdiction existed even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured);

*Aetna Life Ins. Co.*, 300 U.S. at 239 (declaratory judgment jurisdiction existed even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit); *Cardinal Chem. Co.*, 508 U.S. at 98 (holding that appellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity).

While Rembrandt seeks to characterize this finding as mere dicta, lower courts are obliged to follow even dicta from the Supreme Court. *See DaimlerChrysler Corp. v. U.S.*, 361 F.3d 1378, 1385 n.3 (Fed. Cir. 2004) ("Notably, even if dicta, we would feel obligated to follow the Supreme Court's explicit and carefully considered statements . . . ."); *Ins. Co. of the West v. U.S.*, 243 F.3d 1367, 1372 (Fed. Cir. 2001) ("This court is obligated to follow the Supreme Court's interpretation . . . even though that interpretation may be dicta."); *Stone Container Corp. v. U.S.*, 229 F.3d 1345, 1349-50 (Fed. Cir. 2000) (holding that "as a subordinate federal court," it is bound to follow the explicit and carefully considered statements of the Supreme Court). Thus, in patent litigation, while a reasonable apprehension of imminent suit necessarily establishes jurisdiction, the mere desire to avoid the threat of a patent may be sufficient to establish jurisdiction. *MedImmune*, 127 S. Ct. at 774 n.11; *see also Cardinal Chem. Co.*, 508 U.S. at 95-96.

> B.   Applying Both The Supreme Court's Standard And The Narrower Federal Circuit Test Confirms The Existence Of Jurisdiction In This Case.

Rembrandt does not challenge the facts on which CoxCom asserts declaratory judgment jurisdiction. Instead, examining the jurisdictional facts one by one and in a vacuum, Rembrandt argues that the undisputed facts do not meet the Federal Circuit's narrow requirement that a declaratory judgment plaintiff fear imminent suit. Rembrandt's argument fails for two

reasons.  First, as discussed above, *supra* at 8-9, *MedImmune* clarified that the Federal Circuit's

test is narrower and contrary to controlling Supreme Court precedent.  127 S. Ct. at 764 n.11.

Second, when the facts are reviewed in total, compared to the controlling standards, including

the Federal Circuit's narrow test, and reasonable inferences are drawn in favor of CoxCom, it is

clear that there is a substantial controversy between Rembrandt and CoxCom of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment.

> 1.    There Is A Controversy Between Rembrandt And
>        CoxCom As To Whether CoxCom's Products And
>        Services Infringe Rembrandt's Patent Rights.

Rembrandt seems to imply that there was no justiciable "controversy" because, as

of the filing of the Complaint, Rembrandt had not expressly threatened CoxCom with litigation

of the '903 Patent (D.I. 9 at 7).  Although it is true that Rembrandt, as of the filing of the

Complaint, had not expressly charged CoxCom with infringement of the '903 Patent, the

Supreme Court has made clear that a charge of infringement is not necessary to establish a

justiciable controversy.  *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 95-96 (1993); *see also*

*Positec USA Inc. v. Milwaukee Electric Tool*, C.A. No. 05-890 GMS, 2006 WL 2726728, *4-5

(D. Del. Sept. 25, 2006) (holding that a threat to institute litigation against the declaratory

judgment plaintiff's sister company was sufficient to support declaratory judgment jurisdiction);

*Smithkline Beech Am Corp. v. Zenith Goldline Pharm.*, No. Civ.A.00-CV-1393, 2000 WL

963165, *1-2 (E.D. Pa. Jun. 28, 2000) (holding that, even though defendant had not raised with

the plaintiff any issues regarding the patent at issue, the declaratory judgment jurisdiction

existed).

The high speed cable modem internet services at issue are provided based on

DOCSIS standards developed for the cable industry and compliant equipment.  There are a

limited number of vendors capable of supporting and providing cable modems and other equipment for building the architecture necessary to offer cable services like high speed internet (D.I. 1 ¶ 17).   As a result, cable companies like CoxCom, Cablevision, Comcast, Charter Communications and Time Warner often use the same vendors because the cable modems and other equipment offered by such vendors are DOCSIS-compliant.   (*Id.*)   Because CoxCom provides substantially the same services using similar equipment and standards as Time Warner and Cablevision, when Rembrandt alleged that Time Warner and Cablevision were infringing its patent rights, CoxCom reasonably believed that there was a controversy as to whether it also was infringing those same patent rights.

The existence of the controversy was confirmed when Rembrandt filed the Texas action against CoxCom and asserted a claim for infringement of the Rembrandt II patents, including the '903 Patent.  *See Peregrine Surgical, Ltd. v. Synergetics, USA, Inc.*, No. 06-2237, 2006 WL 3857492, *3 (E.D. Pa. Dec. 29, 2006) (explaining that, while a subsequently filed infringement complaint is not dispositive of the question of whether the declaratory judgment plaintiff had a reasonable apprehension of suit, it does demonstrate that an actual controversy existed between the parties).

### 2.    The Controversy Is Real And Not Hypothetical.

Even in its application of the reasonable apprehension of imminent suit test, Rembrandt confuses the analysis.  The case law makes clear that jurisdiction is to be based on the totality of the circumstances -- not on individual facts considered in a vacuum.  *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988) ("When the defendant's conduct, including its statements, falls short of an express charge, one must consider the 'totality of the circumstances' . . . .").  For example, although it may be true that prior

litigation between the parties on a different patent does not, in and of itself, establish jurisdiction, when this fact is combined with the facts that the declaratory judgment defendant is a NPE who: (a) identified a discreet group of defendants that includes the declaratory judgment plaintiff; (b) previously initiated a wave of litigation against the group; and (c) initiated a second wave of litigation against the group, on the patent in suit and based on industry standards, it is clear that a real and concrete controversy exists.

> a.    Rembrandt's Business Of Raising Millions Of Dollars, Acquiring And Suing On Patents Evidences A Real And Actual Controversy.

Rembrandt does not dispute that, as a NPE, its business model is to acquire, license and enforce patents through litigation. Instead, citing numerous pre-*MedImmune* cases, Rembrandt argues that aggressive assertion of its patent rights against third parties is not relevant as to whether the controversy between Rembrandt and CoxCom is real or hypothetical (D.I. 9 at 8-9). Rembrandt is wrong, and the cases it cites are distinguishable. First, the Federal Circuit has held that "a patent owner's willingness and capacity to enforce its patent rights is pertinent to the inquiry for an actual controversy." *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1298 (Fed. Cir. 1992).

Second, *none* of the cases relied upon by Rembrandt involve NPE's with a history of filing infringement actions on the same patents and on the same technology. *See Teva Pharm. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1331 (Fed. Cir. 2005) (action between two drug manufacturers in which the defendant's prior litigation was against alleged infringers of other patents); *Angiodynamics, Inc. v. Diomed Holdings, Inc.*, C.A. No. 06-02-GMS, 2006 WL 2583107, at *3 (D. Del. Sept. 7, 2006) (action between two companies offering competing products in which there was no evidence that the defendant had sued any other party for

infringement of the patents-in-suit); *Fairplay Electric Cars, LLC v. Textron Innovations, Inc.*, 431 F. Supp. 2d 491, 493 (D. Del. 2006) (action between two golf cart manufacturers in which, although there had been prior litigation between the parties regarding the patent in suit, the litigation involved different products and, thus, presumably different technology); *West Interactive Corp.*, 972 F.2d at 1298 (providing no indication that the previous litigation against "unrelated third parties" involved either the same patents or same technology); *Sirius Satellite Research, Inc. v. Acacia Research Corp.*, No. 05 Civ. 7495(PAC), 2006 WL 238999, at *6 (S.D.N.Y. Jan. 30, 2006) (finding no evidence that the defendant had filed previous actions to enforce the same patents or technology at issue).

    In contrast to the cases relied upon by Rembrandt, Rembrandt promotes itself as a litigation-focused NPE having "raised $150 million to acquire patents and litigate patent infringement," and distinguishable from other NPE's as a result of "its ability to pursue patent infringement, regardless of the size or sophistication of the infringer" (D.I. 1, Ex. A). Moreover, by filing infringement actions on the patent in suit against other cable service providers that Rembrandt had previously identified as providing the same services as CoxCom, Rembrandt has demonstrated its readiness and inclination to enforce its patents against CoxCom.

    Finally, contrary to Rembrandt's suggestion, there is nothing wrong with a court or party taking into account the nature of its business in evaluating the existence of a controversy. The Supreme Court itself recognized, in Justice Kennedy's concurrence in *eBay*, that "[a]n industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees," and that such firms could employ "an injunction, and the potentially serious sanctions arising from its violation, . . . as a bargaining tool to charge exorbitant fees . . . ." *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct.

1837, 1842 (2006). Here, too, it is only appropriate that this Court take Rembrandt's professed

business model into account in determining the existence of jurisdiction. That, after all, is a fact

that caused CoxCom to initiate this case.

> b.   Rembrandt's Steady Progress In Suing Other Cable Service
>      Providers Confirmed That The Controversy Is Real And
>      Not Hypothetical.

In *Digital Packet Licensing v. AT&T*, No. 4:04-CV-548-Y; 4:05-CV-224-Y, 2006

WL 462442 (N.D. Tex. Feb. 27, 2006), the court held that jurisdiction existed over Nortel's

declaratory judgment action where Digital Packet Licensing (DPL) had brought infringement

actions against its customers and other related parties that were using the same systems that

Nortel made, used, or sold. *Id.* at *4. The court held "[a]n 'accusation of infringement need not

be made directly to the declaratory judgment plaintiff, but may be made to its customers *or the*

*industry at large*.'" *Id.* (emphasis added) (quoting *Nippon Electric Glass Co. v. Sheldon*, 489 F.

Supp. 119, 121 (S.D.N.Y. 1980)). Other courts applying the Federal Circuit test have also held

that allegations of infringement against others in the industry are sufficient to create reasonable

apprehension of suit and, thus, a real and concrete controversy. *See, e.g., Arrowhead Industrial*

*Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 737 (Fed. Cir. 1988) (reversing dismissal where

defendant had filed an infringement action against a third party on the patents in suit);

*Angiodynamics, Inc. v. Diomed Holdings, Inc.*, No. 06-02 GMS, 2006 WL 2583107, at *3 (D.

Del. Sept. 7, 2006) ("[A]lthough AngioDynamics has shown that Diomed brings lawsuits for

patent infringement to protect its investments, it has not argued that Diomed has sued any party

for infringement of either of the patents-in-suit"); *Apotex, Inc. v. Pfizer, Inc.*, 385 F. Supp. 2d

187 (S.D.N.Y. 2005) (holding that there was no reasonable apprehension where defendant's

litigation history, although extensive, did not relate to either the patents in suit or the same

technology); *Consac Indus. v. Nutramax Labs.*, No. 97-CV-1155(SJ), 1998 WL 229255, at *3 (E.D.N.Y. Mar. 31, 1998) ("The existence of a defendant/patentee's suits against others may create a reasonable apprehension of suit, since it may illustrate not only an intent but a willingness and capacity to employ litigation in pursuit of its patent rights.").

Here, Rembrandt has identified a discreet group of cable service providers (consisting of CoxCom, Time Warner, Charter Communications and Cablevision), directed its litigation efforts at the group, and filed two waves of litigation against the group.[10]  While the first wave involves patents not at issue in this case, it evidences Rembrandt's strategy of filing actions against the group.  For example, in the first wave, Rembrandt sued Comcast, Time Warner, Charter Communications and CoxCom on patents that relate to another industry standard -- ATSC.[11]  At the time that CoxCom filed its declaratory judgment complaint, Rembrandt was taking steps to implement the same strategy with respect to the Rembrandt II patents, and in particular the '903 Patent.  For example, as of the filing of the Complaint, Rembrandt had filed lawsuits against Time Warner and Cablevision, asserting infringement of the '903 Patent.[12]  The day the declaratory judgment Complaint was filed, Rembrandt filed lawsuits against the rest of the group -- CoxCom, Charter Communications and Comcast.  Noting

---

[10]    Attached as Exhibit 7 is a chart identifying the actions.

[11]    ATSC ("Advanced Television System Committee") is a standard that relates to the receipt and broadcast of digital television signals.  Rembrandt alleges that the cable service providers infringe its patent rights through their receipt and retransmission of signals that comply with the ATSC standard.

[12]    The action against Time Warner included additional Rembrandt II patents.  The only Rembrandt II patent asserted against Cablevision, however, is the '903 Patent.

that it had neglected to include the '903 Patent, Rembrandt immediately amended its complaints against CoxCom, Charter and Comcast to assert claims for infringement of the '903 Patent. [13]

Where Rembrandt developed a strategy of suing this discreet group of cable service providers, implemented the strategy with respect to the Rembrandt I patents and was taking steps to do the same with respect to the '903 Patent, CoxCom reasonably believed that Rembrandt would sue it for infringement, including for infringement of the '903 Patent.[14] The filing of the Texas action and immediate amendment thereof, confirms that this belief was reasonable.

Rembrandt argues that because Rembrandt did not include CoxCom as a defendant in the complaints filed against Time Warner and Cablevision and did not sue CoxCom on the same days that it sued Time Warner and Cablevision, CoxCom should have assumed that it was not going to be sued on the '903 Patent (D.I. 9 at 11-12). This argument makes no sense and is contrary to the facts. Rembrandt implemented the same strategy with respect to the

---

[13]    Rembrandt states that it amended its complaint against CoxCom to assert infringement of the '903 Patent only because CoxCom filed this declaratory judgment action (D.I. 9 at 3). This is not credible. Rembrandt filed the amended complaint the very next day after it filed its initial complaint and after CoxCom filed this declaratory judgment action and before it was served with the declaratory judgment complaint (D.I. 5). Moreover, Rembrandt fails to mention that it also amended the complaints against Comcast and Charter Communications to assert the '903 Patent. CoxCom is not aware that either Comcast or Charter Communications have filed declaratory judgment actions against Rembrandt on the '903 Patent.

[14]    Rembrandt argues that, if the Rembrandt II action against Time Warner had caused CoxCom apprehension of suit, CoxCom would have included all of the Rembrandt II patents in this declaratory judgment action (D.I. 9 at 12). However, between the time that Rembrandt filed the Time Warner case and CoxCom filed the declaratory judgment action, Rembrandt sued Cablevision and, of the Rembrandt II group of patents, only included the '903 Patent (D.I. 1, Ex. E). Furthermore, CoxCom was obligated to investigate Rembrandt's patents and make its own determination as to whether there were justiciable controversies regarding each of the patents.

Rembrandt II patents that it implemented with respect to the Rembrandt I patents -- filing several complaints and on different days. *See* Exhibit 7. In Rembrandt I, Rembrandt asserted claims against Comcast first and then months later asserted claims against Time Warner, CoxCom and Charter Communications. Similarly, in Rembrandt II, Rembrandt asserted claims against Time Warner and then subsequently asserted the same claims in complaints filed against the rest of the group. The fact that CoxCom was not sued in the same complaint or on the same days as Time Warner was sued on the '903 Patent means nothing.

In reference to the action filed against Time Warner on the Rembrandt II patents, Rembrandt also argues that "[a]s a matter of law, the mere fact that Rembrandt sued a competitor of CoxCom *on a different group of patents* does not provide an objective basis for CoxCom to believe that it would be sued on the '903 Patent" (D.I. 9 at 12; emphasis added). Rembrandt is in error. The '903 Patent is asserted against Time Warner (D.I. 1, Ex. C ¶¶ 6-10). Moreover, Rembrandt itself has admitted that the patents are the same and that the actions are related. *See* Exhibit 2 at 1 (alleging that the Texas action filed against CoxCom is related to the action filed against Time Warner).

Finally, Rembrandt argues that the time period between the filing of the action against Time Warner and CoxCom's declaratory judgment action indicates that CoxCom did not fear imminent suit by Rembrandt (D.I. 9 at 13). As discussed above, it is clear following *MedImmune* that fear of "imminent suit" is not required to establish jurisdiction. *See supra* at 8-9. Moreover, even if apprehension of imminent suit were the test, Rembrandt is in error. It was only after Rembrandt asserted the claim against Cablevision that it became evident that Rembrandt was following the same litigation strategy that it pursued with respect to the

Rembrandt I patents -- that is, enforcing its patents against a discreet group of cable service providers.

      C.     <u>This Court Should Not Decline Jurisdiction.</u>

      Although Rembrandt is correct that a court may decline to entertain a declaratory judgment action, it "'cannot decline to entertain [a declaratory judgment] action as a matter of whim or personal disinclination.'" *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813 (Fed. Cir. 1996) (quoting *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)). Dismissing a declaratory judgment action only because a subsequent, parallel action for patent infringement was filed in another jurisdiction is also improper. *Id.*; *see also Genentech, Inc. v. Eli Lily & Co.*, 998 F.3d 931, 937 (Fed. Cir. 1993) *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). Such a dismissal "would be contrary to the general rule favoring the forum of the first-filed action." *Id.* Moreover, in determining whether to entertain a declaratory judgment action, a court should consider all the practical factors, and its determination should be based on whether hearing the matter would satisfy the objectives of the Declaratory Judgment Act. *EMC Corp.*, 89 F.3d at 814.

      Rembrandt argues that the Court should decline to exercise jurisdiction because there is already patent litigation pending between these parties in Texas, and "there is no conceivable purpose for this lawsuit to continue" (D.I. 9 at 14). Rembrandt fails to mention, however, that CoxCom has moved to dismiss the Texas actions. CoxCom is not registered to do business in Texas, does no business in Texas and is not subject to personal jurisdiction in Texas. *See* Exhibit 3. Accordingly, CoxCom has moved to dismiss both the Rembrandt I and Rembrandt II actions filed against it in Texas on Rule 12(b)(1) grounds. CoxCom has moved to

dismiss the Rembrandt II complaint on the additional ground that it is a second-filed action to this case.

Finally, there is no prejudice to Rembrandt in having the parties litigate this dispute in Delaware. Rembrandt has already demonstrated its willingness to litigate in this forum by filing suit against Cablevision for infringement of the same patent at issue here.

Rembrandt's motion to dismiss should be denied.

## II.     REMBRANDT SHOULD BE ENJOINED FROM PROCEEDING WITH THE TEXAS ACTION.

There is no basis for simultaneous conduct of the same lawsuit in two different courts. It wastes the resources of the parties. It forces two federal judges to grapple with what one alone could handle. And it raises the specter of inconsistent judgments. It is for these reasons that courts follow the "first-filed" rule, which provides that the first-filed action should proceed and the second-filed action should not.

The first-filed rule originated with the United States Supreme Court. In *Smith v. McIver*, 22 U.S. (9 Wheat.) 532, 535 (1824), Chief Justice Marshall held that "in all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it."

In *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 930 (3d Cir. 1941), the Third Circuit applied this principle to federal concurrent jurisdiction, holding that the district court had abused its discretion in refusing to enjoin a second-filed action:

> The party who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual system permits, be free from the vexation of subsequent litigation over the same subject matter. The economic waste involved in duplicating litigation is obvious. Equally important is its adverse affect upon the prompt and efficient administration of justice. . . . Courts already heavily burdened with litigation with which they must of necessity deal should therefore not be called upon to duplicate each

other's work in cases involving the same issues and the same parties.

In that case, the district court denied Crosley's motion to enjoin Hazeltine from prosecuting later-filed actions.  The Third Circuit reversed, holding that the district court, "having the power to issue the preliminary injunction prayed for, abused its discretion in refusing to exercise that power," and remanded "with directions to grant the temporary injunction prayed for."  *Id.* at 930; *see also Crosley Corp. v. Westinghouse Elec. & Mfg. Co.,* 130 F.2d 474, 475 (3d Cir. 1942) ("[T]he district court first obtaining jurisdiction of the parties and issues in a patent cause on a complaint . . . should ordinarily proceed to adjudicate the controversy and should restrain the parties from seeking in the interim in a later suit in another district to duplicate that adjudication.").

In *Triangle Conduit & Cable Co. v. National Electric Products Corp.,* 125 F.2d 1008, 1009 (3d Cir. 1942), the Third Circuit explained further that a district court has not only the power, but the duty, to enjoin a second-filed action (emphasis added):

> We further held [in *Crosley v. Hazeltine*] that under the circumstances of that case ***it was the duty*** of the Court first obtaining jurisdiction to enjoin the prosecution of the subsequent proceedings in the other court.  As we have seen, in the present case the district court in Delaware first obtained jurisdiction of Triangle and National and of the controversy between them. Having taken jurisdiction of the declaratory suit brought by Triangle, ***it became the duty of that court to adjudicate the controversy.***  The rule which we announced in the *Crosley* case required it to restrain the parties from seeking to have the district court in Michigan duplicate that adjudication.

In *EEOC v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988), *aff'd on other grounds*, 493 U.S. 182 (1990), the Third Circuit elaborated further on the first-filed rule, stating that "this policy of comity has served to counsel trial judges to exercise their discretion by enjoining the subsequent prosecution of similar cases in different federal district courts."  *See*

20

*also Genentech Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) ("The general rule favors the forum of the first-filed action, whether or not it is a declaratory action.").

Following these authorities, this Court has repeatedly held that the first-filed action should proceed and the second-filed action should not.  A plaintiff in this Court is "entitled to be free from the 'vexation of subsequent litigation over the same subject matter' . . . and the courts are entitled to be free from the waste and inefficiency involved in duplicative litigation."  *Cosden Oil & Chem. Co. v. Foster Grant Co., Inc.*, 432 F. Supp. 956, 960 (D. Del. 1977), *aff'd w/o op.,* 577 F.2d 725 (3d Cir. 1978).  Based on this authority, this Court has enjoined parties on numerous occasions from prosecuting second-filed actions.  *See, e.g.*, *Rohm & Haas Co. v. Brotech Corp.*, 770 F. Supp. 928 (D. Del. 1991); *Bamdad Mechanic Co., Ltd. v. United Tech. Corp.*, 109 F.R.D. 128 (D. Del. 1985); *Kewanee Oil Co. v. M&T Chem., Inc.*, 315 F. Supp. 652 (D. Del. 1970); *Matshushita Battery Indus. Co. v. Energy Conversion Devices*, 1996 U.S. Dist. LEXIS 8153 (D. Del. Apr. 23, 1996).

There is no question that Rembrandt's second-filed Texas action involves exactly the same parties, the same accused products and the same subject matter as this first-filed action. There is also no question that the Texas action involves only compulsory counterclaims that should be filed here.  As the Supreme Court has explained, the requirement of Fed. R. Civ. P. 13(a) that a party assert all counterclaims arising out of the same transaction or occurrence "was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters."  *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60 (1962).

This is the first-filed action concerning whether CoxCom's high speed internet products and services infringe Rembrandt's patents.  Because the second-filed Texas action

involves the same parties, the same patents and the same accused products and services, the Court should enjoin Rembrandt from proceeding with the Texas action against CoxCom.

Indeed, Rembrandt has already indicated a willingness to litigate these patents and these issues in this Court -- having sued Cablevision in this Court for infringement of those patents on October 13, 2006 -- just over a month before CoxCom filed this declaratory judgment action in this Court.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Rembrandt's motion to dismiss, and should enjoin Rembrandt from proceeding with its Texas action against CoxCom.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rsmith@mnat.com
 *Attorneys for Plaintiff CoxCom, Inc.*

OF COUNSEL:

Mitchell G. Stockwell
R. Scott Griffin
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA  30309
(404) 815-6500

Tonya R. Deem
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400
(336) 607-7485

February 16, 2007

736211

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on February 16, 2007, I caused to be electronically filed PLAINTIFF COXCOM, INC.'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, AND ITS OPENING BRIEF IN SUPPORT OF ITS MOTION TO ENJOIN DEFENDANT FROM PROCEEDING WITH THE TEXAS ACTION with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Kevin M. Baird
> James M. Lennon
> WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

and that on February 16, 2007, I caused copies to be served upon the following in the manner indicated:

### BY EMAIL AND HAND

> Kevin M. Baird
> James M. Lennon
> WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
> 222 Delaware Avenue, Suite 1500
> Wilmington, DE  19801

> */s/ Rodger D. Smith II*
> Rodger D. Smith II (#3778)
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> (302) 658-9200
> rsmith@mnat.com

# Exhibit 1

R E C E I V E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

NOV 30 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>CHARTER COMMUNICATIONS, INC., )<br>CHARTER COMMUNICATIONS )<br>OPERATING, LLC, and COXCOM, INC. )<br>)<br>Defendants )<br>_____ ) | Case No **2 - 0 6 C V - 5 0 7**<br><br>**JURY TRIAL REQUESTED** |

## COMPLAINT

Plaintiff Rembrandt Technologies, LP ("Rembrandt") files this complaint for infringement of United States Patent Nos. 5,710,761; 5,778,234; 6,131,159 and 6,950,444 under 35 U.S.C. § 271, and in support thereof would respectfully show the Court the following:

## RELATED CASE

This case is related to an action filed in the Marshall Division of the Eastern District of Texas and assigned to Judge Ward, captioned *Rembrandt Technologies, LP* v *Time Warner Inc*, No. 2-06CV-369 filed September 13, 2006.

## THE PARTIES

1. Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004 and offices at 214 W. Fanin, Marshall, TX 75670.

2. Defendant Charter Communications, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscout Dr, Ste

100, St. Louis, MO 63131. Charter Communications, Inc. is a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself.

3. Defendant Charter Communications Operating, LLC is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscout Dr., Ste. 100, St. Louis, MO 63131. Charter Communications Operating, LLC is a subsidiary of Defendant Charter Communications, Inc. and a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself.

4. Defendant Coxcom, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 1400 Lake Hearn Dr., Atlanta, GA 30319. Coxcom, Inc. is a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself.

## JURISDICTION AND VENUE

5. This is an action for patent infringement, arising under the patent laws of the United States, 35 U.S.C. § 1, et seq. This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1338(a).

6. This Court has personal jurisdiction over all named Defendants. Defendants have conducted and do conduct business within the State of Texas. Defendants, directly or through subsidiaries or intermediaries, offer for sale, sell, advertise, and market products and services that infringe the patents-in-suit as described more specifically below. Therefore, because Defendants have committed acts of patent infringement in this district, or is otherwise present or doing business in this district, this Court has personal jurisdiction over Defendants.

7. Venue is proper in this judicial district under 28 U.S.C. §§1391(b), (c), and 1400(b).

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 5,710,761

8. Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

9. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,710,761, entitled "Error Control Negotiation Based on Modulation" ("the '761 patent"). A true copy of the '761 patent is attached as Exhibit A.

10. The '761 patent was duly and legally issued by the United States Patent and Trademark Office on January 20, 1998, after full and fair examination.

11. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '761 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '761 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '761 patent by providing high-speed cable modem internet products and services to subscribers.

12. Upon information and belief, Defendants will continue to infringe the '761 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 5,778,234

13. Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

14.   Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,778,234, entitled "Method for Downloading Programs" ("the '234 patent.") A true copy of the '234 patent is attached as Exhibit B.

15.   The '234 patent was duly and legally issued by the United States Patent and Trademark Office on July 7, 1998, after full and fair examination.

16.   Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '234 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '234 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '234 patent by providing high-speed cable modem internet products and services to subscribers.

17.   Upon information and belief, Defendants will continue to infringe the '234 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

<b><u>COUNT III: INFRINGEMENT OF U.S. PATENT NO. 6,131,159</u></b>

18.   Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

19.   Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,131,159, entitled "System for Downloading Programs" ("the '159 patent.") A true copy of the '159 patent is attached as Exhibit C

20     The '159 patent was duly and legally issued by the United States Patent and Trademark Office on October 10, 2000, after full and fair examination.

21     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '159 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '159 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '159 patent by providing high-speed cable modem internet products and services to subscribers.

22     Upon information and belief, Defendants will continue to infringe the '159 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 6,950,444

23.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

24.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,950,444, entitled "System and Method for a Robust Preamble and Transmission Delimiting in a Switched-Carrier Transceiver" ("the '444 patent"). A true copy of the '444 patent is attached as Exhibit D.

25     The '444 patent was duly and legally issued by the United States Patent and Trademark Office on September 27, 2005, after full and fair examination.

26     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '444 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '444 patent, in this district or otherwise within the

United States. For example, Defendants have infringed and continue to infringe the '444 patent by providing high-speed cable modem internet products and services to subscribers

    27    Upon information and belief, Defendants will continue to infringe the '444 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## PRAYER FOR RELIEF

    WHEREFORE, Rembrandt prays that it have judgment against Defendants for the following:

    (1)    An order that Defendants have infringed the patents-in-suit;

    (2)    A permanent injunction enjoining and restraining Defendants and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association therewith, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

    (3)    An award of damages;

    (4)    An award of increased damages pursuant to 35 U.S.C. § 284;

    (5)    An award of all costs of this action, including attorneys' fees and interest; and

    (6)    Such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

## JURY DEMAND

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury

Dated: November 30, 2006    Respectfully submitted,

By: _Max L. Tribble   by permission EHD_
Max L. Tribble, Jr., Lead Attorney
State Bar No. 20213950
Email: mtribble@susmangodfrey.com
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Attorneys for Rembrandt Technologies, LP

OF COUNSEL:

Edgar Sargent
WA State Bar No. 28283
Email: esargent@susmangodfrey.com
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Brooke A.M. Taylor
WA State Bar No. 33190
Email: btaylor@susmangodfrey.com
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Tibor L. Nagy
Texas Bar 24041562
Email: tnagy@susmangodfrey.com
Susman Godfrey L.L.P.
590 Madison Ave., 8th Floor
New York, NY 10022
Main Telephone: (212) 336-8330
Main Fax: (212) 336-8340

Robert M. Parker
State Bar No. 15498000
Robert Christopher Bunt

State Bar No. 00787165
Charles Ainsworth
State Bar No. 00783521
Parker & Bunt
100 E Ferguson, Suite 1114
Tyler, TX 75702
903-533-9288
Fax: 903-533-9687
Email: rmparker@pbatyler.com
Email: rcbunt@pbatyler.com
Email: charley@pbatyler.com

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Andrew W. Spangler
State Bar No. 24041960
Brown McCarroll
1127 Judson Road, Suite 220
Longview, TX 75601
P. O. Box 3999
Longview, TX 75606
903-236-9800
Fax: 903-236-8787
Email: ccapshaw@mailbmc.com
Email: ederieux@mailbmc.com
Email: aspangler@mailbmc.com

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| REMBRANDT TECHNOLOGIES, LP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:06CV507 (LED) |
| | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| CHARTER COMMUNICATIONS, INC., | ) | |
| CHARTER COMMUNICATIONS | ) | |
| OPERATING, LLC, and COXCOM, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Rembrandt Technologies, LP ("Rembrandt") files this complaint for infringement of United States Patent Nos. 5,008,903, 5,710,761; 5,778,234; 6,131,159 and 6,950,444 under 35 U.S.C. § 271, and in support thereof would respectfully show the Court the following:

## RELATED CASE

This case is related to an action filed in the Marshall Division of the Eastern District of Texas and assigned to Judge Ward, captioned *Rembrandt Technologies, LP* v. *Time Warner Inc.*, No. 2-06CV-369 filed September 13, 2006.

## THE PARTIES

1.     Plaintiff Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, PA 19004 and offices at 214 W. Fanin, Marshall, TX 75670.

2.     Defendant Charter Communications, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscout Dr., Ste. 100, St. Louis, MO 63131. Charter Communications, Inc. is a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself.

3.     Defendant Charter Communications Operating, LLC is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscout Dr., Ste. 100, St. Louis, MO 63131. Charter Communications Operating, LLC is a subsidiary of Defendant Charter Communications, Inc. and a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself.

4.     Defendant Coxcom, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 1400 Lake Hearn Dr., Atlanta, GA 30319. Coxcom, Inc. is a national provider of cable television and internet products and services, and regularly conducts and transacts business in Texas and within this judicial district itself.

## JURISDICTION AND VENUE

5.     This is an action for patent infringement, arising under the patent laws of the United States, 35 U.S.C. § 1, et seq. This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1338(a).

6.     This Court has personal jurisdiction over all named Defendants. Defendants have conducted and do conduct business within the State of Texas. Defendants, directly or through subsidiaries or intermediaries, offer for sale, sell,

advertise, and market products and services that infringe the patents-in-suit as described more specifically below. Therefore, because Defendants have committed acts of patent infringement in this district, or are otherwise present or doing business in this district, this Court has personal jurisdiction over Defendants.

7. Venue is proper in this judicial district under 28 U.S.C. §§1391(b), (c), and 1400(b).

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 5,008,903

8. Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

9. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,008,903, entitled "Adaptive Transmit Pre-Emphasis for Digital Modem Computed from Noise Spectrum" ("the '903 patent"). A true copy of the '903 patent is attached as Exhibit A.

10. The '903 patent was duly and legally issued by the United States Patent and Trademark Office on April 16, 1991, after full and fair examination.

11. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '903 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '903 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continues to infringe the '903 patent by providing high-speed cable modem internet products and services to subscribers.

12. Upon information and belief, Defendants will continue to infringe the '903 patent unless enjoined by this Court. Upon information and belief, such infringement has

been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 5,710,761

13.    Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

14.    Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,710,761, entitled "Error Control Negotiation Based on Modulation" ("the '761 patent").  A true copy of the '761 patent is attached as Exhibit B.

15.    The '761 patent was duly and legally issued by the United States Patent and Trademark Office on January 20, 1998, after full and fair examination.

16.    Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '761 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '761 patent, in this district or otherwise within the United States.  For example, Defendants have infringed and continue to infringe the '761 patent by providing high-speed cable modem internet products and services to subscribers.

17.    Upon information and belief, Defendants will continue to infringe the '761 patent unless enjoined by this Court.  Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 5,778,234

18.     Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

19.     Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 5,778,234, entitled "Method for Downloading Programs" ("the '234 patent."). A true copy of the '234 patent is attached as Exhibit C.

20.     The '234 patent was duly and legally issued by the United States Patent and Trademark Office on July 7, 1998, after full and fair examination.

21.     Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '234 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '234 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '234 patent by providing high-speed cable modem internet products and services to subscribers.

22.     Upon information and belief, Defendants will continue to infringe the '234 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 6,131,159

23.     Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

24. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,131,159, entitled "System for Downloading Programs" ("the '159 patent."). A true copy of the '159 patent is attached as Exhibit D.

25. The '159 patent was duly and legally issued by the United States Patent and Trademark Office on October 10, 2000, after full and fair examination.

26. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '159 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '159 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '159 patent by providing high-speed cable modem internet products and services to subscribers.

27. Upon information and belief, Defendants will continue to infringe the '159 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 6,950,444

28. Rembrandt refers to and incorporates herein the allegations of Paragraphs 1-7 above.

29. Rembrandt is the owner of all right, title and interest, including the right to sue, enforce and recover damages for all infringements, in U.S. Patent No. 6,950,444, entitled "System and Method for a Robust Preamble and Transmission Delimiting in a

Switched-Carrier Transceiver" ("the '444 patent"). A true copy of the '444 patent is attached as Exhibit E.

30. The '444 patent was duly and legally issued by the United States Patent and Trademark Office on September 27, 2005, after full and fair examination.

31. Defendants have directly or indirectly infringed, and are continuing to directly or indirectly infringe, the '444 patent by practicing or causing others to practice, by inducement and contributorily, the inventions claimed in the '444 patent, in this district or otherwise within the United States. For example, Defendants have infringed and continue to infringe the '444 patent by providing high-speed cable modem internet products and services to subscribers.

32. Upon information and belief, Defendants will continue to infringe the '444 patent unless enjoined by this Court. Upon information and belief, such infringement has been, and will continue to be, willful, making this an exceptional case and entitling Rembrandt to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

**PRAYER FOR RELIEF**

WHEREFORE, Rembrandt prays that it have judgment against Defendants for the following:

(1)  An order that Defendants have infringed the patents-in-suit;

(2)  A permanent injunction enjoining and restraining Defendants and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association therewith, from making, using, offering to sell, selling, and importing into the

United States any product, or using, offering to sell, or selling any service, which falls within the scope of any claim of the patents-in-suit;

   (3)  An award of damages;

   (4)  An award of increased damages pursuant to 35 U.S.C. § 284;

   (5)  An award of all costs of this action, including attorneys' fees and interest; and

   (6)  Such other and further relief, at law or in equity, to which Rembrandt is justly entitled.

## JURY DEMAND

Rembrandt hereby demands a jury trial on all issues appropriately triable by a jury.

Dated: December 1, 2006    Respectfully submitted,

        By:/s/ Max L. Tribble, Jr. by permission E. L. DeRieux
         Max L. Tribble, Jr., Lead Attorney
         State Bar No. 20213950
         Email: mtribble@susmangodfrey.com
         Susman Godfrey L.L.P.
         1000 Louisiana Street, Suite 5100
         Houston, TX 77002
         Telephone: (713) 651-9366
         Facsimile: (713) 654-6666

         Attorneys for Rembrandt Technologies, LP

OF COUNSEL:

Edgar Sargent
WA State Bar No. 28283
Email: esargent@susmangodfrey.com
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000

Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Brooke A.M. Taylor
WA State Bar No. 33190
Email: btaylor@susmangodfrey.com
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Tibor L. Nagy
Texas Bar 24041562
Email: tnagy@susmangodfrey.com
Susman Godfrey L.L.P.
590 Madison Ave., 8th Floor
New York, NY 10022
Main Telephone: (212) 336-8330
Main Fax: (212) 336-8340

Robert M. Parker
State Bar No. 15498000
Robert Christopher Bunt
State Bar No. 00787165
Charles Ainsworth
State Bar No. 00783521
Parker Bunt & Ainsworth
100 E Ferguson, Suite 1114
Tyler, TX 75702
903-533-9288
Fax: 903-533-9687
Email: rmparker@pbatyler.com
Email: rcbunt@pbatyler.com
Email: charley@pbatyler.com

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Andrew W. Spangler
State Bar No. 24041960
Brown McCarroll
1127 Judson Road, Suite 220
Longview, TX 75601
P. O. Box 3999

Longview, TX 75606
903-236-9800
Fax: 903-236-8787
Email: ccapshaw@mailbmc.com
Email: ederieux@mailbmc.com
Email: aspangler@mailbmc.com

Franklin Jones, Jr.
State Bar No. 00000055
Jones & Jones, Inc.
P. O. Drawer 1249
Marshall, TX 75671
903-938-4395
Fax: 903-938-3360
Email: maizieh@millerfirm.com

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| USA Video Technology Corporation, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Case No. **2-06CV-239** |
| | § | |
| TIME WARNER INC.; COX | § | |
| COMMUNICATIONS, INC.; CHARTER | § | **JURY TRIAL DEMANDED** |
| COMMUNICATIONS, INC.; | § | |
| COMCAST CABLE | § | |
| COMMUNICATIONS, LLC; COMCAST | § | |
| OF RICHARDSON, LP; COMCAST OF | § | |
| PLANO, LP; COMCAST OF DALLAS, | | |
| LP | | |
| | | |
| Defendants | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, USA Video Technology Corporation ("USVO"), files this Original Complaint against Defendants, Time Warner Inc. ("Time Warner"), Cox Communications, Inc. ("Cox"), Charter Communications, Inc. ("Charter"), Comcast Cable Communications LLC ("Comcast"), Comcast of Richardson, LP ("Comcast Richardson"), Comcast of Plano, LP ("Comcast Plano"), and Comcast of Dallas, LP ("Comcast Dallas") and alleges as follows:

### THE PARTIES

1. USVO is a corporation organized under the laws of the State of Connecticut with its principal place of business at 83 Halls Road, P.O. Box 245, Old Lyme, Connecticut, 06371.

2. Time Warner, on information and belief, is a corporation organized under the laws of the State of New York. Time Warner is doing business in Texas, and, on information and

belief, has a principal place of business at 1 Time Warner Center, New York, NY 10019-8016. Time Warner may be served with process by serving its registered agent, the CT Corporation System, 701 Brazos Street, Suite 360, Austin, TX 78701.

3. Cox, on information and belief, is a corporation organized under the laws of the State of Delaware. Cox is doing business in Texas, and, on information and belief, has a principal place of business at 1400 Lake Hearn Drive, Atlanta, GA 30319. Cox may be served with process by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

4. Charter, on information and belief, is a corporation organized under the laws of the State of Delaware. Charter is doing business in Texas, and, on information and belief, has a principal place of business at 12405 Powerscourt Drive, St. Louis, MO 63131. Charter may be served with process by serving its registered agent, Corporation Service Company DBA CSC-Lawyers Incorporating Service Company, 701 Brazos, Suite 1050, Austin, TX 78701.

5. Comcast, on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast is doing business in Texas, and, on information and belief, has a principal place of business at 1500 Market Street, Philadelphia, PA 19102-2148. Comcast may be served with process by serving its registered agent, Comcast Capital Corporation at 1201 Market Street, Suite 1000, Wilmington, DE 19801.

6. Comcast Richardson on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Richardson is doing business in Texas, and, on information and belief, has a principal place of business at 1201 Market Street, Suite

2

1405, Wilmington, DE 19801. Comcast Richardson may be served with process by serving its registered agent, CT Corporation System, 350 North St Paul St., Dallas, TX 75201

7. Comcast Plano on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Plano is doing business in Texas, and, on information and belief, has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 10901. Comcast Plano may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

8. Comcast Dallas on information and belief, is a corporation organized under the laws of the State of Delaware. Comcast Dallas is doing business in Texas, and, on information and belief has a principal place of business at 1201 Market Street, Suite 1405, Wilmington, DE 19801. Comcast Dallas may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

## JURISDICTION & VENUE

9. This is an action for infringement of a United States patent. Accordingly, this action arises under the patent laws of the United States of America, 35 U.S.C. § 1 et. seq. and jurisdiction is properly based on Title 35 United States Code, particularly § 271, and title 28 United States Code, particularly § 1338(a)

10. Venue is proper in this court under Title 28 United States Code § 1391(b) and 1400(b).

## PATENT INFRINGEMENT COUNT

11. On July 14, 1992, United States Patent No. 5,130,792 ("the '792 patent") entitled "Store and Forward Video System" was duly and legally issued. A true and correct copy of the '792

3

patent is attached as Exhibit A. The '792 patent is directed to systems that communicate video programs to subscribers upon request, commonly referred to as video-on-demand (VOD).

12. Pursuant to 35 U.S.C. § 282, the above-listed United States Patent is presumed valid.

13. USVO is the owner of the '792 patent.

14. Time Warner, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Time Warner provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Time Warner has in the past and continues to infringe at least claim 1 of the '792 patent.

15. Cox, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Cox provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Cox has in the past and continues to infringe at least claim 1 of the '792 patent.

16. Charter, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Charter provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Charter has in the past and continues to infringe at least claim 1 of the '792 patent.

17. Comcast, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

4

18. Comcast Richardson, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Richardson provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

19. Comcast Plano, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Plano provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

20. Comcast Dallas, on information and belief, operates digital cable systems in which it provides video-on-demand (VOD) services to its subscribers. Comcast Dallas provides its subscribers with digital set-top boxes to enable access to the VOD services. By offering such products and/or services Comcast has in the past and continues to infringe at least claim 1 of the '792 patent.

21. The Defendants' infringement of the '792 patent alleged above has injured USVO and thus, it is entitled to recover damages adequate to compensate for the Defendants' infringement, which in no event can be less than a reasonable royalty.

### DEMAND FOR JURY TRIAL

22. USVO hereby demands a jury trial on all claims and issues triable of right by a jury.

### PRAYER FOR RELIEF

Wherefore, USVO prays for entry of judgment:

5

A. that Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas, have infringed one or more claims of the '792 patent;

B. that Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas, account for and pay to USVO all damages caused by the infringement of the '792 patent, which by statute can be no less than a reasonable royalty;

C. that USVO be granted pre-judgment and post-judgment interest on the damages caused to them by reason of Defendants, Time Warner, Cox, Charter, Comcast, Comcast Richardson, Comcast Plano and Comcast Dallas's infringement of the '792 patent;

D. that USVO be granted its attorneys' fees in this action;

E. that costs be awarded to USVO;

F. that USVO be granted such other and further relief as the Court may deem just and proper under the current circumstances.

Respectfully submitted,

Date: 6/12/06

Edward W. Goldstein
Texas Bar. No. 08099500
GOLDSTEIN, FAUCETT & PREBEG, LLP
1177 West Loop South, Suite 400
Houston, TX 77027
Tel: 713/877-1515
Fax: 713/877-1737
E-mail: egoldstein@gfiplaw.com

T. John Ward, Jr.
State Bar No. 00794818
Law Office of T. John Ward, Jr., P.C.
P.O. Box 1231

6

Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)
E-mail: jw@jwfirm.com
ATTORNEYS FOR PLAINTIFF

Of Counsel:

GOLDSTEIN, FAUCETT & PREBEG, L.L.P
Corby R  Vowell
Texas Bar No  24031621
1177 West Loop South, Suite 400
Houston, Texas  77027
(713) 877-1515 – Telephone
(713) 877-1737 – Facsimile

# EXHIBIT A

US005130792A

## United States Patent [19]

### Tindell et al.

| [11] | Patent Number: | 5,130,792 |
|---|---|---|
| [45] | Date of Patent: | Jul. 14, 1992 |

[54] **STORE AND FORWARD VIDEO SYSTEM**

[75] Inventors: **Elbert G. Tindell**, Dallas; **Kyle Crawford**, Grand Prarie, both of Tex.

[73] Assignee: **USA Video Inc.**, Dallas, Tex

[21] Appl. No.: **475,137**

[22] Filed: **Feb 1, 1990**

[51] Int. Cl.5 .............................................. H04N 7/14
[52] U.S. Cl. ................................ 358/85; 358/86; 358/102; 358/134; 379/100
[58] Field of Search .................. 358/86, 133, 85, 134, 358/102; 379/53, 100

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,028,733 | 6/1977 | Ulicki | 358/102 X |
| 4,506,387 | 3/1985 | Walter | 455/612 |
| 4,513,390 | 4/1985 | Walter et al | 358/102 X |
| 4,703,348 | 10/1987 | Yuasa | 358/133 |
| 4,769,833 | 9/1988 | Farleigh et al | 358/86 X |
| 4,772,956 | 9/1988 | Roche et al | 358/134 X |
| 4,782,397 | 11/1988 | Kimoto | 358/102 X |
| 4,816,901 | 3/1989 | Music et al | 358/85 X |
| 4,890,320 | 12/1989 | Monslow | 380/10 |
| 4,890,321 | 12/1989 | Seth-Smith et al | 358/86 X |
| 4,918,523 | 4/1990 | Simon | 358/133 |
| 4,924,311 | 5/1990 | Ohki et al | 358/133 X |
| 4,947,244 | 8/1990 | Fenwick | 358/86 |
| 4,949,187 | 8/1990 | Cohen | 358/102 X |
| 4,953,196 | 8/1990 | Ishiwaka et al | 358/85 X |

*Primary Examiner*—Victor R. Kostak
*Attorney, Agent, or Firm*—Kenneth C. Hill

[57] **ABSTRACT**

A system and method for transferring video programs from a first location to a remote location provides for communication of the programs over selected commercial telephone networks. The program signals are digitized, compressed, and stored at the first location, and transferred to the remote location on request of a viewer. Due to the compression of the program, the time required for electronically transferring the program to the remote location is much less than the viewing time for such program. The compressed program is reconstructed at the remote location for viewing on available video display devices.

**9 Claims, 4 Drawing Sheets**





Fig. 1

Fig. 2

Fig. 3



Fig. 4



Fig. 5



Fig. 6

Fig. 7

5,130,792

**1**

## STORE AND FORWARD VIDEO SYSTEM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to video systems and more specifically to a system and method for transferring a video program for display at a remote location.

2. Description of the Prior Art

Viewing of various types of video programs has become increasingly popular. These programs are generally viewed on standard television sets. Typical video programs include motion pictures, entertainment programs for television, and educational and training programs. An extremely wide variety of programs have been designed or adapted for television viewing.

In order to transfer the video programs to a remote location where they can be viewed, programs can be broadcast using radio waves, transferred to the remote location by means of a specially installed dedicated cable, or transfer of a physical copy on video tape or video disk can be made. Each method of distributing video programs has drawbacks for certain applications.

When video programs are transferred using radio waves, there is little or no control over who receives and views the program. This method of transferring video programs is not suitable for limited distribution of pay programs. In addition, the number of channels for transferring programs is not unlimited, and picture quality of the program can be degraded by atmospheric conditions.

Barring technical problems, programs transferred to a remote location along a specially installed, dedicated cable generally have a reliably good picture quality. However, the cable must be installed at each remote location, and controlled through a centralized facility. Although many video channels can be carried over some cable systems, the number of channels is, again, not unlimited. As is the case with broadcast systems, transmitting equipment must be made available at the time any particular program is to be viewed. The selection of programs and times for viewing are made centrally, as is the case with broadcast systems, and are not under the control of a viewer at a remote location.

Physical transport of video tapes to a remote location allows the viewer to select the program to be viewed and the time for viewing. However, such tapes must be physically transported to the remote location. This takes time, and is often not convenient for the viewer. In addition, the physical video tape or disk containing the programming is subject to loss, theft, and deterioration.

It would be desirable to provide a system and method for transmitting video programs to remote locations which overcomes various drawbacks as described above.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a system and method for transferring video programs from a first location to a remote location.

It is another object of the present invention to provide such a system and method wherein the programs are electronically transferred in a short period of time relative to the viewing time of the programs.

It is a further object of the present invention to provide such system and method which does not require

**2**

that special, dedicated cables be connected to the remote location.

Therefore, according to the present invention, a system and method for transferring video programs from a first location to a remote location provides for communication of the programs over selected commercial telephone networks. The program signals are digitized, compressed, and stored at the first location, and transferred to the remote location on request of a viewer. Due to the compression of the program, the time required for electronically transferring the program to the remote location is much less than the viewing time for such program. The compressed program is reconstructed at the remote location for viewing on available video display devices.

### BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself however, as well as a preferred mode of use, and further objects and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a high level block diagram of a system for transferring video programs to a remote location;

FIG. 2 is a block diagram of a central data facility;

FIG. 3 is a block diagram of a system for digitizing and compressing video programs;

FIG. 4 is a block diagram of a distribution interface for use with the system of FIG. 1;

FIG. 5 is a block diagram of a receiver for use at a remote location;

FIG. 6 is a flowchart describing a method for making video programs available for transfer to a remote location; and

FIG. 7 is a flowchart illustrating a method for requesting, receiving, and displaying video programs at a remote location.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIG. 1, a system for transferring video programs to a remote location includes a central data facility 10 connected to a commercial telephone network 12. The central data facility 10 will be described in further detail in connection with the following figures. Telephone network 12 preferably includes optical fiber connections capable of transferring digital data at very high rates. Such optical fiber systems are currently being installed in selected locations in the United States, and are expected to be widely available in the future.

At a remote location, a telephone 14 and receiving unit 16 are connected to the telephone network 12. A video display device 18, such as a television conforming to the NTSC standard, is connected to the receiving unit 16 for displaying video programs which have been transferred from the central data facility 10 to the receiving unit 16. A viewer who wishes to down load a program from the central data facility 10 into his receiving unit 16 calls the central data facility 10 using the normal telephone 14. After the program has been ordered, the user places the telephone 14 on-hook and switches the receiving unit 16 to standby. The central data facility 10 then returns the call and down loads the requested program into the receiving unit 16 for viewing at a time selected by the viewer.

5,130,792

3

A keyboard or other input device is preferably provided on the receiving unit 16 for the viewer to identify the requested program. Identifying information for the receiving unit, used for billing and call-back, can be stored in the receiving unit.

A block diagram of the central data facility 10 is shown in FIG. 2. The central data facility 10 includes a central processor 20 connected to one or more mass storage devices 22. Mass storage devices 22 are preferably high density devices such as optical disks. Programs which are to be handled by the central data facility 10 are originally provided from one or several different types of video source 22 as known in the art. The video programs are digitized and compressed in a digitizing processor 26, and transferred to the central processor 20 for retention in mass storage devices 22.

Incoming requests for programs are connected to a request interface 28, which is in turn connected to the central processor 20. Outgoing programs being transmitted to remote receiving units are routed through a distribution interface 30.

In a preferred embodiment, a user connects to the central data facility 10 through the request interface 28 by means of a standard TOUCH-TONE (DTMF) telephone. Once a connection has been made, the viewer can identify himself and request any available program by entering a proper set of codes. The DTMF tones transferred to the request interface 28 are converted to characters and transmitted to the central processor 20. Central processor 20 identifies the caller and determines whether the requested selection is available. Desired information, such as the availability of a selection, any delay which may be incurred prior to down loading the selected program, or an indication of the charges incurred in the transaction, can be returned to the viewer through a request interface 28 by means of DTMF tones or recorded or synthesized spoken messages.

Once a request has been made and acknowledged, central processor 20 selects an available output channel to distribution interface 30, and requests a telephone switching network connection. Since each viewer must identify himself when the request is made, central processor 20 is able to call an authorized number at a known location corresponding to such user. Once the connection is established, the requested program can be transferred from mass storage 22 through the distribution interface 30 to the remote location. Accounting data regarding the transaction is logged by the central processor 20 for administrative purposes.

Referring to FIG. 3, a block diagram of the digitizing and compression processor 26 is shown. Source 24 provides separate video and audio signals to processor 26. The video signal is applied to a sync and blanking stripper circuit 32. The various sync signals and blanking intervals contained in the video signal are necessary only for display of the program, and can be recreated in the receiving unit 16. The output from sync and blanking stripper 32 is connected to a signal separator 34, which breaks the video signal into its various basic elements. The number of separate channels into which the video signal is separated at this point will depend upon system implementation, with signals such as luminance and chromanence being likely candidates for separate handling.

The separated signals are then converted to digital signals in analog to digital converters 36, and stored in a buffer 38. As shown in FIG. 3, three separate video signals are digitized, but one, two, or more than three

4

signals may be used. If the video signal is not split into two or more parts, the output of the sync and blanking stripper 32 can be input directly to an analog to digital converter 36.

Since the audio signal is frequency modulated instead of amplitude modulated, it is preferably handled separately from the video signal. The audio signal is demodulated and filtered in filter 40, and digitized in analog to digital converter 42. The audio signal is also stored in buffer 38.

Digital data from buffer 38 is input to a data compression circuit 44. Compressed data is input to an encoder 46, which encrypts the data in order to preserve privacy. From the encoder 46, the digital data representing the program originally provided by the source 24 is transferred to the central processor 20.

Buffer 38 can be a relatively small buffer, which requires that data be extracted therefrom and compressed in data compression circuit 44 as it is being generated by the source 24. In the alternative, buffer 38 can include mass storage capable of holding an entire program. In this event, the compression and encoding of the data can be performed after the entire program has been digitized, if desired.

Referring to FIG. 4, a block diagram of a preferred embodiment for the distribution interface 30 is shown. Central processor 20 is connected to a high speed bus 48, which is in turn connected to several gateways 50. Although two gateways 50 are shown in FIG. 4, the number actually used depends upon details of the system implementation, especially with reference to the data throughput capabilities of the central processor 20 and the gateways 50.

Each gateway 50 is connected to a low speed bus 52. Each low speed bus 52 is preferably a commercially available local area network. A plurality of optical converters 54 are connected to each low speed bus 52. In FIG. 4, only two converters 54 are shown connected to each low speed bus 52, but more are preferably connected in an actual implementation. The number of converters 54 connected each low speed bus 52 depends on the data transfer rate of the converters 54 and data handling capability of the buses 52.

Data transferred to a converter 54 is placed into an internal buffer 56. Control circuitry 58 controls operation of the converter 54 and communicates with the gateway 50 over low speed bus 52. Control circuitry 58 also controls operation of optical drivers 60, 62. Each optical driver 60, 62 transmits the data from buffer 56 via a modulated light signal as known in the art. Each optical driver 60, 62 is connected to an optical coupler 64, which combines the different light signals onto a single optical fiber. In a preferred embodiment, optical drivers 60, 62 generate light having different wavelengths, which is multiplexed onto a single optical fiber by coupler 64. Particular system designs can utilize only a single optical driver 60, or more than the two optical drivers 60, 62 shown in FIG. 4.

The distribution interface 30 shown in FIG. 4 allows a single central processor 20 to drive a relatively large number of converters 54 at one time. Various alternative designs to that shown in FIG. 4 can, of course, be utilized if desired.

FIG. 5 shows a preferred embodiment of receiving unit 16. The receiving unit 16 shown in FIG. 5 is used only as a stand alone receiver, and does not incorporate the automatic program request facilities described in connection with FIG. 1.

5,130,792

5

The incoming optical signals are filtered by wavelength and split in optical splitter 64, and converted to digital electrical signals. In the embodiment shown in FIG. 5, two different wavelengths of light were used to transmit information over the optical fiber connection, so two separate channels of digital information are generated by splitter 64. The number of optical drivers 60, 62 as described in connection with FIG. 4 determines the number of channels into which the incoming data is split by splitter 64.

Each channel of digital data is connected from splitter 64 to a serial to parallel converter 66, which converts the serial data to byte-wide data. As is known in the art, the serial transmission of the program data preferably includes redundant error correcting code (ECC), allowing for correction of errors within the receiving unit 16. Error correction is performed in error correction units 68, and the data is temporarily stored in buffer 70.

Under control of control unit 72, data is removed from buffer 70 and transferred to decoder 74. Decoder 74 decrypts the compressed data, undoing the encryption effects of encoder 46 described in connection with FIG. 3. Decoded data is then transferred through storage interface 76 and stored into mass storage device 78. Mass storage device 78 is preferably an erasable optical disk, or other similar relatively low cost, high density storage medium.

Data is stored onto mass storage device 78 until the entire requested program has been down loaded from the central data facility 10. Due to the removal of unnecessary information, compression of the remaining data, and high speed transfer, this down loading can be accomplished in much less time than is required to view the program in real time. Once transfer has been completed, control unit 72 communicates such fact to user interface 80, which indicates through visual or audible means to a viewer that the down loaded program is now available for viewing. User interface 80 provides basic functions for the viewer, such as setup for down loading a program, play a program, and pause during play of a down loaded program.

Once a viewer selects the play mode, control unit 72 causes the data stored in mass storage device 78 to be transferred through storage interface 76 to a data decompression unit 82. Data decompression unit 82 restores the compressed data to its raw, uncompressed form, and transfers it to buffer 84. Data is extracted from buffer 84 in real time as needed for viewing, and converted to analog form in digital to analog converter 86. The original video and audio signals are then restored in signal reconstruction circuit 88, which restores blanking intervals, sync signals, and the like which were removed in the digitizing and compression processor 26. The output of signal reconstruction circuitry 88 is a composite video signal or a modulated RF signal suitable for input to a standard television set. If desired, the program signal can alternatively be recreated as a digital signal suitable for display on a digital monitor as known in the art.

Referring to FIG. 6, a preferred method for making a video program available for transmission to a remote location is shown. The program is first digitized 90 and compressed 92 as described in connection with FIG. 3. The program is also preferably encoded 94, and stored 96 in a non-volatile mass storage device. If desired, the encoding step 94 may be left out.

6

At this point, the program is compressed and stored in condition to be transferred. The number of programs which can be stored at one time is limited only by the capabilities of the central processor 20, and the storage available in mass storage devices 22. When a request is received for a particular program 98, a check is made to see whether that program is available 100. If the requested program is not available, perhaps because the viewer made a mistake when entering his selection, such fact is indicated to the viewer 102. If the program is available for down loading, that fact is confirmed to the viewer 104 and the central data facility 10 sets up a telephone connection with the remote location 106. Transfer of the program 108 is then performed as described above.

Referring to FIG. 7, a preferred method is shown by which the receiving unit 16 at the remote location receives and displays a requested program. First, a connection is made to the central data facility 110. As described above in connection with FIG. 1 this is preferably done by utilizing a standard TOUCH-TONE (DTMF) telephone handset to dial the central facility and enter a selection.

The viewer then requests the desired program 112, and waits to see if it is available 114. If not, the process is complete. If the requested selection is available, the viewer hangs up the telephone handset and switches the receiving unit 16 to standby. The program is then received by the receiving unit 118, decoded, and stored into mass storage 122. When the viewer is ready to view the program, it is decompressed 124 and played back 126 for viewing on a video display. The viewer may preferably pause display of the program at any time by entering a command at the user interface 80, and may view the program multiple times.

The convenience and usefulness of the system described above depends in large part on the ability to be able to quickly down load a video program to the receiving unit 16. In order to illustrate the convenience of the system described above, an example illustrating the numbers involved will now be described.

A single television channel has a 6 megahertz bandwidth. By stripping unnecessary signals as described above, a video signal can be sampled at a rate of 16 megahertz and retain a good signal quality. Samples having a resolution of 8 bits provide sufficient video fidelity for television purposes. This results in a raw data rate of 16 megabytes per second of video data.

Assuming a desired program, such as a motion picture, to have a length of two hours, 7200 seconds of data must be digitized and stored. At a rate of 16 megabytes per second, this results in 115.2 gigabytes of raw data. As is known in the art, video information is highly redundant, so that large compression factors are obtainable. This means that a total data storage requirement of approximately 2–4 gigabytes is expected to be sufficient for a two hour video program. This is the storage requirement for a single program both in the central data facility 10 and the receiving unit 16. This amount of data is well within the capability of optical disks which are presently becoming available.

Assuming 2.3 gigabytes are required for a compressed program, and that a 50% overhead is required for serial transmission of the program data, for error correcting code, blocking, and the like, 3.45 gigabytes of serial data must be transmitted between the central data facility 10 and the receiving unit 16. At eight bits per byte, this results in 27.6 gigabits to be transferred.

5,130,792

7

Optical fiber connections currently planned for installation to residential customers will have a maximum data transfer rate of 144 megabits per second. At this rate, the required 27.6 gigabits can be transferred to the receiving unit 16 in 192 seconds, which is just over three minutes. Thus, approximately three minutes is required to transfer a typical video program to the receiving unit 16.

Note that the numbers described above do not require the use of more than one wavelength of light on a single optical fiber. If it is necessary to increase the sampling rate, or the magnitude of each sample, two or more wavelengths of light can be multiplexed on a single cable as described in connection with FIGS. 4 and 5. This would allow better resolution of the video signal with no increase in transmission time.

If a video camera and compression circuitry is available at a remote location, it is possible to use the system described above to transfer video information between two remote locations. A call to the central data facility can be used to initialize the connection between two remote locations, and the central data facility is no longer involved once the connection is setup. Near real-time video signals obtained at one location are compressed and transferred to the second remote location over the phone lines. Instead of storing the signals onto the mass storage device 78, they are transferred directly to the data decompression circuitry 82 and displayed at the second remote location. Near real-time video communication can be accomplished by providing cameras and compression circuitry at each end of a conversation.

While the invention has been particularly shown and described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes in form and detail may be made therein without departing from the spirit and scope of the invention.

What is claimed is:

1. A system for transmitting video programs to remote locations over a switched telephone network, comprising:

a central data facility having means for storing digital compressed versions of video programs;

a request interface connected to said central data facility and to the telephone network, wherein said request interface receives requests for video programs made over the telephone network and communicates them to said central data facility;

a distribution interface connected to said central data facility and to the telephone network, wherein said distribution interface initiates connections over the telephone network with remote locations in response to requests received by said request interface, and transmits thereto compressed versions of video programs previously requested through said request interface, such compressed versions being transmitted in less time than is required to view the programs in real time;

a receiver at each remote location for connecting to the telephone network and receiving compressed video programs transmitted from said distribution interface, for storing the received programs, and for subsequently playing the video programs at a real time rate on a video display.

2. The system of claim 1, wherein requests are made to said request interface through preselected sequences

8

of DTMF transmissions made from a telephone transceiver.

3. The system of claim 1, wherein said distribution interface comprises:

a plurality of converters for converting digital video programs to a format suitable for transmission over a telephone line; and

a controller for simultaneously providing data representative of digital compressed video programs to each of said converters, wherein a plurality of the remote receivers can be simultaneously receiving such programs.

4. The system of claim 3, wherein said controller comprises:

a high speed central processor for providing processing and data transfer functions;

at least one gateway connected to said central processor by a high speed communications bus; and

a communications network having a lower data carrying capacity than the high speed communications bus connected to each of said gateways, wherein a plurality of converters are connected to each communications network, and wherein said central processor controls the transfer of data to said converters through said gateways over the high speed communications bus and communications network

5. The system of claim 1, further comprising:

means for inputting video programs; and

conversion means connected to said inputting means and to said central data facility for digitizing and compressing video programs read in to said inputting means, and for transmitting such compressed video programs to said central data facility for storage and subsequent transmission to remote locations.

6. A method for viewing video programs at a location remote from a central data facility, comprising the steps of:

receiving at the central data facility a request for a selected program over a switched telephone network, such request identifying a preregistered requester;

determining whether the selected program is available;

if the selected program is available, initiating a connection over the telephone network to a remote receiving unit previously associated with the preregistered requester;

transmitting a previously stored compressed version of the selected program over the initiated connection in less time than is required to view the program in real time;

receiving the selected program at the remote receiving unit and storing it on a mass storage device; and

after all of the selected program has been stored on the mass storage device, decompressing the selected program and playing it back in real time on a video display.

7. The method of claim 6, wherein the request received at the central data facility comprises a sequence of tones generated by a DTMF telephone.

8. The method of claim 6 wherein, if the selected program is available, such availability is confirmed during a connection in which such request is made, followed by terminating such connection prior to said step of initiating a connection.

9. A system for transmission of video programs over a switched telephone network, comprising:

5,130,792

9

a central data facility for storing a plurality of video programs in a digital, compressed format;

means connected to said central data facility for digitizing and compressing video programs, and communicating them to said central data facility for storage;

a request interface connected to the telephone network and to said central data facility for receiving requests for desired video programs over the telephone network, such request being communicated to said request interface by sequences of tones generated by a DTMF telephone in response to a user pressing buttons thereon in selected patterns, such patterns identifying the user and the desired video program, wherein said request communicates to the user a confirmation of availability if a desired video program is available for the communication to the user;

a distribution interface connected to said central data facility and to the telephone network, said distribution interface containing a plurality of converters for converting compressed digital data to a form suitable for transmission over the telephone net-

10

work, wherein said distribution interface initiates a connection with a receiving unit at a preselected remote location in response to the user's request and transmits the digitized, compressed video program to such remote unit over such connection in less time than is required to view the program in real time;

a plurality of receiving units at a plurality of remote locations, each of said receiving units connected to the telephone network and being capable of completing a connection initiated by said distribution interface and receiving digitized, compressed video programs over such connections, wherein each of said receiving units includes a mass storage subsystem for storing a received video program in compressed format, and a decompression subsystem for reading a stored video program from the mass storage subsystem at the user's convenience and converting it to a decompressed form suitable for display in real time; and

a video display device connected to each receiving unit for displaying the converted video program.

* * * * *

# Exhibit 4

**CableLabs®**

Home | Member/DocZone Login | Careers | Contact Us

Search

| About CableLabs | Members' Area | Current Projects | Join CableLabs | Certification & Qualification | News Room | Conferences | |

# Revolutionizing Cable Technology®

**Cable Connections**

**Projects**

**Press Releases**

**Events**

Cable Television Laboratories, Inc. (CableLabs®), a nonprofit research and development consortium, is dedicated to helping its cable operator members integrate new cable telecommunications technologies into their business objectives.

Find out more about OCAP, CableCARDs, and interactive video.

To find cable services in your area, go to the Go2Broadband Service Locator.

Visit This Is Cable to see why cable is Faster. Better. Cooler.

Find information about unidirectional digital cable-ready products.

For information on the cable industry's commitment to addressing concerns about television content, visit Cable Puts You in Control.

- DOCSIS®
- CableHome®
- PacketCable™
- OpenCable™
- Go2Broadband$^{SM}$
- VOD Metadata
- Digital Advertising

- 01/31/07 2007 Major Cable Operators Sign Up for OCAP™ Technology Licenses
- 01/30/07 2007 Zieroth Named CableLabs® General Counsel; Cary and Krauss Are Promoted
- 01/24/07 2007 CES Featured Cable's Two-Way Future; High-Definition Cable Content Now Available on PCs
- 01/09/07 CableLabs® Certifies LG Electronics' OCAP™-Based, Two-Way Digital Television
- 01/08/07 Singapore's StarHub Joins CableLabs

CableLabs Winter C 2007
The Hyatt Regency D Center, Denver, Colo March 4–7, 2007

CableLabs MSO & Ve to-Face Meeting
The Hyatt Regency D Center, Denver, Colo March 7, 2007

CableLabs Events

Demo Opportuni at CableLabs Eve

Please note that some Web page functionality may be lost on this site if JavaScript has been disabled.

Copyright | Privacy Policy







| Home | Member/DocZone Login | Careers | Contact Us |

About CableLabs | Members' Area | Current Projects | Join CableLabs | Certification & Qualification | News Room | Conferences | C

Overview    Senior Staff    Board of Directors    Member Companies    Careers    Contact Us

## OVERVIEW

Founded in 1988 by members of the cable television industry, Cable Television Laboratories, Inc. (CableLabs®) is a nonprofit research and development consort is dedicated to pursuing new cable telecommunications technologies and to helpir cable operator members integrate those technical advancements into their busine objectives.

CableLabs serves the cable television industry by:

- researching and identifying new broadband technologies;
- authoring specifications;
- certifying products; and
- disseminating information.

CableLabs benefits the cable television industry and consumers by:

- enabling interoperability among different cable systems;
- facilitating retail availability of cable modems and advanced services; and
- helping cable operators deploy innovative broadband technologies.

CableLabs is funded by the monthly subscription fees paid by members as well as testing-related fees. Cable operators from around the world are eligible to become members.

- CableLabs History
- CableLabs Governance
- Membership
- Press Contact

Copyright | Privacy Policy

**Cable**Labs®

| Home | Member/DocZone Login | Careers | Contact Us |

Search

| About CableLabs | Members' Area | Current Projects | Join CableLabs | Certification & Qualification | News Room | Conferences | C |

Overview     Senior Staff     Board of Directors     Member Companies     Careers     Contact Us

# MEMBER COMPANIES

CableLabs' members are exclusively cable system operators. They do not include competitive network platforms such as direct broadcast satellite (DBS), telephone companies delivering video services, electrical utilities delivering broadband services, multi-channel multipoint distribution systems (MMDS) or the like. Nor do they include manufacturers or content providers (such as cable programmers, broadcasters or movie studios). Our members are located in the United States, Canada, Mexico, South America, Europe and Asia.

*Current as of 11/28/06*

Access Communications (Canada)
Advance/Newhouse Communications ("Bright House Networks")
Armstrong Utilities, Inc.
Atlantic Broadband
Aurora Cable TV, Ltd. (Canada)
BendBroadband
Bresnan Communications
Buckeye Cablevision, Inc.
Buford Media Group, LLC
Cable America Corporation
Cable de Tula, S.A. de C.V. ("Cablemas") (Mexico)
Cable One, Inc.
Cablevision Systems Corporation
Campbell River TV Association (CRTV) (Canada)
CCS, LLC d/b/a Community Cable Service
Cequel III
Chambers Communications Corporation
Charter Communications, Inc.
Cogeco Cable, Inc. (Canada)
Comcast Cable Communications, Inc.
Cox Communications, Inc.
CRRS-TV (Canada)
EastLink (Canada)
FamilyView Cablevision
General Communications, Inc. ("GCI")
Insight Communications Company
Lake Hughes Cable
Liberty Global Inc.
Massillon Cable TV, Inc.
MCT Communications, Inc.
Mediacom Communications Corporation
Midcontinent Communications
Mountain Cablevision Ltd. (Canada)
Princetown Cable Company
Rogers Cable, Inc. (Canada)
Seaside Communications (Canada)
Shaw Communications Inc. (Canada)
StarHub (Singapore)
Sunflower Broadband
Tele-Media Corporation
Time Warner Cable
Tri-County Communications Corporation
Valley Cable TV, Inc.
Vidéotron Ltée (Canada)
Westman Communications Group (Canada)
WinDBreak Cable

Copyright | Privacy Policy



| Home | Member/DocZone Login | Careers | Contact Us |

Search

| About CableLabs | Members' Area | **Current Projects** | Join CableLabs | Certification & Qualification | News Room | Conferences |

DOCSIS®    CableHome®    PacketCable™    OpenCable™    Go2Broadband℠    VOD Metadata    Digital Advertising    UDCP



### DOCSIS Home



### CableLabs Press Release Policy

Guidelines for vendor companies publishing press releases using CableLabs trademarks (i.e., DOCSIS®, CableHome®, PacketCable™, OpenCable™, and OCAP™).

more −>

**Project Primer**

The CableLabs® Certified™ Cable Modem project, also known as DOCSIS® (Data Over Cable Service Interface Specification), defines interface requirements for cable modems involved in high-speed data distribution over cable television system networks (see PowerPoint slide show). The certified cable modem project also provides cable modem equipment suppliers with a fast, market-oriented method for attaining cable industry acknowledgment of DOCSIS compliance and has resulted in high-speed modems being certified for retail sale.

MSOs and CableLabs require interoperability among DOCSIS modems. While no CableLabs member company will be required to purchase DOCSIS modems, we expect the majority of modems purchased will be DOCSIS certified. MSOs and CableLabs require vendors seeking product certification to work with other vendors and CableLabs as part of the hot-staging for interoperability venues. Please refer to the links below to learn more about this certification process.

**Benefits to cable operators/consumers:**

- Cable operators can provide a variety of high-value services through an "always-on" internet connection, including broadband Internet connectivity, telephony, real-time interactive gaming, and video conferencing. DOCSIS products are standards-based, so manufacturers can provide enhanced features at competitive prices.
- Consumers have a low-cost way to get a broadband connection to the Internet so that they can take advantage of the tremendous potential of the web without investing a lot of time or money.

**CableLabs is a research consortium; we do not market or sell cable modems.**

For more information, please see our project primer, or our press release archives.

To find out if cable modem service is available in your area, please fill out and submit the CableLabs Go2Broadband Service Locator form.

| DocZone Log |
| :-- |
| ›› DOCSIS Hor |
| ›› Specification |
| ›› Documents |
| ›› Certification |
|    Qualification |
| ›› News & Eve |
| ›› How to Part |
| ›› FAQ |
| ›› Glossary |
| ›› Careers |
| ›› Contact DO |

Copyright | Privacy Policy

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP | |
|      Plaintiff, | |
|      v. | C.A. No. 06-635-GMS |
| CABLEVISION SYSTEMS CORPORATION, and CSC HOLDINGS, INC. | |
|      Defendants. | |

**JOINT STATUS REPORT**

In accordance with the Court's Notice of Scheduling Conference, dated January 31, 2007 (D.I. 15), counsel for Rembrandt Technologies, LP ("Rembrandt") and counsel for Cablevision Systems Corporation, and CSC Holdings, Inc. ("Cablevision") submit this Joint Status Report in preparation for the Status and Scheduling Conference before the Court on February 13, 2007. Attached for the Court's consideration is a chart summarizing the parties' proposed schedule for this action. (Exhibit A).

**1.      JURISDICTION AND SERVICE**

The parties agree that this Court has jurisdiction over the subject matter of, and the parties to, this action and that the defendants have been properly served.

**2.      SUBSTANCE OF THE ACTION**

     **(a)      The Parties' Claims and Defenses**

Plaintiff Rembrandt brought this action against Cablevision alleging infringement of U.S. Patent Nos. 5,243,627 ("the '627 patent"); 5,852,631 ("the '631 patent"); 5,719,858 ("the '858 patent"); 4,937,819 ("the '819 patent"); and 5,008,903 ("the '903 patent") (collectively "the Rembrandt patents"). Rembrandt alleges that Cablevision, by their provision of high speed internet and related services to cable television subscribers, has infringed and continues to infringe the '631, '858, '819, and '903 patents. Rembrandt also alleges that Cablevision, by

1

their receipt and retransmission over their cable television systems of digital terrestrial broadcast signals that comply with the ATSC Digital Television Standard, has infringed and continues to infringe the '627 patent. Rembrandt further alleges that Cablevision's infringement of the Rembrandt patents has been willful and seeks monetary and other damages it has incurred as a result of Cablevision's willful infringement of the Rembrandt patents. Rembrandt also seeks the entry of a permanent injunction enjoining Cablevision's continued infringement of the Rembrandt patents.

Cablevision denies that it infringes any of the above five patents and further asserts that those patents are invalid and/or unenforceable. Cablevision has brought counterclaims seeking declarations of non-infringement and/or invalidity and/or unenforceability with respect to each of Rembrandt's patents. In the event that Cablevision is found to infringe any valid and enforceable claim of Rembrandt's patents, however, Cablevision submits that Rembrandt will be unable to satisfy the standards recently articulated by the Supreme Court in *eBay Inc. v. MercExchange L.L.C.*, 126 S. Ct. 1837 (2006), for injunctive relief.

(b)     **The Patents and Products In Suit**

The titles of the patents-in-suit and the areas of technology to which they pertain (as described in the "Field of the Invention" sections of the patents) are:

- The '627 patent - Signal point interleaving technique - "The present invention relates to the transmission of digital data over band-limited channels."

- The '631 patent - System and method for establishing link layer parameters based on physical layer modulation - "The present invention generally relates to data communication protocols, and more particularly, to presetting the link layer parameters per the physical layer modulation in a protocol stack for modems."

- The '858 patent - Time-division multiple-access method for packet transmission on shared synchronous serial buses - "The present invention relates to data communications, and more particularly, to communications systems that have channelized network access, and may transport both synchronous data and variable-bit-rate data such as frame relay (hereafter referred to as packet data), in a time-division multiplexed format."

♦ The '819 patent - Time orthogonal multiple virtual dce for use in analog and digital networks - "This invention relates to an apparatus and method for a master unit in a multidrop network to communicate to and from a plurality of remote units, using a plurality of host applications using half duplex polled protocols, through the use of time division multiple access techniques."

♦ The '903 patent - Adaptive transmit pre-emphasis for digital modem computed from noise spectrum - "This invention relates to an apparatus for determining a frequency-dependent signal-to-noise ratio in a communications network so as to allow proper equalization in a transmit pre-emphasis mode."

For each of the patents, there may be multiple products in dispute relating to Cablevision's provision of digital television, voice, and data services. Further, two separate standards, "ATSC" and "DOCSIS," are likely to be implicated by Rembrandt's claims. ATSC ("Advance Television System Committee") is a standard that relates to the receipt and broadcast of digital television signals. Rembrandt's Complaint alleges that the Cablevision infringes the '627 patent through its receipt and retransmission of signals that comply with the ATSC standard. DOCSIS ("Data-Over-Cable Service Interface Specifications") is a specification that describes the operational parameters of equipment that is used for cable networks. Rembrandt alleges that DOCSIS-compliant equipment infringes the '631, '858, '819, and '903 patents.

(c)    **Related Litigations**

There are currently eleven other lawsuits pending relating to one or more of the Rembrandt patents at issue here, including six lawsuits in the Eastern District of Texas and five lawsuits in the District of Delaware.[1]   Of the Delaware cases, four of the other suits

---

[1]    In one of the recently-filed Texas lawsuits asserting the '903 patent, *Rembrandt Technologies, LP v. Charter Communications, Inc.* et al. (E.D. Tex. 2:06-cv-507), Defendant CoxCom has made a motion to transfer the case to the District of Delaware. That motion is likely to be fully briefed later this month.

relate to the '627 patent,[2] and the final one relates to the '903 patent.[3]  Although this Court

has not yet issued Notices of Scheduling Conferences in the five Delaware suits, it may be

efficient for discovery to be coordinated in the related Delaware cases to some extent.

### (d)  Additional Information Provided By Cablevision

Cablevision notes that none of the five patents in this action are related, and none of

the patents cites to any of the others.  The five asserted patents contain, in total, more than

100 claims.  Although Rembrandt has not yet identified the claims that it asserts that

Cablevision infringes, based upon Rembrandt's allegations in the Complaint and in other

proceedings, Rembrandt may attempt to assert dozens of claims in this action.  There are

seven inventors named on the five patents; of those seven, there is only one "overlapping"

inventor whose name appears on two of the five patents.  In addition, the patents in suit

involve disparate and complex technologies, will implicate unique infringement, validity, and

enforceability issues, and are likely to involve different witnesses and other discovery.

### 3.    IDENTIFICATION OF ISSUES

The parties agree that the issues to be decided in this matter include at least the

following:

1)    whether Cablevision has directly or indirectly infringed one or more claims of

the Rembrandt patents literally or under the doctrine of equivalents;

2)    whether any infringement by Cablevision of any claims of the Rembrandt

patents has been willful;

3)    whether any of the asserted claims of the Rembrandt patents are invalid;

---

[2]    *Rembrandt Technologies, LP v. CBS Corp.*, Case No. 06-727-GMS (D. Del.); *Rembrandt Technologies, LP v. NBC Universal, Inc.*, Case No. 06-729-GMS (D. Del.); *Rembrandt Technologies, LP v. ABC, Inc.*, Case No. 06-730-GMS (D. Del.); *Rembrandt Technologies, LP v. Fox Entertainment Group* et al., Case No. 06-731 (GMS) (D. Del.).

[3]    *CoxCom, Inc. v. Rembrandt Technologies, LP*, Case No. 06-721-GMS (D. Del.). Rembrandt has moved to dismiss CoxCom's Complaint for lack of subject matter jurisdiction.

4)      whether Rembrandt's claims for damages are limited and/or barred under the doctrine of laches;

5)      whether Rembrandt's enforcement of any of its patent rights is limited and/or barred under the doctrine of estoppel;

6)      whether Rembrandt's enforcement of any of its patent rights is limited and/or barred due to the existence of any express or implied license and/or patent exhaustion;

7)      whether Rembrandt's claims for damages are limited and/or barred by the patent notice statute (35 U.S.C. § 287(a));

8)      whether Rembrandt's claims are limited and/or barred under the doctrines of patent misuse or unclean hands;

9)      the damages to which Rembrandt is entitled if Cablevision is found to have infringed any valid and enforceable claim of the Rembrandt patents; and

10)      whether Rembrandt is entitled to a permanent injunction enjoining Cablevision's alleged infringement of the Rembrandt patents.

## 4.      NARROWING OF ISSUES

The parties expect that they may be able to narrow the issues as discovery in this case proceeds.

## 5.      RELIEF

Rembrandt requests that this Court award Rembrandt damages adequate to compensate it for such infringement and enter a permanent injunction enjoining Cablevision from making, using, offering for sale and selling products that infringe the Rembrandt patents. According to Rembrandt, the appropriate measure of damages in this case is a reasonable royalty. Rembrandt further requests that the Court enter judgment against Cablevision declaring that Cablevision has infringed the Rembrandt patents and that Cablevision's conduct has been willful, and awarding Rembrandt treble damages sustained as a result of Cablevision's willful infringement.

Rembrandt also seeks recovery of attorney's fees and costs due to the exceptional nature of this case in accordance with 35 U.S.C. § 285.

Cablevision seeks declaratory judgments that each of the patents-in-suit is not infringed and/or invalid and/or unenforceable. Cablevision denies that Rembrandt is entitled to any relief. Cablevision also seeks attorney's fees and costs, due to the exceptional nature of this case, in accordance with 35 U.S.C. § 285.

## 6.     AMENDMENT OF PLEADINGS

The parties are not aware of any amendments needed to the pleadings at this time, but reserve the right to amend their pleadings within the time period set forth in the schedule entered by the Court.

## 7.     JOINDER OF PARTIES

The parties are not aware of any additional parties that should be joined in this action at this time. The parties, however, reserve the right to move to join parties, if appropriate, within the time period set forth in the schedule entered by the Court.

## 8.     DISCOVERY

**Scheduling of Litigation Events.**

The parties' agreement as to the identification and timing of deadlines and events in this action is set forth for the Court's consideration in Exhibit A.

The parties are mindful of the Court's interest in proceeding expeditiously. The parties respectfully submit that the proposed schedule takes account of that interest and is necessary and appropriate, given the number and complexity of the issues raised by Rembrandt's patents, the technology, and the accused products. At present, Rembrandt believes that it will require discovery on at least the following issues:

A.     the design, development, and operation of the accused products and services;

B.     the identification of the asserted claim(s) and Cablevision's alleged

infringement of those claims;

C.      documents, testimony, and expert opinion materials regarding, infringement, willful infringement, damages and damages amounts.

D.      the factual basis for each party's claims, affirmative defenses, and counterclaims, including any opinion of counsel upon which any party intends to rely;

E.      expert and third party discovery on the above-listed items.

At present, Cablevision believes that it will require discovery on at least the following additional issues:

F.      the validity of the asserted claims and the enforceability of the asserted patents;

G.      the conception and reduction to practice of the claimed inventions;

H.      the prosecution of the patents at issue;

I.      prior art relating to the technology covered by the patents;

J.      Rembrandt and/or its predecessors-in-interest's participation in the standard-setting processes for the ATSC and/or DOCSIS standards;

**Limitations on Discovery.** Rembrandt and Cablevision propose that the parties limit discovery as follows:

1)      **Fact Depositions.**    At this stage of the case, the parties agree that the limitations of depositions contained in FRCP 30(a)(2)(A) should be modified as follows: each side shall be permitted to take a maximum of 175 hours of depositions by fact witnesses, including 30(b)(6) depositions.  Unless otherwise agreed to by the parties, the deposition of an individual non-30(b)(6) witness is limited to one day of seven hours of actual examination. No deposition of any witness shall exceed seven hours of examination in a single day *provided*, however, that: (A) a deposition of an individual inventor shall not exceed fourteen hours over two days, unless that inventor is a named inventor on more than one patent in suit, in which the deposition of such individual inventor may continue for an additional seven

hours over an additional day for each patent in suit on which he or she is named in excess of one; and (B) there shall be no specific hour limit with respect to depositions conducted pursuant to FRCP 30(b)(6), and such depositions may proceed for as many hours as reasonably necessary.

2)    In addition, Cablevision believes that no more than 75 of the 175 hours of fact depositions per side should be depositions of parties (i.e., depositions of Cablevision or Rembrandt employees).  Rembrandt believes that there should be no such limitation and to the extent any limitation is necessary, it should be to third party discovery.

3)    Requests for Admissions shall be limited to fifty (50) per side, excluding Requests for Admissions directed at authenticating documents; and

4)    Interrogatories shall be limited to fifty (50) per side.

**9.    ESTIMATED TRIAL LENGTH**

The parties estimate that the trial of this case will take a total of twelve (12) days. The parties propose that the trial be scheduled at the court's convenience, consistently with the proposed schedule set forth in Exhibit A.

**10.    JURY TRIAL**

Both parties seek a jury trial on all issues that are so triable to a jury.

**11.    SETTLEMENT**

The parties have not yet explored the possibility of settlement, but are willing to do so at the appropriate opportunity.

**12.    OTHER MATTERS**

Because confidential information will have to be exchanged in this action, the parties agree that a protective order will be necessary and will attempt to agree on the form of such an order.

**13.    CONFIRMATION OF RULE 26(f) TELECONFERENCE.**

Counsel for the parties have conferred about each of the above matters.

WOMBLE CARLYLE SANDRIDGE
 & RICE, PLLC

/s/ Kevin M. Baird_____
George Pazuniak (# 478)
Kevin M. Baird (# 4219)
James M. Lennon (# 4570)
AnnaMartina Tyreus (# 4771)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Tel:  (302) 252-4324
Fax:  (302) 661-7725
kbaird@wcsr.com

OF COUNSEL:
Timothy G. Barber
Womble Carlyle Sandridge & Rice, PLLC
One Wachovia Center
301 South College Street, Suite 3500
Charlotte, NC 28202-6037

John F. Morrow, Jr.
Womble Carlyle Sandridge & Rice, PLLC
One West Fourth Street
Winston-Salem, NC 27101

Barry S. Goldsmith
Womble Carlyle Sandridge & Rice, PLLC
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182-2738

*Counsel for Plaintiff Rembrandt
Technologies, LP*

February 9, 2007

RICHARDS, LAYTON & FINGER, P.A.

/s/ Frederick L. Cottrell, III_____
Frederick L. Cottrell, III
Kelly E. Farnan
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE  19899
farnan@rlf.com

Josh A. Krevitt (admitted *pro hac vice*)
JKrevitt@gibsondunn.com
Charles J. Boudreau (admitted *pro hac vice*)
CBoudreau@gibsondunn.com
Gibson, Dunn & Crutcher LLP
200 Park Avenue
47th Floor
New York, NY  10166

David Segal (admitted *pro hac vice*)
DSegal@gibsondunn.com
Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine,  California  92614

Amanda Tessar (admitted *pro hac vice*)
atessar@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1801 California St., Suite 4200
Denver, CO 80202

*Counsel for Defendants Cablevision Systems
Corporation, and CSC Holdings, Inc.*

# Exhibit 6A


Westlaw.

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
ANGIODYNAMICS, INC., Plaintiff,
v.
DIOMED HOLDINGS, INC., Defendant.
**C.A. No. 06-02 GMS.**

Sept. 7, 2006.

David E. Wilks, Reed Smith LLP, Wilmington, DE,
Arthur Dresner, Stephen M. Chin, Reed Smith LLP,
New York, NY, for Plaintiff.

Frederick L. Cottrell, III, Richards, Layton & Finger,
Wilmington, DE, Michael A. Albert, Michael N.
Rader, Wolf, Greenfield & Sacks, P.C., Boston, MA,
for Defendant.

*MEMORANDUM*

GREGORY M. SLEET, District Judge.

**I. INTRODUCTION**

**\*1** On January 3, 2006, AngioDynamics, Inc.
("AngioDynamics") brought this declaratory
judgment action against Diomed Holdings, Inc.
("Diomed"). Presently before the court are Diomed's
Motion to Dismiss (D.I.8), and AngioDynamics'
Motion to Amend (D.I.10). For the following
reasons, the court will grant Diomed's motion to
dismiss and deny AngioDynamics' motion to amend.

**II. BACKGROUND**

A subsidiary of Diomed, Diomed Inc., owns U.S.
Patent Nos. 6,981,971 (the "'971 patent") and
6,986,766 (the "'766 patent") (collectively, the
"patents-in-suit"). The patents-in-suit are directed to
product features, which include markings along an
introducer sheath, of a system for delivering laser
energy to the walls of a vein, and a method directed
to the use of a product with those features. (D.I 4 ¶ ¶
13, 16-17.) The method of delivering laser energy to
the walls of a vein is known as endovenous laser

treatment. (D.I. 11, at 4.) Both Diomed and
AngioDynamics offer products relating to
endovenous laser treatment. Diomed, however, has
the exclusive rights in three patents, including the
patents-in-suit, that relate to endovenous laser
treatment.

AngioDynamics alleges that the issuance of the
patents-in-suit, as well as Diomed's conduct,
including the filing of a lawsuit against it and other
companies for infringement of a different patent and
the making of certain statements regarding the
patents-in-suit, have given it a reasonable
apprehension that Diomed would sue it for patent
infringement. (D.I. 4 ¶ 31.) Accordingly,
AngioDynamics has filed a declaratory judgment
action, asking the court to declare all claims of the
patents-in-suit invalid, non-infringed, and
unenforceable. (Id. at Prayer for Relief.)

On January 31, 2006, Diomed filed a motion to
dismiss for lack of subject matter jurisdiction. On
February 14, 2006, AngioDynamics filed a motion to
amend its first amended complaint.

**III. DISCUSSION**

Diomed contends that the court should dismiss both
counts of the declaratory judgment action because
AngioDynamics had no objectively reasonable
apprehension of imminent suit on the '971 and '776
patents and, therefore, AngioDynamics' claim is
premature. In other words, Diomed contends the
court lacks subject matter jurisdiction over
AngioDynamics' declaratory judgment action.

A motion to dismiss under Rule 12(b)(1) of the
Federal Rules of Civil Procedure challenges the
jurisdiction of the Court to address the merits of a
plaintiff's complaint. Such a challenge may present
either a facial or a factual challenge to subject matter
jurisdiction. See Mortensen v. First Fed. Sav. & Loan
Ass'n, 549 F.2d 884, 891 (3d Cir.1977). When
asserting a facial challenge, a defendant contends that
the complaint alleges facts that, even if true, would
be insufficient to establish the Court's jurisdiction.
Gould Elecs. Inc. v. United States, 220 F.3d 169, 176
(3d Cir.2000). The present motion presents a facial
challenge to the complaint because the jurisdictional
facts are not in dispute. Such a motion requires the
court to consider the allegations of the complaint as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 2
Slip Copy, 2006 WL 2583107 (D.Del.)
**(Cite as: 2006 WL 2583107 (D.Del.))**

true and to make all reasonable inferences in the plaintiff's favor. *See id.* Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. *Lang v. Pacific Marine & Supply Co.,* 895 F.2d 761, 764 (Fed.Cir.1990).

**\*2** The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy ... [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an "actual controversy between the parties ." *Medimmune, Inc. v. Centocor, Inc.,* 409 F.3d 1376, 1378-79 (Fed.Cir.2005) (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1331 (Fed.Cir.2005)). "In general, the presence of an 'actual controversy' within the meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed.Cir.1996) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H .B. Fuller Co.,* 940 F.2d 631, 634 (Fed.Cir.1991), *cert. denied,* 112 S.Ct. 658 (1991). Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1526 (Fed.Cir .1992) (citations omitted).

In the patent context, the Federal Circuit has developed a two-part test for determining whether the declaratory judgment action is justiciable: (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken by the declaratory judgment plaintiff with the intent to conduct such activity. *See Goodyear Tire & Rubber Co. v. Releasomers Inc.,* 824 F.2d 953, 955 (Fed.Cir.1987) (citations omitted). In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc.,* 742 F.2d 1388, 1399 (Fed.Cir.1984).

Here, neither party disputes that the second element has been satisfied. Thus, the court's determination turns on whether AngioDynamics has a reasonable apprehension of suit. "When the defendant's conduct, including its statements falls short of an express charge [or threat], one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988) (quoting *Goodyear,* 824 F.3d at 955). AngioDynamics, therefore, must be able to demonstrate that it has a reasonable apprehension of imminent suit. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (this requirement of imminence reflects the mandate in Article III of the U.S. Constitution that the injury in fact be "concrete," and "actual or imminent, not conjectural or hypothetical"); *see Teva Pharms. v. Pfizer, Inc.,* 395 F.3d 1324, 1333 (Fed.Cir.2005); *E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp.,* 383 F.Supp.2d 642, 647 (D.Del.2005). [FN1]

> FN1. AngioDynamics maintains that the suit does not have to be imminent for a reasonable apprehension to exist and attempts to distinguish *Teva Pharms. v. Pfizer, Inc.,* 395 F.3d 1324 (Fed.Cir .2005), a recent case in which the Federal Circuit stated that an "actual controversy" exists between parties when there is a reasonable apprehension of *imminent* suit. 395 F.3d at 1333 (emphasis in original). AngioDynamics contends that *Teva* is distinguishable from the case at bar because it "involved a pharmaceutical drug application that was subject to compliance with provisions of the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act." (D.I. 11, at 16.) According to AngioDynamics, "when the *Teva* Court stated that the suit must be imminent for 'reasonable apprehension,' it was addressing the unique situation that arises in Hatch-Waxman cases." (Id. at 17.) The court cannot agree with AngioDynamics' position. While it is true that the declaratory judgment subject matter jurisdiction issue in *Teva* arose as a result of a pharmaceutical drug application, that fact was not critical to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court's statement regarding imminency of suit. Indeed, the court set forth the imminency requirement for reasonable apprehension in the context of discussing the standard that it must apply to determine whether the suit was fit for judicial review. Moreover, the court did not, as AngioDynamics suggests, single out or distinguish Hatch-Waxman cases as "unique" during its discussion of the reasonable apprehension element of the two-part test.

**\*3** In the present case, AngioDynamics contends that the following facts, when viewed in their totality, create a reasonable apprehension of an infringement suit by Diomed: (1) Diomed's history of defending its patents, as demonstrated by its lawsuits against AngioDynamics and other companies for infringement of U.S. Patent No. 6,398,777 (the "'777 patent"); (2) Diomed's lawsuit against Vascular Solutions, Inc. ("Vascular Solutions") and a former Diomed employee for trade secret misappropriation; and (3) a statement made by James Wylie ("Wylie"), Diomed's President and Chief Executive Officer, at a July 28, 2005 conference call set up to review the company's second quarter financial results.

After having considered these facts in the context of the relevant case law, the court is unpersuaded that AngioDynamics has demonstrated a reasonable apprehension of imminent suit. First, although AngioDynamics has shown that Diomed brings lawsuits for patent infringement to protect its investments, it has not argued that Diomed has sued any party for infringement of either of the patents-in-suit. Thus, while relevant to the court's analysis, Diomed's lawsuits for infringement of the '777 patent do not lead the court to a finding of reasonable apprehension. See DuPont Dow Elastomers, L.L. C. v. Green Tweed of Delaware, 148 F.Supp.2d 412, 415 (D.Del.2001) (granting motion to dismiss declaratory judgment action based, in part, on the fact that the defendant did not have a pattern of suing on the patent-in-suit).

Likewise, Diomed's lawsuit against Vascular Solutions and a former Diomed employee for trade secret misappropriation does not lend credence to AngioDynamics' contention of a reasonable apprehension. To support its contention, AngioDynamics cites to Vanguard Research, Inc. v. PEAT, Inc., 304 F.3d 1249 (Fed.Cir.2002) and Goodyear Tire & Rubber Co. v. Releasomers Inc., 824 F.2d 953 (Fed.Cir.1987), two cases in which the

Federal Circuit concluded that the plaintiff had a reasonable apprehension of suit, based partly on prior litigation involving trade secret misappropriation. What AngioDynamics fails to mention in its briefing, however, is the fact that the prior lawsuits for trade secret misappropriation in both Vanguard and Goodyear were lawsuits filed by the patentee against the declaratory judgment plaintiff. See Vanguard, 304 F.3d at 1255; Goodyear, 824 F.2d at 954. Here, in contrast, Diomed filed its trade misappropriation lawsuit against another company and one of its own former employees.

Additionally, the Federal Circuit did not just look at the prior lawsuit against the declaratory judgment plaintiffs in Vanguard and Goodyear. In Vanguard, the patentee also had informed the plaintiff's customers that the plaintiff was using patented technology without a license. See Vanguard, 304 F.3d at 1255. In the present case, AngioDynamics has neither alleged nor presented evidence regarding conduct on the part of Diomed directed to its customers. See DuPont Dow, 148 F.Supp.2d at 415 (dismissing case for lack of declaratory judgment jurisdiction based, in part, on the absence of conduct interfering with the plaintiff's customer relations). In Goodyear, the patentee had told the plaintiff's representative that, when the patents-in-suit issued, the parties "would have to talk about infringement of the patents by Goodyear and possible licensing since Goodyear might be liable for past patent infringement," and that "the parties might wind up in Federal Court on these issues." Goodyear, 824 F.2d at 956 n. 5. Here, as will be discussed below, Diomed did not directly discuss the newly issued patents with AngioDynamics, and did not use any language in statements about the patents that would give AngioDynamics a reasonable apprehension of suit. As such, Diomed's present lawsuit for trade secret misappropriation does not support of finding of reasonable apprehension, even when considered together with its lawsuits for infringement of the '777 patent.

**\*4** Finally, AngioDynamics points to Wylie's statement during Diomed's second quarter 2005 earnings conference call. According to the amended complaint, Wylie stated the following:

It is important to note that on July 26, Diomed announced that it had received a Notice of Allowance from the U.S. Patent and Trademark Office for a patent on Diomed's proprietary technique of using a marked introducer sheath to control the rate of withdrawal of an optical fiber during an intravenous laser procedure. Diomed

introduced a marked introducing sheath especially configured for use in the proprietary technology in the fourth quarter of 2003. Currently, all EVLT procedure kits sold by Diomed contain a marked introducer sheath for use in the method covered by the allowed patent. Notably, both AngioDynamics and Vascular Solutions are offering marked introducer sheaths particularly for use in a technique *embraced by* the now allowed Diomed patent. Further, it is important to point out that this case is not connected to the U.S. Patent 6,398,777 infringement lawsuits for which I will now provide an update.

(D.I. 4 ¶ 22.) (emphasis added). The Federal Circuit, on many occasions, has addressed statements made by the patentee to either potential infringers or third parties. On the one hand, the Federal Circuit has stated that the test for finding a controversy "cannot turn on whether the parties used polite terms in dealing with one another." *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 811 (Fed.Cir .1996). That is, " 'in light of the subtleties in lawyer language,' *Arrowhead,* 846 F.2d at 736, the Federal Circuit has not required ... 'magic words' to create a justiciable controversy." *DuPont Dow,* 148 F.Supp.2d at 415. On the other hand, "the 'reasonable apprehension of suit' test requires more than the nervous state of mind of a possible infringer; it requires that the objective circumstances support such an apprehension." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1053-54 (Fed.Cir.1995). Indeed, the court has determined that a patentee does not create a reasonable apprehension when the patentee states directly to the potential infringer that its activities "fall within," "are covered by," and are "operations under" the patent. *Shell Oil v. Amoco,* 970 F.2d 885, 889 (Fed.Cir.1992). Additionally, the Federal Circuit has held that a "patentee's statement that it intend[s] to enforce [its] patent [does] not ... create a reasonable apprehension of suit." *Phillips Plastics,* 57 F.3d at 1054.

 In the present case, the court is not convinced that Wylie's statement that AngioDynamics' products are "embraced by" the patents-in-suit was sufficient to give rise to a reasonable apprehension of suit. The statement was not made to AngioDynamics directly; rather, it was made during a conference call that Diomed utilized to announce and discuss its financial results with investors and other interested third parties. [FN2] Moreover, the statement is consistent with the types of statements that the Federal Circuit has already determined do not create a reasonable apprehension on the part of the potential infringer. *See, e.g., Shell,* 970 F.2d at 889; *Phillips Plastics,* 57

F.3d at 1054. Lastly, while AngioDynamics contends that the "embraced by" language used in the conference call was enough to create a reasonable apprehension on its part, it ignores the remainder of the call, during which Wylie, in response to a question from a caller, stated that he did not "want to get into a discussion on the call relative to infringement" and did not "want to comment" on what Diomed would do with the patent. (D.I. 9, Ex. A at 35:32-36:35.) These statements could not have created any apprehension of an imminent suit in AngioDynamics, much less an objectively reasonable apprehension.

>        FN2. According to AngioDynamics, Diomed "must have reasonably anticipated" that at least one representative of AngioDynamics would have participated in the conference call because it was "broad[ly] advertise[d]" in a Diomed press release inviting any "interested parties" to participate. (D.I. 11, at 8.) Thus, AngioDynamics asserts that Wylie's statement was made to the general industry, including its customers, and "broadcast specifically to [it]." (Id.) AngioDynamics; assertion is of no moment, however, because the court concludes that the statement "embraced by" is not one which would trigger a reasonable apprehension of suit. The court's conclusion is confirmed by the fact that AngioDynamics has neither alleged nor argued that the statement has interfered with its customer relations. *See, e.g., Arrowhead,* 846 F.3d at 737 (noting that the patentee's conduct "produced an apprehension of litigation serious enough to cause a demand for indemnification from the potential infringer's customers); *Vanguard,* 304 F.3d at 1251 (discussing patentee's interference with potential infringer's customers).

 *5 Essentially, the facts of the present case boil down to the following: Diomed has sued AngioDynamics and other companies for infringement of a patent "not directly related to" either of the patents-in-suit. (See D.I. 11, at 14.) Diomed has also sued Vascular Solutions and one of its former employees for trade secret misappropriation involving the technology that is the subject of the patents-in-suit. Additionally, Diomed's ownership of the patents-in-suit may serve as a potential roadblock to AngioDynamics' sales of its endovenous laser treatment system. However,

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 2583107 (D.Del.)
**(Cite as: 2006 WL 2583107 (D.Del.))**

Diomed has not expressly threatened to sue AngioDynamics, and its statements regarding the patents-in-suit were made during a 2005 second quarter earnings conference call with investors and interested third parties. Moreover, during that conference call, Wylie refused to "comment on what we [Diomed] will potentially do or not do with this [recently allowed] patent." (D.I. 9, Ex. A at 35:32-36:35.) To conclude that Diomed's conduct provided AngioDynamics with a reasonable apprehension of suit would amount to a finding that "a reasonable apprehension of suit arises when a patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity," which does not meet the objective test for determining declaratory justiciability. *Cygnus Therapeutics Sys. v. ALZA Corp.,* 92 F.3d 1153, 1160 (Fed .Cir.1996); *see Nokia Corp. v. Interditial Commc'ns,* No. Civ. A. 05-16-JJF, 2005 WL 3525696, at *3 (D.Del. Dec. 21, 2005). Accordingly, the court will dismiss AngioDynamics' complaint. [FN3]

> FN3. AngioDynamics has filed a Motion to Amend (D.I.10) in order to correct the name of the defendant and state with more particularity its allegations with respect to unenforceability. "[A] court should deny leave to amend if the moving party is guilty of undue delay, bad faith, dilatory motive, prejudice, or his or her amended claims are futile." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). Because AngioDynamics' second amended complaint would not cure the defect in the court's jurisdiction, allowing it to amend would be futile. Thus, the court will deny AngioDynamics' motion to amend.

### *ORDER*

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss (D.I.8) is GRANTED.

2. The First Amended Complaint (D.I.4) shall be dismissed without prejudice.

3. The plaintiff's Motion to Amend (D.I.10) is DENIED.

Slip Copy, 2006 WL 2583107 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 819704 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Diomed's Motion to Dismiss and Answering Brief in Opposition to Angiodynamics' Motion to Amend (Feb. 21, 2006)Original Image of this Document (PDF)

• 2006 WL 819703 (Trial Motion, Memorandum and Affidavit) Angiodynamics, Inc.'s Answering Brief in Opposition to Diomed Holdings, Inc.'s Motion to Dismiss and Angiodynamics, Inc.'s Brief in Support of Angiodynamics, Inc.'s Motion for Leave to Amend Angiodynamics, Inc.'s First Amended Complaint (Feb. 14, 2006)Original Image of this Document (PDF)

• 1:06cv00002 (Docket) (Jan. 3, 2006)

END OF DOCUMENT

# Exhibit 6B

Westlaw.

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1998 WL 229255 (E.D.N.Y.)
**(Cite as: 1998 WL 229255 (E.D.N.Y.))**

☞

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
CONSAC INDUSTRIES, INC. Plaintiff,
v.
NUTRAMAX LABORATORIES, INC., Defendant.
**No. 97 CV 1155(SJ).**

March 31, 1998.
Jordan and Hamburg, New York, By C. Bruce
Hamburg, Thomas M. Furth, Lainie E. Dolinger, for
Plaintiff.

Friedman, Wang & Bleiberg, New York, By Robert
Scher, Esq., for Defendant.

Bowie & Jensen, LLC, Towson, MD, By Robert R.
Bowie, Jr., Esq., Michael D. Oliver, Esq., Of
Counsel Attorneys for Defendant.

Covington & Burling, Washington, DC, By Paul
Berman, Esq., Dawn Nunziato, Esq., Of Counsel
Attorneys for Defendant.

MEMORANDUM & ORDER

JOHNSON, District J.

**\*1** Plaintiff Consac Industries, Inc. ("Consac" or
"Plaintiff") brings this action pursuant to the
Declaratory Judgment Act, 28 U.S.C. § 2201.
Defendant Nutramax Laboratories, Inc.'s
("Nutramax" or "Defendant") now moves this Court
to dismiss the complaint pursuant to Fed.R.Civ.P.
12(b)(1), on the basis that there is no justiciable
controversy for this Court to adjudicate. For the
reasons stated below, Defendant's motion is denied.

BACKGROUND

Nutramax is a Maryland corporation that holds
United States Patent No. 5,587,363 ("the '363
patent") which covers products including the
ingredients glucosamine and chondroitin sulfate.
Complaint ¶ ¶ 2, 5; Nutramax Memo Exhibit D.
These ingredients are found in Nutramax's products
COSAMIN® and COSAQUIN®). Id. These

products are also covered by United States patent No.
5,364,845 ("the '845 patent") held by Nutramax.
Complaint ¶ 4.

Since the issuance of the '363 Patent, Consac has
made and/or offered for sale, products containing
glucosamine and chondroitin sulfate. Complaint ¶ 6.
Consac regularly obtains glucosamine in the form of
salts, chondroitin sulfate, and manganese, and is able
to produce and sell nutritional supplement products
containing these ingredients and intends to do so.
Complaint ¶ 10.

On February 21, 1997, Consac received a letter from
attorneys representing Nutramax advising Consac
that its sale of products containing those ingredients
may infringe the '363 patent. Complaint ¶ 8;
Exhibit A to the Complaint ("the letter"). The letter
gave Consac fifteen business days to respond. Exhibit
A. Consac forwarded the letter to its attorney, C.
Bruce Hamburg at Jordan and Hamburg.
Declaration of C. Bruce Hamburg ¶ 3. The letter
prompted Mr. Hamburg to order the file histories on
each of these patents from the U.S. Patent and
Trademark Office. Id., ¶ 4. The '845 file history
included copies of infringement suits filed by
Nutramax in the Northern District of Maryland. Id. ¶
5. One infringement suit was filed against 10
defendants on September 1, 1995, another
infringement suit was filed on October 3, 1995, and
another infringement suit was filed on April 2, 1996.
Id.; Exhibit A to Hamburg Declaration. There was
no prior litigation involving the newer '363 patent.
However, the '363 patent had issued on December 24,
1996, approximately only three months prior to
institution of this suit. On March 7, 1997, Consac
commenced this action seeking a declaratory
judgment of non-infringement and invalidity of said
patents. Complaint ¶ 3. On April 2, 1997, Nutramax
moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1)
on the basis that no justiciable controversy existed.

DISCUSSION

Under the Declaratory Judgment Act, 28 U.S.C. §
2201, a United States District Court may declare the
rights and relations of any interested party upon the
filing of an appropriate pleading if an actual
controversy exists. Aetna Life Ins. Co. v. Haworth,
300 U.S. 227, 239-41, 57 S.Ct. 461, 81 L.Ed. 617
(1937). To establish an actual controversy, the
plaintiff has the burden of establishing by a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1998 WL 229255 (E.D.N.Y.)
**(Cite as: 1998 WL 229255 (E.D.N.Y.))**

preponderance of the evidence that it has a reasonable apprehension that it will be sued. *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 887 (Fed.Cir.1992). However, in the context of patent cases, the requirement for an actual controversy has been construed liberally by the Second Circuit, *Nippon Electric Glass Co., Ltd. v. Sheldon,* 489 F.Supp. 119, 209 USPQ 1023, 1025 (S.D.N.Y.1980), as well as by other circuits.

*\*2* A two-prong test is employed to determine whether an actual controversy exists:

> First, the defendant's conduct must have created on the part of plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device.

*Goodyear Tire & Rubber Co. V. Releasomers, Inc.,* 824 F.2d 953, 955, 3 U.S.P.Q.2d 1310 (Fed.Cir.1987). "[T]he test requires two core elements: (1) acts of defendant indicating an intent to enforce its patent; and (2) acts of plaintiff that might subject it or its customers to suit for patent infringement." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 737, 6 USPQ2d 1685 (Fed.Cir.1988).

The first prong of the test is concerned with defendant's conduct, while the second considers plaintiff's conduct. Nutramax's motion to dismiss only addresses the first prong of the test, since the second prong is not at issue; Consac has satisfied the second prong since it is either making and/or offering for sale the products of both patents ('363 and '845) or has made sufficient preparation to do so. The first prong requires plaintiff to have an "objectively reasonable apprehension of being sued" as a result of defendant's actions. *Indium Corporation of America v. Semi-Alloys, Inc.,* 781 F.2d 879, 883, 228 USPQ 845, 848 (Fed.Cir.1985).

When there is an express charge of infringement, an actual controversy clearly exists and courts have found that plaintiffs have a reasonable apprehension of being sued. *Arrowhead,* 846 F.2d at 736. The more difficult situation is where, as here, the patent holder has not made an express charge of infringement. Consac argues that Nutramax's language in its letter, although artfully worded, constitutes an express charge of infringement. However, this Court finds no express charge in the letter. The issue then is whether Nutramax's

statements constitute an implied charge of infringement sufficient to give Consac a reasonable apprehension of being sued if it continued to sell its products.

In the letter, Nutramax informs Consac that "the Product [sold by Consac] appears to infringe the '363 Patent" and "may also infringe the '845 Patent" and that "Nutramax has not licensed or authorized the sale of the Product [sold by Consac]." Nutramax also states in its letter that it "reserves the right to seek appropriate relief against Country Life [FN1] in respect of infringement of the '363 and '845 Patent."

> FN1. Consac does business under the name Country Life.

The language "appears" or "may" infringe and/or the reservation of rights respecting patent infringement in Nutramax's letter clearly raise the possibility of a patent infringement suit. It is well settled that a "plaintiff should not be denied the right to a declaratory judgment by a mere play on words." *E.W. Bliss Co. v. Cold Metal Products Co.,* 137 F.Supp. 676, 678 108 USPQ 47, 48 (N.D.Ohio 1955) (referring to language in defendant/ patentee's letter that products "might be of an infringing similarity"). "[I]in light of the subtleties in lawyer language," the courts do not require an express charge of infringement to find an actual controversy. *Goodyear,* 824 F.2d at 956. *See also Goodyear,* 824 F.2d at 956 ("we cannot read the Declaratory Judgment Act so narrowly as to require that a party actually be confronted with an express threat of litigation to meet the requirements of an actual case or controversy").

*\*3* In a case similar to that at bar, *AIR-vend, Inc. v. Thorne Industries, Inc.,* 625 F.Supp. 1123, 1126 (D.Minn.1985), an attorney for the patentee wrote a letter to the plaintiff raising the possibility of a patent infringement suit. The letter discussed the belief that the plaintiff was producing and marketing equipment similar to their patented equipment. It also referred to their patent and a patent application, and the remedies available to the patentee in a patent infringement suit. The court found a reasonable apprehension of suit and held that "[w]ithout question, a case or controversy existed." *Id.* In another case involving a letter sent by the patent holder, the court found a substantial controversy existed warranting issuance of a declaratory judgment even though the letter was a "cordial one" and contained no explicit threat of suit. *E.W. Bliss,* 137 F.Supp. at 678 (finding the threat of infringement

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1998 WL 229255 (E.D.N.Y.)
**(Cite as: 1998 WL 229255 (E.D.N.Y.))**

implicit in the circumspect language of the letter).

 In cases such as these where the defendant's conduct falls short of an express charge, courts consider the "totality of the circumstances" in determining whether that conduct meets the first prong of the test. *Goodyear,* 824 F.2d at 955.  In determining whether a charge of infringement could be reasonably inferred the court must look at the entire course of action and all of the defendant's relevant conduct. *Sherwood Medical Industries,* 512 F.2d 724, 728 (8th Cir.1975). Law suits filed against other parties by the patent holder are such circumstances that may give rise to an objectively reasonable apprehension of suit by the movant in a declaratory judgment action.  As the *Arrowhead* court explained, "The law does not require enterprises to keep their heads in the sand while a patentee picks them off one by one and at its leisure." 846 F.2d at 738.

 In this case, prior to filing the declaratory judgment action, Consac learned that Nutramax had brought three suits on the '845 patent and one of the suits was against ten defendants.   As shown in the Hamburg Declaration, the existence of these suits was known by Consac prior to filing the present declaratory judgment action.      The existence of a defendant/patentee's suits against others may create a reasonable apprehension of suit, since it may illustrate "not only an intent but a willingness and capacity to employ litigation in pursuit of its patent rights." *Arrowhead,* 846 F.2d at 737.

 Courts have long held that a plaintiff's knowledge of a defendant's suits against others contributes to a reasonable apprehension of being sued.   *See Goodyear,* 824 F.2d at 956 (by suing in state court for the same technology covered by the patents, defendant has engaged in a course of conduct that shows a willingness to protect that technology); *Shell Oil,* 970 F.2d at 888 ("related litigation may be evidence of a reasonable apprehension"); *Dewey & Almy Chemical Co. v. American Anode, Inc.,* 137 F.2d 68, 70--71 (3rd Cir.1943); *Arrowhead,* 846 F.2d at 738.  As stated in *EMC Corp. v. Norand Corp.,* 89 F.3d 807 (Fed.Cir.)," when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer is not required to wait for the patentee to decide when and where to sue, but can take the initiative and seek declaratory relief."

 **\*4** In addition, in this case, Nutramax had already referred this matter to their attorneys.  The letter was written by a lawyer at the law firm of Bowie &

Jensen, Attorneys at Law, and has as its first sentence "[t]his office represents Nutramax Laboratories, Inc." This is further evidence supporting Consac's reasonable apprehension of suit.  As stated in another case finding reasonable apprehension, "[b]oth the letter to plaintiff ... and the prior ... litigation were strong indications that defendant would act affirmatively to enforce the protection claimed under the ... patents." *Owatonna Manuf. Co. v. Melrose Co.,* 301 F.Supp. 1296 (D.Minn.1969).

 Finally, further supporting Plaintiff's objectively reasonable apprehension of suit is the fact that the letter required a reply within fifteen business days regarding infringement of the patents.  This Court reads the letter as an implied threat that Nutramax will take legal action against Consac if the deadline imposed by Nutramax is not met.

 In sum, the totality of the circumstances lead this Court to find that Consac had an objectively reasonable apprehension of suit.  As stated above, these circumstances include the implied charge of infringement in Nutramax's letter, the implied threat of suit in Nutramax's letter, the fact that Nutramax's letter required a response within 15 days to respond to Nutramax's attorneys, the fact that the letter does not express a wish to resolve the matter amicably, the fact that Nutramax had already referred the matter to its attorneys, the fact that Nutramax has filed three other suits, one of them against 10 defendants, alleging infringement of its patent, and the fact that Nutramax was aware of those suits.

CONCLUSION

 Because Consac has established that Nutramax's actions resulted in a reasonable apprehension of suit, this Court has subject matter jurisdiction over the complaint.      Accordingly, Nutramax's motion to dismiss for want of a justiciable controversy is denied.  The parties are directed to appear before the Magistrate Judge Robert Levy to arrange a discovery schedule.

 SO ORDERED.

 Not Reported in F.Supp., 1998 WL 229255 (E.D.N.Y.)

 **Motions, Pleadings and Filings (Back to top)**

• 1:97cv01155 (Docket) (Mar. 10, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6C



ᴄ

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Fort Worth Division.
DIGITAL PACKING LICENSING, INC.
v.
AT & T, et al.
**No. 4:04-CV-548-Y, 4:05-CV-224-Y.**

Feb. 27, 2006.

Jonathan T. Suder, Edward E. Casto, Jr., Friedman Suder & Cooke, Fort Worth, TX, Charles M. Hosch, Strasburger & Price, Dallas, TX, Keith A. Rutherford, Russell T. Wong, Wong Cabello Lutsch Rutherford & Brucculeri, Houston, TX, for Digital Packing Licensing, Inc.

Fernando Rodriguez, Jr., Bryant C. Boren, Christopher W. Kennerly, Fernando Rodriguez, Jr., Baker Botts, Dallas, TX, Lea F. Courington, Gwinn & Roby, Dallas, TX, Adam P Seitz, B. Trent Webb, John E. Gibson, Shook Hardy & Bacon, Kansas City, MO, for AT & T, et al.

*ORDER DENYING PLAINTIFF / CONSOLIDATED DEFENDANT'S MOTION TO DISMISS*

MEANS, J.

**\*1** Pending before the Court is plaintiff/consolidated defendant Digital Packet Licensing, Inc. ("DPL")'s Motion to Dismiss Complaint for Declaratory Judgment [doc. # 57], filed May 9, 2005. Having carefully considered the motion, response, and reply, the Court concludes that the motion should be DENIED.

### I. *BACKGROUND*

DPL owns U.S. Patent No. 4,782,485 ("the '485 patent"), U.S. Patent No. 5,018,136 ("the '136 patent"), and U.S. Patent No. 5,444,707 ("the '707 patent"). On July 27, 2004, DPL brought this suit ("the infringement suit"), asserting patent-infringement claims regarding the '485 patent against various defendants, only some of whom remain.

On January 26, 2005, DPL sent a letter ("the 2005 letter") to consolidated plaintiff Nortel Networks, Inc. ("Nortel") informing Nortel of its ownership of the '485, '136, and '707 patents and of its claims in the infringement suit. The 2005 letter also stated:

Please understand that [DPL] has no plans to sue your company. In part due to other ongoing litigation, [DPL] has not fully investigated your company's products or services to determine the extent to which any claims of the '485 Patent may be infringed by your company. However, we do believe that at least your company's Packet Voice Gateway Communication Server 2000, and other VoIP products may infringe one or more of the claims of the '485 Patent, the ' 136 Patent and the '707 Patent either directly or by contributing to or inducing the direct infringement of others.

At this time, we merely want to make sure that you are aware of the '485, ' 136 and '707 Patents so you may appropriately consider the potential relevance of the patent claims to your company's products and services. We would be happy to discuss a preferred licensing arrangement under the patents with you or your counsel. Please note, however, that this preferred licensing window may only be open to you for a limited time. If, on the other hand, you believe that your company does not need to be licensed under these patents, it would be most helpful if you would provide us with some insight into your reasoning.

(Nortel's Mot. Dismiss Ex. A. (letter).)

On March 17 Nortel filed suit in the Dallas division of this Court ("the declaratory suit") requesting a declaratory judgment that some or all of the claims of DPL's patents are invalid and/or that Nortel was not infringing DPL's patents. The case was transferred to the Fort Worth division of this Court and later consolidated with the infringement suit. DPL filed a motion to dismiss for lack of subject-matter jurisdiction on May 9.

### II. *STANDARD OF REVIEW*

Federal Rule of Civil Procedure Rule 12(b)(1) authorizes the dismissal of a case for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir.1998) (citing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 2
Not Reported in F.Supp.2d, 2006 WL 462442 (N.D.Tex.)
(Cite as: 2006 WL 462442 (N.D.Tex.))

*Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996)).

**\*2** On a Rule 12(b)(1) motion, which concerns the court's very power to hear a case, the trial court is free to weigh the evidence and satisfy itself of its authority to preside over the matter. *See MDPhysicians & Assocs., Inc. v. State Board of Ins.,* 957 F.2d 178, 181 (5th Cir.), *cert. denied,* 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992) (quoting *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)). In ruling on a 12(b)(1) motion to dismiss, the court may therefore rely on: 1) the complaint alone; 2) the complaint supplemented by undisputed facts; or 3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts. *MCG, Inc. v. Great Western Energy Corp.,* 896 F.2d 170, 176 (5th Cir.1990) (citing *Williamson,* 645 F.2d at 413).

The standard for reviewing a 12(b)(1) motion, however, depends upon whether the defendant makes a facial or factual attack on the plaintiff's complaint. *See Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981). A facial attack is made by the mere filing of a Rule 12(b)(1) motion, at which point "the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Id.* If those jurisdictional allegations sufficiently allege a claim for recovery directly under the Constitution or laws of the United States, the complaint stands and the federal court must entertain the suit. *See id.; Bell v. Hood,* 327 U.S. 678, 681-82, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Jurisdiction therefore remains undefeated by the possibility that the complaint may fail to state a claim upon which the plaintiff actually could recover. *See Bell,* 327 at 682.

In contrast, in a factual attack the defendant submits affidavits, testimony, or other evidentiary materials in support of the motion. In such a circumstance, the plaintiff "has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson,* 644 F.2d at 523; *see also Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986). Where a court reviews extrinsic evidence for a Rule 12(b)(1) motion, no presumption of truthfulness attaches to the plaintiff's allegations. *See Williamson,* 645 F.2d at 412-13. Moreover, "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Id.*

Regardless of whether the jurisdictional attack is facial or factual, a motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would establish the Court's jurisdiction. *See Home Builders,* 143 F.3d at 1010 (5th Cir.1998).

### III. *ANALYSIS: The Declaratory Judgment Act and Patent Law*

The Declaratory Judgment Act ("DJA") provides:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**\*3** 28 U.S.C.A. § 2201(a) (LexisNexis 2005). Because federal courts do not render advisory opinions, "the Declaratory Judgment Act requires the existence of an actual case or controversy between the parties before a federal court can constitutionally assume jurisdiction." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 955 (Fed.Cir.1987) (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). Thus, for the Court to have subject-matter jurisdiction over Nortel's claims there must be an actual case or controversy between Nortel and DPL.

In patent cases the test for determining whether an actual case or controversy exists is two-pronged:

First, the defendant's conduct must have created on the part of the plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce that device. *Indium [Corp. of Am. v. Semi-Alloys, Inc.,* 781 F.2d 879], 882-83, 228 U.S.P.Q. at 848 [ (Fed.Cir.1985) ] (citing *Jervis B. Webb Co. v. S. Sys., Inc.,* 742 F.2d 1388, 1398-99, 222 U.S.P.Q. (BNA) 943, 949 (Fed.Cir.1984)).

*Id.* "The element of threat or reasonable apprehension of suit turns on the conduct of the patentee, while the infringement element depends on the conduct of the asserted infringer." *BP Chems. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993) (citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988)). "The test, however stated, is objective and is applied to the facts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2006 WL 462442 (N.D.Tex.)
**(Cite as: 2006 WL 462442 (N.D.Tex.))**

existing when the complaint is filed." *Arrowhead, 846 F.2d at 736* (citation omitted).

A. *Reasonable Apprehension of Suit*

 A purely subjective apprehension of an infringement suit or a nervous state of mind on the infringer's part are insufficient bases for satisfying the actual-controversy requirement. *See Indium, 781 F.2d at 883; Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051, 1053-54 (Fed.Cir.1995)* (citation omitted). Objective circumstances at the time the complaint is filed must support an apprehension of future suit. *See id.*

 There is, unfortunately, no bright-line test for determining whether Nortel's actions objectively could give rise to a reasonable apprehension of suit:
> Respecting defendant's conduct, it must be such as to indicate defendant's intent to enforce its patent. If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more. In light of the subtleties in lawyer language, however, the courts have not required an express infringement charge. *Goodyear, 824 F.2d at 956, 3 USPQ2d at 1312.* When the defendant's conduct, including its statements, falls short of an express charge, one must consider the "totality of the circumstances" in determining whether that conduct meets the first prong of the test. *Id. at 955, 824 F.2d 953, 3 USPQ2d at 1311.*

**\*4** *Arrowhead, 846 F.2d at 736.*

 The 2005 letter did not contain an express charge of infringement; in fact, it specifically stated that there were no plans to sue Nortel. (Nortel's Mot. Dismiss Ex. A. (letter).) *See Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888-89 (Fed.Cir.1992)* ("We agree with Amoco that a statement that Shell's activities 'fall within' Amoco's claims in the context of the parties' licensing negotiations can hardly be considered an express charge of infringement."). Because there is no express charge of infringement, the Court must review the totality of the circumstances at the time of Nortel's commencement of this suit.

 The 2005 letter certainly indicated DPL's intent to enforce its patents. It informed Nortel of DPL's patent ownership, indicated that DPL was currently enforcing the '485 patent in an infringement suit in this Court, stated DPL's belief that Nortel's products may infringe DPL's patents, and offered to Nortel the opportunity to discuss licensing arrangements.

 Moreover, the infringement suit touches directly upon Nortel's interests. Though Nortel is not a defendant in the infringement suit, Nortel's customers are. "Related litigation may be evidence of a reasonable apprehension." *Shell Oil, 970 F.2d at 888.* Furthermore, in bolstering its claims in the infringement suit, DPL specifically referred to those customers' uses of Nortel products. An example is a letter from DPL to infringement-suit defendant Sprint Corporation ("Sprint") which stated:
> Our investigation reveals that Sprint sells many types of phone service that exploit the claimed voice-over-packet system of the '485 patent....
> The attached claim charts are exemplary and represent how calls marketed by Sprint may be serviced in a way that infringes the '485 patent.

 (Pls.' App. at 121.) Attached to the claim chart was a Nortel press release discussing Nortel's "network migration" with Sprint through its "supply[ ] to Sprint [of] the key elements required for a carrier--grade Voice over IP network." (*Id.* at 192.) The infringement suit is undoubtedly related to Nortel's claims for declaratory relief. Nortel's "network migration" with Sprint relates to the very type of system through which Sprint allegedly infringed DPL's patents--a voice-over packet system.

 Furthermore, though the literature referring to Nortel is only "exemplary" and represents how Sprint's services "may" infringe the '485 patent, DPL's reliance on Sprint's use of Nortel's technology, combined with the 2005 letter, certainly could create an objectively reasonable apprehension on Nortel's part that it was next to be sued. An "accusation [of infringement] need not be made directly to the declaratory judgment plaintiff, but may be made to its customers or the industry at large." *Nippon Electric Glass Co. v. Sheldon, 489 F.Supp. 119, 121 (S.D.N.Y.1980); see also Airship Indus. (UK) Ltd. v. Goodyear Tire & Rubber Co., 643 F.Supp. 754, 759 (S.D.N.Y.1986)* (same) (quoting *Nippon* ). Such a conclusion would only be strengthened by DPL's statements in the 2005 letter that it believed Nortel may be infringing DPL's patents. It is worth noting that at least one of the Nortel elements used by Sprint (as stated in the press release)--the Communication Server 2000--is referenced by DPL in the 2005 letter as possibly infringing DPL's patents.

 **\*5** In addition, the related litigation (the infringement suit) is not against unrelated third parties. *See W. Interactive Corp. v. First Data Res., Inc., 972 F.2d 1295, 1298 (Fed.Cir.1992);* Am.

Not Reported in F.Supp.2d                                                                                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 462442 (N.D.Tex.)
(Cite as: 2006 WL 462442 (N.D.Tex.))

*Dental Techs. v. Kreativ, Inc.,* CIVIL ACTION NO. C-97-374, 1997 U.S. Dist. LEXIS 21579, at *8 (S.D.Tex. Dec. 5, 1997). And, DPL's commencement of the infringement suit establishes DPL's willingness and capacity to enforce its patent rights. *See W. Interactive, 972 F.2d at 1298* (citing *Arrowhead, 846 F.2d at 737).* Plus, given all of these facts, Nortel would not have been unreasonable in viewing the 2005 letter as a method for strong-arming Nortel into beginning licensing-agreement negotiations with DPL.

Given all these considerations, the Court cannot conclude that DPL was unreasonable in its apprehension of future suit from DPL. The important question is whether, in light of the totality of the circumstances, Nortel may be said to have reasonably apprehended suit from DPL in the *future. See Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 636 (Fed.Cir.1991)* (citation omitted) ("the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues"); *Goodyear, 824 F.2d at 956.* DPL's self-serving assurances regarding its present intent aside, and given the timing of the 2005 letter, its content, and DPL's related litigation, there is a *future* threat supporting an objectively reasonable apprehension. *See Teva Pharms. USA, Inc. v. Pfizer Inc., 395 F.3d 1324, 1342-43 (Fed.Cir.2005).*

B. *Production or Preparation to Produce the Infringing Item*

As stated above, to evaluate whether the second prong of the actual-controversy test is met the Court must examine the conduct of the asserted infringer-- Nortel. *See BP Chems., 4 F.3d at 978* (citing *Arrowhead, 846 F.2d at 736).* A declaratory-judgment plaintiff must have a true interest to be protected by a declaratory judgment. *See Arrowhead, 846 F.2d at 736* (citing *C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 879, 219 USPQ 197, 202 (Fed.Cir.1983); Windsurfing Int'l v. AMF Inc., 828 F.2d 755, 758, 4 USPQ2d 1052, 1055 (Fed.Cir.1987)).* An actual controversy is not present where a plaintiff hopes to "obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." *Id.* (citing *Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87, 90, 137 USPQ 235, 236 (2d Cir.1963); Jervis B. Webb Co., 742 F.2d at 1399, 222 USPQ at 949).* A "[p]laintiff must be

engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." *Id.* (citing *Indium, 781 F.2d at 883, 228 USPQ at 848; Jervis B. Webb Co., 742 F.2d at 1399, 222 USPQ at 949.*)

**\*6** DPL argues that the second prong is unmet because DPL "has not asserted any charge of infringement against Nortel." (DPL's Mot. at 6.) As discussed above, however, DPL's infringement allegations directly touch upon Nortel's products. Moreover, the 2005 letter indicates that Nortel's infringement is likely; it also implies that a licensing agreement is necessary in order to protect Nortel's products from the legal penalties of infringement. That, combined with DPL's reliance upon information concerning Nortel's products and/or services in order to bolster its infringement claims against related third parties (the infringement defendants), demonstrates the weakness of DPL's argument.

The Court deems these facts sufficient to pass the second prong of the actual-case-or-controversy test. Nortel is not seeking an advisory opinion on whether it can begin a certain type of conduct; rather, it moves for a declaration that its present activity does not infringe DPL's patents. That type of claim meets the second prong's requirements. [FN1] *See id.* at 738 n. 10 ("All that the second prong of the test requires is a showing that plaintiff's conduct evidences a real interest in an activity that may, potentially, be enjoined.") Consequently, the Court concludes that this suit does involve an actual case or controversy, and thus that the Court has subject-matter jurisdiction over the action. [FN2]

> FN1. The Court notes that Nortel does not have to establish that it is actually infringing DPL's patents in order to demonstrate an actual case or controversy: "[i]t is at best incongruous to require that one seeking a declaration of noninfringement prove its process or product is the 'same as' or 'identical' to the patented process or product." *Arrowhead, 846 F.2d at 738.*

> FN2. The Court declines to exercise its discretion to decline jurisdiction for the reasons stated in Nortel's response.

IV. *CONCLUSION*

Therefore, DPL's Motion to Dismiss Complaint for Declaratory Judgment [doc. # 57] is DENIED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 462442 (N.D.Tex.)
**(Cite as: 2006 WL 462442 (N.D.Tex.))**


 Not Reported in F.Supp.2d, 2006 WL 462442
(N.D.Tex.)


**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3136864   (Trial Pleading) Bell Atlantic
Communications, Inc. d/b/a Verizon Long Distance's
Answer to Plaintiff's Third Amended Complaint (Oct.
18, 2005)Original Image of this Document (PDF)


• 2005 WL 2610322   (Trial Pleading) SBC Internet
Services, Inc.'s Answer to Plaintiff's Third Amended
Complaint (Sep. 9, 2005)Original Image of this
Document (PDF)


• 2005 WL 2610317  (Trial Pleading) Plaintiff's Third
Amended Complaint (Sep. 6, 2005)Original Image of
this Document with Appendix (PDF)


• 2005 WL 2372198   (Trial Pleading) Plaintiff's
Second Amended Complaint (Aug. 22, 2005)Original
Image of this Document with Appendix (PDF)


• 2005 WL 1561094   (Trial Motion, Memorandum
and Affidavit) Defendant Digital Packet's Reply to
Plaintiff Nortel's Memorandum in Opposition to
Defendant's Motion to Dismiss (Jun. 15,
2005)Original Image of this Document (PDF)


• 2005 WL 988221   (Trial Pleading) AT&T Corp.'S
Answer to First Amended Original Complaint and
Counterclaims (Apr. 4, 2005)Original Image of this
Document (PDF)


• 2005 WL 695389  (Trial Motion, Memorandum and
Affidavit) Defendant Verizon Communications Inc's
Motion to Dismiss and Brief in Support (Feb. 14,
2005)Original Image of this Document (PDF)


• 2004 WL 2232662   (Trial Pleading) Original
Complaint (Jul. 28, 2004)Original Image of this
Document (PDF)


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6D

LEXSEE 1996 US DIST. LEXIS 8153



Analysis
As of: Feb 16, 2007

**MATSUSHITA BATTERY INDUSTRIAL CO., LTD., TOYOTA MOTOR CORPORATION, and TOYOTA MOTOR SALES, U.S.A., INC., Plaintiffs, v. ENERGY CONVERSION DEVICES, INC. and OVONIC BATTERY COMPANY, INC., Defendants.**

**Civil Action No. 96-101-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1996 U.S. Dist. LEXIS 8153*

**April 23, 1996, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**DISPOSITION:** Defendants' motion to stay or dismiss the declaratory judgment action or, in the alternative, to transfer the case to the Eastern District of Michigan denied. Plaintiffs' motion to enjoin defendants' infringement suit in the Eastern District of Michigan granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants sought to stay or dismiss plaintiffs' action for declaration of invalidity and non-infringement of defendants' patent or, in the alternative, to transfer the case to another district court. Plaintiffs sought to enjoin defendants' infringement suit then pending in the other district court.

**OVERVIEW:** The parties had been negotiating a licensed use of defendants' patented battery by plaintiffs. Plaintiffs had rejected defendants' offers to enter a joint venture, however defendants had offered to continue negotiating and were awaiting a response from plaintiffs when the declaratory judgment action was filed. The next day, defendants filed their suit. Defendants alleged that plaintiffs filed their action in bad faith. The court held that neither a stay nor dismissal was warranted because the record did not reflect an improper race to the courthouse. The court also found that defendants failed to demonstrate that the interests of justice dictated transferring the action. The court reasoned that: (1) defendants' claim that litigation away from the most convenient forum was burdensome was suspect because defendants

engaged in business throughout the United States; (2) defendants failed to show a unique or unexpected burden resulting from litigation in the forum state, which was the state of their incorporation; and (3) defendants' showing of the necessity of compulsory process was insufficient to warrant transfer.

**OUTCOME:** The court denied defendants' motion to stay or dismiss plaintiffs' declaratory judgment action or, in the alternative, to transfer the case to another district court. The court granted plaintiffs' motion to enjoin defendants' infringement suit.

**LexisNexis(R) Headnotes**

*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Discretion*
*Civil Procedure > Declaratory Judgment Actions > State Judgments > Discretion*
[HN1] The Declaratory Judgment Act, *28 U.S.C.S. §§ 2201-02*, gives the court before which a declaratory judgment action is brought discretion to hear, or refuse to hear, the suit.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction*
[HN2] In general, a court may not dismiss a suit for a declaration of non-infringement on the ground that an infringement suit was subsequently filed. In all cases of

federal concurrent jurisdiction, the court which first has possession of the subject must decide it. This "first filed rule" gives the district court hearing the first filed case the power to enjoin later filed cases involving the same parties and the same issues. There are, however, certain recognized exceptions to the first filed rule, and other exceptions may be made when justice or expediency requires, as in any issue of choice of forum.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Declaratory Judgment Actions > State Judgments > Factors*
[HN3] Whether a party has filed a declaratory judgment action anticipatorily or in bad faith is a proper factor for the court to consider in deciding whether to dismiss a first filed action.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN4] A court will not consider convenience a factor in deciding whether to make an exception to the first filed rule.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN5] *28 U.S.C.S. § 1404*(a) provides that, for the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN6] The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN7] A plaintiff's choice of forum should not be lightly disturbed. As a general rule, because plaintiffs' choice of forum is accorded substantial weight, the burden is on the defendants to establish that the balance of conven-

ience of the parties and witnesses strongly favors the defendants. Plaintiff's choice of forum is paramount.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN8] Even if a district court is the more convenient trial forum for both the parties and the non-party witnesses, this factor would not be sufficient to compel a transfer.

*Civil Procedure > Venue > Forum Non Conveniens*
[HN9] Absent some showing of a unique or unexpected burden, corporations incorporated in Delaware should not be successful in arguing that litigation in their state of incorporation is inconvenient.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN10] In analyzing a claim that a transfer is warranted in the interests of justice, the court must consider judicial resources, cost to the parties, access to proof, and the availability of compulsory process.

**COUNSEL:** Kent A. Jordan, Esquire, of Morris, James, Hitchens & Williams, Wilmington, Delaware, Attorney for plaintiff. Of Counsel for plaintiff Matsushita Battery Industrial Co.: Morton Amster, Esquire, Michael J. Berger, Esquire, and Abraham Kasdan, Esquire, of Amster, Rothstein & Ebenstein, New York, New York; Of Counsel for plaintiffs Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc.: Edward W. Greason, Esquire and Arthur D. Gray, Esquire, of Kenyon & Kenyon, New York, New York.

Bruce M. Stargatt, Esquire, Josy W. Ingersoll, Esquire, and John W. Shaw, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, Attorneys for defendants. Of Counsel: Chester T. Kamin, Esquire, David J. Bradford, Esquire, and Jeffrey A. Koppy, Esquire, of Jenner & Block, Chicago, Illinois; Lawrence G. Norris, Esquire, of Rothwell, Figg, Ernst & Kurz, Washington, D.C.; and Marvin S. Siskind, Esquire, [*2] Vice President/Patent Counsel, Energy Conversion Devices, Inc., Troy, Michigan.

**JUDGES:** SUE L. ROBINSON, District Judge

**OPINION BY:** SUE L. ROBINSON

**OPINION:**

**MEMORANDUM OPINION**

Dated: April 23, 1996

1996 U.S. Dist. LEXIS 8153, *

Wilmington, Delaware

**SUE L. ROBINSON,** District Judge

## I. INTRODUCTION

Plaintiff Matsushita Battery Industrial Co. Ltd. ("MBI") filed this declaratory judgment action on February 28, 1996. n1 Plaintiffs seek a declaration of invalidity and non-infringement of Ovonic's United States Patent Number *5,348,822* (" *'822* patent"). On February 29, 1996, defendants Energy Conversion Devices, Inc. ("ECD") and Ovonic Battery Company Inc. ("Ovonic") filed suit against plaintiffs in the United States District Court for the Eastern District of Michigan, claiming infringement of the same patent. Currently before the court are defendants' motion to stay or dismiss the declaratory judgment action or, in the alternative, to transfer the case to the Eastern District of Michigan (D.I. 6) and plaintiffs' motion to enjoin defendants' infringement suit in the Eastern District of Michigan. (D.I. 19) The motions have been fully briefed, and the court heard oral arguments on April 10, 1996. For [*3] the reasons set forth below, defendants' motion will be denied and plaintiffs' motion to enjoin will be granted.

n1 Toyota Motor Corporation ("Toyota") and Toyota Motor Sales, U.S.A., Inc. ("Toyota Sales") were added as plaintiffs in an amended complaint dated March 7, 1996. (D.I. 11)

## II. BACKGROUND

Defendant ECD and its subsidiary Ovonic are Delaware corporations whose principal place of business is Troy, Michigan. (D.I. 8 at Ex. B) Over the past fifteen years, Ovonic has developed new technology in the field of rechargeable nickel metal hydride ("NiMH") batteries, and holds numerous patents in this area. (D.I. 8 at Ex. B) Batteries made with this new technology have the advantages of long life, no memory effect, and no environmentally hazardous materials. Ovonic has found particular success in marketing its technology for use in "consumer batteries" (e.g., batteries for camcorders, laptop computers, and cellular telephones) and in the development of a commercially viable electric vehicle ("EV") [*4] battery. (D.I. 8 at Ex. B) In June 1994, Ovonic formed a joint venture with General Motors Corporation ("GM") to produce and market batteries for EVs on a worldwide basis. (D.I. 8 at Ex. B) Ovonic has also been awarded several contracts by the United States Advanced Battery Consortium ("USABC"), which is composed of Ford

Motor Company, GM, and Chrysler Corporation, to further develop EV battery technology. (D.I. 8 at Ex. B)

Plaintiff MBI, a Japanese corporation with its headquarters in Osaka, operates worldwide as one of the largest producers of batteries. (D.I. 11 at P 3) MBI has also conducted extensive research and development in the area of NiMH batteries. Toyota, a Japanese corporation, and Toyota Sales, which is incorporated and based in California, have joined MBI in testing programs for MBI's EV batteries. (D.I. 11 at PP 4, 5, 16, 17)

In 1992, defendants and MBI negotiated a series of licensing agreements concerning NiMH technology for use in consumer batteries. During those negotiations, the parties apparently discussed licensing EV battery technology as well, but were unable to reach agreement. They did, however, execute a side letter in which they agreed "if necessary [*5] and appropriate, to explore the possibility of arriving at mutually acceptable terms for the grant to MBI of patent licenses under ECD/OBC's Hydride Battery Patents for large hydride battery applications such as electric vehicle propulsion." (D.I. 8 at Ex. 1)

Between 1992 and 1995, ECD/Ovonic and MBI continued to communicate while working independently to develop NiMH batteries for EV application. The record indicates that fairly frequent correspondence, meetings between engineers from both companies, and an exchange of sample batteries took place during this period. (D.I. 8 at Ex. I-K)

In May 1995, Stanford Ovshinsky, President and CEO of ECD, contacted Steve Kawauchi, Executive Vice President of MBI, and requested a meeting to discuss ECD's proposal for the licensing of EV battery technology. (D.I. 21 at B109) Two months later, MBI broke off negotiations, indicating through its attorney that it had "no interest in pursuing the ECD/OBC Proposal given to Mr. Kawauchi by Mr. Ovshinsky and also does not have any counterproposal to make to ECD/OBC." (D.I. 21 at B111) In response to this communication, ECD notified MBI that it was prepared to take legal action, ostensibly for patent [*6] infringement. (D.I. 8 at Ex. B-2) After a conciliatory reply from MBI and a letter from GM to MBI's parent company urging that negotiations resume, ECD decided not to file suit, and negotiations of some sort apparently continued. (D.I. 8 at Ex. B-4, B-5, B-6, B-7; D.I. 21 at B113-B129)

The final breakdown in negotiations, which led to this suit, occurred after ECD learned that Toyota planned a program for testing EVs in the United States using NiMH batteries manufactured by MBI. On February 5, 1996 ECD sent letters protesting this action to Toyota Sales, Southern California Edison Company (which was involved in the planned project), and MBI. (D.I. 21 at

B89-92; D.I. 8 at Ex. B-8) In its letter to MBI, ECD stated, "ECD would urge Matsushita to accelerate its discussions about the possibilities for the GM Ovonic Joint Venture. If a definite plan is developed for MBI participation and investment in GM Ovonic, ECD is prepared to resume discussions with MBI to resolve our outstanding issues in a satisfactory manner." (D.I. 8 at Ex. B-8) In response to this communication, ECD received a letter dated February 15 which stated, in its entirety, "Your letter to Steve Kawauchi was received while [*7] he is on a business trip out of the country. He will respond to you on his return." (D.I. 8 at Ex. B-9) On February 26, 1996 Ovonic, through its attorney, notified MBI of its belief that MBI was infringing Ovonic's *822 patent by supplying Toyota with EV batteries for testing in the United States. Ovonic demanded that MBI cease and desist or Ovonic would take legal action. (D.I. 8 at Ex. B-10) Two days later, without responding further to either of ECD/Ovonic's letters, MBI filed the instant declaratory judgment action.

## III. DISCUSSION

### A. Dismissal under the Declaratory Judgment Act

Plaintiffs filed this suit pursuant to the Declaratory Judgment Act, *28 U.S.C. §§ 2201-02.* [HN1] The Act gives the court before which a declaratory judgment action is brought discretion to hear, or refuse to hear, the suit. *Wilton v. Seven Falls Co., 515 U.S. 277, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995); Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 936 (Fed. Cir. 1993),* cert. denied, *510 U.S. 1140, 114 S. Ct. 1126, 127 L. Ed. 2d 434 (1994); Samuel Goldwyn, Inc. v. United Artists Corp., 113 F.2d 703, 709 (3d Cir. 1940).* [HN2] In general, a court may not dismiss a suit for a declaration of noninfringement on the ground that an infringement suit [*8] was subsequently filed. *Genentech, 998 F.2d at 937;* see generally *Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir. 1941),* cert. denied, *315 U.S. 813, 86 L. Ed. 1211, 62 S. Ct. 798 (1942)* ("In all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it."). This "first filed rule" gives the district court hearing the first filed case the power to enjoin later filed cases involving the same parties and the same issues. *EEOC v. University of Pennsylvania, 850 F.2d 969, 971 (3d Cir. 1988),* aff'd, *493 U.S. 182, 107 L. Ed. 2d 571, 110 S. Ct. 577 (1990).*

There are, however, certain recognized exceptions to the first filed rule, and other exceptions may be made "when justice or expediency requires, as in any issue of choice of forum." *Genentech, 998 F.2d at 937,* citing *Kahn v. General Motors Corp., 889 F.2d 1078, 1081-83 (Fed. Cir. 1989).* Defendants urge the court to find an exception to the first filed rule in this case because plaintiffs engaged in an improper "race to the courthouse" in order to avoid litigating in the Eastern District of Michigan. Defendants maintain that plaintiffs filed this action in bad faith, knowing that defendants were awaiting a response [*9] to their request for further negotiations. To allow this action to proceed, they argue, would penalize good faith efforts to negotiate and reward precipitous litigation. In addition, defendants argue that the comparative convenience of each forum to the parties and non-party witnesses weighs in favor of dismissing this action in favor of the later filed suit.

[HN3] Whether a party has filed a declaratory judgment action anticipatorily or in bad faith is a proper factor for the court to consider in deciding whether to dismiss a first filed action. *Serco Services Co., L.P. v. Kelley Co., Inc., 51 F.3d 1037, 1039-40 (Fed. Cir. 1995); Davox Corp. v. Digital Systems Int'l, Inc., 846 F. Supp. 144, 148 (D. Mass. 1993); Bausch & Lomb Inc. v. Alcide Corp., 684 F. Supp. 1155, 1158-60 (W.D.N.Y. 1987).* In Serco Services, the Federal Circuit held that "we cannot say that it was an abuse of discretion to consider that [plaintiff] intended to preempt [defendant's] infringement suit, as the district court found, as **one factor** in the decision whether to dismiss the declaratory suit in favor of [the] subsequent infringement action." *Serco Services, 51 F.3d at 1040* (emphasis [*10] added).

In the case at bar, the parties have offered conflicting versions of the tenor of their negotiations. Defendants maintain that they had a long and fruitful history of negotiations with plaintiffs, that they were patiently and in good faith awaiting a reply from Mr. Kawauchi, and that they were shocked to discover that plaintiffs had filed suit without having responded to defendants' offer to negotiate. Plaintiffs, on the other hand, characterize their decision to file suit as a reasonable response to defendants' repeated demands that MBI enter into a joint venture, despite MBI's emphatic rejection of previous such demands. Having received a letter from defendants explicitly threatening imminent legal action, plaintiffs argue that they reasonably and in good faith made the decision to file for declaratory judgment.

After reviewing the numerous affidavits and items of correspondence submitted by the parties, the court finds that the record is unclear as to the precise tone of the negotiations between the parties. Although MBI may have acted hastily in filing suit without responding to ECD/Ovonic's February 1996 letters, despite its indications that Mr. Kawauchi would respond, [*11] the court cannot conclude from the record before it that an improper race to the courthouse took place. Furthermore, even if plaintiffs' actions could be considered anticipatory, absent any other factors weighing toward dismissal or transfer, the court declines to grant defendants' motion on this ground alone. See Id. n2

n2 Defendants also argue that Michigan is a more convenient forum for the parties and non-party witnesses. As discussed fully in the following section, the court finds this argument unpersuasive. Thus, [HN4] the court will not consider convenience a factor in deciding whether to make an exception to the first filed rule.

## B. Transfer of Venue

[HN5] Title 28, Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Congress intended through Section 1404 to place discretion in the district court to adjudicate motions to transfer [*12] according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988).* [HN6] "The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court." *SportsMEDIA Technology Corp. v. Upchurch, 839 F. Supp. 8, 9 (D. Del. 1993).* The parties do not dispute that the Eastern District of Michigan is a proper venue for this action.

[HN7] A plaintiff's choice of forum should not be lightly disturbed. As a general rule, "because plaintiffs' choice of forum is accorded substantial weight, the burden is on the defendants to establish that the balance of convenience of the parties and witnesses **strongly** favors the defendants." *Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981)* (citing *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970),* cert denied, *401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971)* (emphasis added). Plaintiffs' choice of forum is "paramount." *Wesley-Jessen Corp. v. Pilkington Visioncare, 157 F.R.D. 215, 216, 863 F. Supp. 186 (D. Del [*13] 1993).*

### 1. Convenience of Parties and Witnesses

Defendants contend that "the Eastern District of Michigan is an unusually appropriate and convenient forum for all concerned." They assert that defendants and all of their likely fact witnesses reside in Michigan, that plaintiffs regularly conduct business there, and that third party witnesses, "all relevant files and corporate records," and Ovonic's testing facilities are located in Michigan.

[HN8] Even if the Eastern District of Michigan were the more convenient trial forum for both the parties and the non-party witnesses, this factor would not be sufficient to compel a transfer. This case is analogous to *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215, 863 F. Supp. 186 (D. Del. 1993).* In that case, a defendant made a similar showing regarding the locations of parties, documents, and nonparty witnesses. The court concluded that transfer was inappropriate for three reasons. First, the court noted that, for a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect. *Wesley-Jessen, 157 F.R.D. at 218.* Defendants in this case have [*14] argued that they do not operate nationally, and that their small size would result in a disproportionate burden on them if they were forced to litigate in Delaware. The record indicates, however, that defendants have attended meetings and negotiations throughout the world. The second factor noted by the court in Wesley-Jessen is the incorporation of defendant in Delaware. Here again, the court outlined the heightened burden on such a business. [HN9] "Absent some showing of a unique or unexpected burden, these corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient." Id. Finally, the court noted the somewhat archaic nature of the "convenience of the parties" factor in determining a motion to transfer:

> A third reason for denying the motion to transfer is that technological advances have substantially reduced the burden of having to litigate in a distant forum . . . . These technologies have shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is recorded and can be transferred and have lowered the cost of moving that information from one place to another.

[*15]

Id. The court also notes that discovery in this case will take place throughout the United States and in Japan. The overall burden of litigating this case, therefore, will likely be the same regardless of where the trial itself is to be held. In light of these factors, the court finds that defendants have not demonstrated that litigation in Delaware imposes on them a unique or unexpected burden.

### 2. Interests of Justice

Defendants argue that a transfer is warranted in the interests of justice. [HN10] In analyzing this claim, the court must consider judicial resources, cost to the parties, access to proof, and the availability of compulsory process. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 821 F. Supp. 962, 966 (D. Del. 1993).* No party contends that a transfer would have any impact on judicial resources or cost to the parties. Addressing compulsory process, defendants maintain that several important witnesses, who according to defendants are likely to be reluctant to testify, reside outside the reach of the court's subpoena power. The court addressed an analogous contention in *Critikon, 821 F. Supp. at 967.* In that case, defendant

> had not represented [*16] to the court that [the third party witness] would be unwilling to testify at trial voluntarily. Because [the witness] is a former employee of [defendant], . . . the court must assume that he would be willing to testify absent a subpoena.

In this case, defendants have offered the affidavit of David J. Bradford, who represented defendants in another patent infringement case in this district. Based on his experience in that case, Mr. Bradford asserts that GM, GM-Ovonic, Ford Motor Company, and USABC "will not voluntarily testify or produce documents in this case." (D.I. 29 at Ex. 3) Defendants have not specifically identified any witnesses who have refused to testify; despite Mr. Bradford's opinion, the court does not find defendants' showing of the necessity of compulsory process sufficient to warrant transfer.

With respect to the availability of records, this court held in Critikon:

> The location of documents, in the context of access to proof, in a document-intensive case such as this can be misleading. No matter where the trial is held, [defendant's] ... counsel and [plaintiff's] ... counsel will be required to travel to [various places] to select and [*17] produce the requested discovery. Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial.

*821 F. Supp. at 966-67.* In light of the wide geographical scope of discovery in this case, the possibility that the nonparties mentioned in Mr. Bradford's affidavit will have relevant evidence and will request protective orders in the Eastern District of Michigan is likewise unpersuasive. For these reasons, the court finds that defendants have not established that this factor compels the transfer of this action.

Based on the record as it presently stands, defendants have failed to demonstrate that the interests of justice dictate transferring this action.

### IV. CONCLUSION

For the forgoing reasons, defendants' motion to stay or dismiss the declaratory judgment action or, in the alternative, to transfer the case to the Eastern District of Michigan will be denied. Plaintiffs' motion to enjoin defendants' infringement suit in the Eastern District of Michigan will be granted. An order consistent with this opinion shall issue.

# Exhibit 6E



Slip Copy                                                                                                Page 1
Slip Copy, 2006 WL 3857492 (E.D.Pa.)
**(Cite as: 2006 WL 3857492 (E.D.Pa.))**

c

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
PEREGRINE SURGICAL, LTD.
v.
SYNERGETICS, USA, INC. and Synergetics, Inc.
**Civil Action No. 06-2237.**

Dec. 29, 2006.
Bruce E. Rodger, Paul Mardinly Durham James Flandreau & Rodger PC, Media, PA, Robert J. Basil, Collier & Basil, PC, New York, NY, for Peregrine Surgical, Ltd.

Adam S. Barrist, Frey Petrakis Deeb Blum Briggs & Mitts PC, Philadelphia, PA, Kara R. Yancey, Molly B. Edwards, Harness, Dickey & Pierce, PLC, St. Louis, MO, Matthew L. Cutler, Rudolph A. Telscher, JR., Harness Dickey & Pierce PLC, Clayton, MO, for Synergetics, USA, Inc. and Synergetics, Inc.

***MEMORANDUM & ORDER***

SURRICK, J.

 **\*1** Presently' before the Court is Defendants' Motion To Dismiss (Doc. No. 7). For the following reasons, Defendants' Motion will be granted.

 **I. BACKGROUND**

 Peregrine Surgical, Ltd. ("Peregrine") and Synergetics, USA, Inc. and Synergetics, Inc. ("Synergetics") are competitors in the field of surgical products for ophthalmic surgery. (Doc. No. 4 at 2 .) Synergetics is the holder of U.S. Patent No. 5,921,998 ("the '998 Patent") for the product, the Diamond Dusted Membrane Scraper ("DDMS"). (Doc. No. 7 at 2 .) Synergetics acquired the rights to the '998 Patent on October 1, 1999. (Id.) The DDMS is a surgical instrument that separates and removes proliferative membranes from the retina while reducing the risk of damaging the retina or forming a retinal tear. (Id.) Peregrine is engaged, and alleges that it was, at the time of the filing of the Complaint

in this case, engaged in the manufacturing and marketing of a product it calls "SOS," which shares certain physical characteristics with the DDMS. (Doc. No. 4 at 2.) On May 26, 2006, Peregrine filed a Complaint in this Court seeking a Declaratory Judgment against Synergetics. Peregrine seeks a judgment declaring that it has not committed any act of infringement with regard to the '998 Patent and an order permanently enjoining Synergetics from asserting any claims under the '998 Patent against Peregrine for any activity relating to Peregrine's SOS product. (Doc. No. 1.) Peregrine filed an Amended Complaint on June 19, 2006. (Doc. No. 4.)

 Synergetics and Peregrine engaged in prior litigation involving patent infringement actions for products not related to the '998 Patent. In 2004, Synergetics sued Peregrine in the Eastern District of Pennsylvania for patent infringement on two Synergetics patents for a connector/adapter system, patents which are not in dispute in the instant matter. (Doc. No. 11 at 3; *Synergetics Inc. v. Peregrine Surgical Ltd., et al.,* Civ. A. No. 04-CV-4939.) On January 1, 2006, Synergetics sued Peregrine for patent infringement in this district for patents and products not at issue in the 2004 suit or in the instant litigation. (*See Synergetics, Inc. v. Peregrine Surgical, Ltd., et al.,* Civ. A. No. 06-CV-107; Doc. No. 27 at 1.) [FN1] The 2004 case settled after mediation with the presiding judge, the Honorable Norma L. Shapiro. (Doc. No. 11 at 3-4.) On June 15, 2006, counsel for both parties met with Judge Shapiro to discuss the terms of a possible settlement. (Id. at 4 .) Among the terms discussed was the notion that Peregrine would not manufacture or sell its SOS product for a period of two years. (Id.) Peregrine's Board of Directors rejected this term and proposed an abstention of one year on the production and sale of the SOS. (Id.) Ultimately, the parties settled that litigation without any restrictions on the manufacture or sale of the SOS membrane scraper. (Id. at 4-5.) There were no discussions between the parties regarding the SOS product prior to the filing of the Complaint on May 26, 2006. (See id. at 5.) Moreover, at oral argument on the Motion to Dismiss, held on December 14, 2006, counsel for Synergetics stated, and counsel for Peregrine agreed, that Synergetics had no knowledge of the SOS product prior to Peregrine's filing of the instant Complaint seeking a declaratory judgment. (Hr'g Tr. at 6, 9, 10.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 2
Slip Copy, 2006 WL 3857492 (E.D.Pa.)
**(Cite as: 2006 WL 3857492 (E.D.Pa.))**

FN1. On November 12, 2006, Plaintiff filed a Motion for Leave to File a Surreply in Opposition to Motion to Dismiss Case (Doc. No. 27) in which it sought to file a surreply in the form of a Certification of Robert J. Basil. We will grant this Motion and consider the Certification to be Plaintiff's Surreply.

**\*2** On August 17, 2006, Defendants moved, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Complaint, arguing that there was no actual controversy when the Complaint was filed and hence that the Court lacks subject matter jurisdiction over the case. (Doc. No. 7.) On November 8, 2006 Synergetics filed suit against Peregrine in the United States District Court for the District of Missouri, claiming that Peregrine's SOS product infringes Synergetics's '998 Patent. (*Synergetics v. Peregrine Surgical Ltd.,* Civ. A. No. 06-CV-1632; Doc. No. 27 at 2.) On November 15, 2006, Plaintiff filed a Motion for Preliminary Injunction in this Court seeking an order barring Synergetics from taking any action in furtherance of the Missouri action until the declaratory judgment action in this Court is resolved. (Doc. No. 28.) As mentioned above, oral argument was held on the Motion to Dismiss on December 14, 2006. (Doc. No. 33.)

## II. LEGAL STANDARD

A motion to dismiss will be granted under Federal Rule of Civil Procedure 12(b)(1) when the court lacks subject matter jurisdiction over a claim. *EEOC v. Creative Playthings, Ltd.,* 375 F.Supp.2d 427, 431 (E.D.Pa.2005) (citing *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005)). When ruling on a 12(b)(1) motion, courts distinguish between "facial" attacks and factual attacks on a court's subject matter jurisdiction. *Id.* Courts review a "facial" attack based on the parties' pleadings but may look beyond the pleadings to determine jurisdiction in reviewing a factual attack. *Id; In re Kaiser Group Int'l Inc.,* 399 F.3d 558, 561 (3d Cir.2005). In either case, the plaintiff bears the burden of demonstrating that the court has proper jurisdiction over the claim. *Mash Enterprises, Inc. v. Prolease Atl. Corp.,* 199 F.Supp.2d 254, 256 (E.D.Pa.2002). When considering a "facial" challenge, we must accept all of the allegations in the Complaint as true and construe them in the light most favorable to the plaintiff. *In re Kaiser Group Int'l,* 399 F.3d at 561. We may also consider exhibits attached to the Complaint, matters of public record, and

"undisputedly authentic" documents that a defendant attaches to the motion to dismiss. *EEOC v. Equicredit Corp. of Am.,* Civ. No. 02-844, 2002 WL 31371968, at \*2 n. 1 (E.D.Pa. Oct.8, 2002) (citing *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993)). [FN2]

FN2. Defendants do not specify whether they bring a facial or factual attack on the Court's subject matter jurisdiction. In assessing this Motion, we have considered the pleadings as well as the parties' statements at oral argument.

## III. DISCUSSION

### A. Standard for Declaratory Judgment Actions in Patent Cases

Declaratory Judgment actions may only be brought when an "actual controversy" exists between "interested parties." 28 U.S.C. § 2201(a); *B.P. Chems., Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 977 (Fed.Cir.1993). When courts are asked to make declaratory judgments where patent rights are involved, courts apply a two-prong test to determine whether an actual controversy exists. *Id. at 978.* The test requires the existence of both: "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Id.; see also Interdynamics, Inc. v. Firma Wolf,* 698 F.2d 157, 166 (3d Cir.1983) (citing *Int'l Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210-11 (7th Cir.1980)). [FN3]

FN3. We note that "the question of what test to apply to determine the justiciability under the Declaratory Judgment Act in a patent case 'pertains to patent law' " and, as a result, "Federal Circuit jurisprudence controls." *Institut Pasteur v. Simon,* 332 F.Supp.2d 755, 757 n. 2 (E.D.Pa.2004) (citing *Flex-Foot, Inc. v. CRP, Inc.,* 238 F.3d 1362, 1365 (Fed.Cir.2001)).

### B. Reasonable Apprehension

**\*3** The Complaint alleges and Plaintiff confirmed during oral argument that Peregrine is, and was at the time the Complaint was filed, engaged in the manufacture and marketing of its SOS product. (Doc. No. 1 at 2; Hr'g Tr. at 9.) The Complaint alleges that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3
Slip Copy, 2006 WL 3857492 (E.D.Pa.)
**(Cite as: 2006 WL 3857492 (E.D.Pa.))**

Peregrine has already produced this product for sale and has accepted purchase orders for it. (Doc. No. 1 at 2.) The Complaint also alleges that the product shares certain characteristics with Synergetics's DDMS product such that its production and sale of the SOS product could constitute infringement of the '998 Patent. (*Id.*) The fact that Synergetics has now filed suit in Missouri alleging that the SOS product infringes the '998 Patent certainly supports this allegation. Clearly, Plaintiff has established the second prong of the two-prong test--that it is engaged in activity that could constitute infringement. The first prong, whether Synergetics created a reasonable apprehension on the part of Peregrine that Peregrine would face an infringement suit based on its SOS product, is more problematic.

Defendants claim, and Plaintiff does not disagree, that Synergetics had no knowledge of the SOS product until Plaintiff filed its Complaint for declaratory relief on May 26, 2006. (Hr'g Tr. at 6, 9, 10.) Plaintiff points to two events, both of which occurred after the Complaint was filed, in support of its contention that an actual controversy exists. First, Peregrine points to the June 15, 2006 settlement conference with Judge Shapiro in the separate litigation between the parties, during which the SOS product was discussed. At this conference, Defendants proposed, as a part of the settlement, that Plaintiff abstain from manufacturing and marketing its SOS product for two years. Plaintiff proposed a one year moratorium, which Defendants rejected. The matter was settled without agreement on the SOS product. Plaintiff asserts that these negotiations demonstrate that Synergetics had a significant amount of information about the SOS product by June 15, 2006, enough to demand a two-year moratorium and reject a proposed one-year moratorium. (Doc. No. 11 at 5.) In addition to the settlement negotiations in June 2006, Plaintiff points to the November 2006 filing of the Missouri patent infringement case, the realization of Peregrine's concerns that its SOS product would bring a patent infringement suit by Synergetics. (Doc. No. 27 at Certification ¶ 4.)

While Plaintiff is correct that the June 2006 negotiations and the Missouri suit filed in November 2006 together demonstrate that there is currently an actual controversy, neither of these events is dispositive on the issue of subject matter jurisdiction in this case. "An objective standard governs whether a party is under a reasonable apprehension of suit." *Black & Decker, Inc. v. Robert Bosch Tool Corp., 371 F.Supp.2d 965, 968 (N.D.Ill.2005).* In order to

find that subject matter jurisdiction is proper, we must find that Plaintiff had a reasonable apprehension that it would face a patent infringement suit at the time it filed its Complaint. *West Interactive Corp. v. First Data Res., Inc., 972 F.2d 1295, 1297 (Fed.Cir.1992)* (court applies test for reasonable apprehension "at the time the complaint is filed"); *Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 883 (Fed.Cir.1985)* ( "The test is an objective one--reasonable apprehension, like other jurisdictional prerequisites, must exist at the time suit is filed."); *Holley Performance Prods., Inc. v. Barry Grant, Inc., No. 04 C 5758, 2004 WL 3119017, at *2 (N.D.Ill.Dec.20, 2004).* As a result, events that occurred after the filing of the Complaint cannot control. *See Fairplay Elec. Cars, LLC v. Textron Innovations, Inc., 431 F.Supp.2d 491, 493 (D.Del.2006)* (holding that plaintiff cannot rely on a letter to establish reasonable apprehension because it was sent after the lawsuit was filed). Under the circumstances, neither the settlement negotiations before Judge Shapiro nor the subsequently filed Missouri action can be relied upon to demonstrate that reasonable apprehension existed at the time that Peregrine filed its Complaint in this case on May 26, 2006.

**\*4** In addition to its attempt to rely on the two subsequent events to demonstrate reasonable apprehension of suit, at oral argument Peregrine also suggested that we may find that it has met the first prong of the actual controversy test by looking to the totality of circumstances in existence at the time the Complaint was filed. In particular, Peregrine points to three factors, which led it to file the declaratory judgment action: (1) the history of litigiousness between these two parties; (2) the similarity of the products; and (3) Defendants' competitive nature in this field. (Hr'g Tr. at 15.) Plaintiff is correct that "courts must examine the totality of circumstances in determining whether a controversy exists." *Black & Decker, Inc., 371 F. Supp 2d at 968* (citing *C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 880 (Fed.Cir.1983)).* In addition, Plaintiff correctly points to language in *Interdynamics, Inc. v. Firma Wolf,* in which the Third Circuit commented that in applying the actual controversy test to fact situations, " 'courts should make a pragmatic judgment, aware of the business realities that are involved.' " *Interdynamics, Inc., 698 F.2d at 168* (quoting *Sherwood Med. Indus., Inc. v. Deknatel, Inc., 512 F.2d 724, 728 (8th Cir.1975)).* Nevertheless, we are compelled to conclude that under the totality of circumstances present in this case, Plaintiff has failed to demonstrate a reasonable apprehension of suit at the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time the Complaint was filed.

A review of the case law on this issue makes clear that the mere history of litigiousness coupled with Plaintiff's perception of Defendants' competitive nature and the similarity of the products at issue is not sufficient. First, a prior history of litigation is not necessarily relevant to the determination at all. The fact that a company has engaged in prior litigation over other patents does not produce a reasonable apprehension of suit in the instant case. *See Glaxo Group, Ltd. v. Dr. Reddy's Labs., Ltd.,* 325 F.Supp.2d 502, 507 (D.N.J.2004) ("[T]he fact that Glaxo has previously exhibited litigious tendencies with respect to other patents does not produce a reasonable apprehension of litigation in this case."); *see also Fairplay Elec. Cars, LLC,* 431 F.Supp.2d at 493 (distinguishing case from one where reasonable apprehension found because prior litigation involved different product than the one at issue in instant litigation); *cf. Sherwood Med. Indus., Inc .,* 512 F.2d at 728 (finding prior litigation, along with other factors, to create reasonable apprehension when prior litigation involved same patent). While some courts have found prior litigation to be relevant to this determination, they do so in cases where the prior litigation involves the same product, technology, or patent that is at issue in the declaratory judgment action. *See Sherwood Med. Indus., Inc.,* 512 F.2d at 728; *Interdynamics, Inc.,* 698 F.2d at 168, 168 n. 12 (finding reasonable apprehension when prior and instant litigation arose in context of contempt proceedings for violation of consent decree on same patent). In the instant case, Plaintiff can point to no suits on the '998 Patent by Synergetics against any party before Peregrine filed its declaratory judgment action. The two prior suits between Peregrine and Synergetics involved unrelated patents and unrelated products. The fact that two companies that are both engaged in the production of ophthalmic surgical devices have a history of patent infringement litigation involving other products does not create an objectively reasonable apprehension of suit in this case.

*5 In addition, the history of litigation coupled with the fact that Peregrine considers Synergetics to be a fierce competitor and the fact that the products are similar do not, by themselves, create a reasonable apprehension of suit. More is required. For example, in *Sherwood Medical Industries,* the Eighth Circuit found a reasonable apprehension of suit based on the totality of circumstances where the plaintiff pointed to four separate actions on the part of the defendant that led to its reasonable apprehension. The court

considered the following circumstances:

> First, [defendant] had brought an action for infringement of these patents against another competitor in this field around 1969. Second, [defendant]'s patent attorney wrote [a], letter to [plaintiff], subtly pointing out that [defendant] had sued in the past to protect its patents and that it wished to determine whether or not [plaintiff]'s device might also infringe this patent. Third, even after [plaintiff] refused to send a sample, [defendant] went to some effort to obtain some of [plaintiff]'s units for examination. Fourth, a high ranking employee of [defendant], its director of new products, told [plaintiff]'s project manager that [plaintiff's] devices infringed the patents and that this was the opinion of [defendant]'s attorneys also. *Sherwood Med. Indus., Inc.,* 512 F.2d at 728.

In contrast, in *Indium,* the Federal Circuit upheld the district court's dismissal of declaratory judgment claims despite evidence of prior litigation by the patent holder and a letter by the patent holder to the declaratory judgment plaintiff offering the plaintiff an opportunity to license the patent at issue on a non-exclusive basis. *Indium Corp. of Am.,* 781 F.2d at 883. Similarly, in *West Interactive,* the Federal Circuit rejected the notion that a meeting between third parties could constitute sufficient evidence of reasonable apprehension of suit. At the meeting between a licensee of the patent at issue and a third party, the licensee commented that both the plaintiff and the third party had infringed the patents at issue. While the third party communicated this conversation to the plaintiff, the court did not consider these third party communications to be sufficient evidence of reasonable apprehension. *West Interactive Corp.,* 972 F.2d at 1297-98.

In this case, Plaintiffs have failed to present sufficient evidence to satisfy the objective actual controversy test. Plaintiffs can point to no communication at all between the parties about this patent prior to the filing of the declaratory judgment action. The only communication between the parties came in June 2006, after the Complaint had been filed. In addition, Plaintiff concedes that Defendants did not even have any knowledge of its SOS product prior to the commencement of the instant litigation. The only prior litigation between the two parties involved patents that are not at issue in the instant litigation. This history cannot, on its own, support a finding of reasonable apprehension. The fact that Plaintiff considers Defendant to be a fierce competitor is certainly not sufficient for the Court to conclude that there was an objectively reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 3857492 (E.D.Pa.)
**(Cite as: 2006 WL 3857492 (E.D.Pa.))**

apprehension of suit. We acknowledge that Plaintiff's conclusion that it would face a patent infringement suit by Synergetics ultimately proved true. However, this suggests merely that Peregrine made an astute prediction based on the circumstances, not that there was sufficient evidence to satisfy the burden of the objective actual controversy test. "[A]lthough the apprehension may have been real, we do not agree that it was reasonable on the present record." *Indium Corp. of Am., 781 F.2d at 883*.

**\*6** In reviewing all of the facts and circumstances, we are compelled to conclude that Peregrine has failed to carry its burden of establishing that it had a reasonable apprehension of suit under the '998 Patent at the time it filed the declaratory judgment action. Accordingly, we will grant Defendants' Motion to Dismiss for lack of subject matter jurisdiction.

An appropriate Order follows.

### *ORDER*

AND NOW, this *29th* day of December, 2006, upon consideration of Defendants' Motion To Dismiss (Doc. No. 7) and all papers submitted in support thereof and in opposition thereto, and after oral argument, it is ORDERED as follows:

1. Plaintiff's Motion for Leave to File a Surreply in Opposition to Motion to Dismiss Case (Doc. No. 27) is GRANTED.

2. Defendants' Motion to Dismiss (Doc. No. 7) is GRANTED. Plaintiff's Complaint is DISMISSED with prejudice.

IT IS SO ORDERED.

Slip Copy, 2006 WL 3857492 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 2304093 (Trial Pleading) Amended Complaint Declaratory Judgment Action (Jun. 14, 2006)Original Image of this Document (PDF)

• 2006 WL 1557115 (Trial Pleading) Complaint (May 26, 2006)Original Image of this Document (PDF)

• 2:06cv02237 (Docket) (May 26, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6F



Slip Copy                                                                                                          Page 1
Slip Copy, 2006 WL 2726728 (D.Del.)
**(Cite as: 2006 WL 2726728 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
POSITEC USA INC., and Positec USA Inc.,
Plaintiffs,
v.
MILWAUKEE ELECTRIC TOOL
CORPORATION, Defendant.
**C.A. No. 05-890 GMS.**

Sept. 25, 2006.

William J. Marsden, Jr., Fish & Richardson, P.C.,
Wilmington, DE, for Plaintiffs.

Jack B. Blumenfeld, Leslie A. Polizoti, Morris,
Nichols, Arsht & Tunnell LLP, Wilmington, DE, for
Defendant.

*MEMORANDUM*

GREGORY M. SLEET, District Judge.

**I. INTRODUCTION**

**\*1** On December 27, 2005, Positec USA Inc. (a
North Carolina corporation) and Positec USA Inc. (a
South Carolina corporation) (collectively, "Positec
USA") brought this declaratory judgment action
against Milwaukee Electric Tool Corporation
("Milwaukee"). Presently before the court is
Milwaukee's Motion to Dismiss (D.I.9). For the
following reasons, the court will deny the motion to
dismiss.

**II. BACKGROUND**

Milwaukee is the assignee of U.S. Patent Nos.
6,108,916 (the "'916 patent"), 6,301,790 (the "'790
patent"), and 6,588,112 (the "'112 patent")
(collectively, the "patents-in-suit"). The patents-in-
suit are directed to circular saws having a movable
handle. (D.I. 4 ¶ ¶ 13, 16-17.) In September 2005,
Milwaukee became aware of the WORX Circular
Saw (the "WORX Saw"), which is manufactured by
one of the companies of Positec Group Limited (the
"Positec Group"). (D.I. 12, at 3.) Milwaukee

contacted Positec Germany GmbH ("Positec
Germany"), by letter, to inquire further about the
design of the WORX Saw, and to get some
information about the manufacturer of the saw. (D.I.
10, at 2.) Milwaukee's letter also included copies of
the patents-in-suit. Positec Germany responded to
Milwaukee, via email, stating that it had forwarded
the September 2005 letter and patents-in-suit to
Positec Machinery Co. Ltd. ("Positec China"). (D.I.
12, at 5.) On October 10, 2005, Milwaukee sent a
letter and copy of the patents-in-suit to Positec China
to again inquire about the design of the WORX Saw
and its manufacturer. (D.I. 10, at 2.) Positec China
responded on October 23, 2005, stating that "Positec
does not make use of any valid claim of Milwaukee."
*(Id.)* On November 4, 2005, Milwaukee responded,
requesting the basis for Positec China's claim that
Positec did not infringe and sales information
regarding the WORX saw. *(Id.)* Positec China did not
respond to the letter. *(Id.)* On December 15, 2005,
Milwaukee sent another letter to Positec China,
which stated that certain claims of the patents-in-suit
were infringed by the WORX Saw. (D.I. 13, Ex. 7 at
2 .) The letter advised Positec China to "immediately
cease" the manufacture, offer for sale, sale, and use
of the WORX Saw. *(Id.)* The letter further stated that
Milwaukee "will be forced to commence an
infringement action," in the event that Positec China
did not cease its activities by December 29, 2005.
*(Id.)* Finally, the letter insisted that Positec China
provide the contact information of the manufacturer,
if it did not manufacture the WORX Saw, and the
contact information for the importer of the saws so
that "Milwaukee can enforce its intellectual property
rights against such parties." (Id. at 3.) Positec USA
subsequently brought the present declaratory
judgment lawsuit against Milwaukee.

Positec USA alleges that Milwaukee's conduct has
given it a reasonable apprehension that Milwaukee
would sue it for patent infringement. (D.I. 1 ¶ 21.)
Accordingly, Positec USA asks the court to declare
all claims of the patents-in-suit invalid and non-
infringed. *(Id.* at Prayer for Relief.)

**\*2** On January 17, 2006, Milwaukee filed a motion
to dismiss for lack of subject matter jurisdiction.
Also, on January 17, 2006, Milwaukee sent another
letter to Positec China, "explain[ing]" that its prior
correspondence with Positec Germany and Positec
China, including the December 15, 2005 letter, "was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 2726728 (D.Del.)
(Cite as: 2006 WL 2726728 (D.Del.))

only intended to 'initiate a dialogue in the hopes of reaching an amicable global business resolution.' " (D.I. 14, at 3.)

## III. DISCUSSION

Milwaukee contends that the court should dismiss this declaratory judgment action because Positec USA had no objectively reasonable apprehension of imminent suit on the '916, '790, and '112 patents and, therefore, its claims are premature. In other words, Milwaukee contends the court lacks subject matter jurisdiction over Positec USA's declaratory judgment action.

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such a challenge may present either a facial or a factual challenge to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977).* When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. *Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir.2000).* The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiff's favor. *See id.* Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. *Lang v. Pacific Marine & Supply Co., 895 F.2d 761, 764 (Fed.Cir.1990).*

The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy ... [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201(a).* Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an "actual controversy between the parties ." *Medimmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1378-79 (Fed.Cir.2005)* (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1331 (Fed.Cir.2005)).* "In general, the presence of an 'actual controversy' within the meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *EMC Corp. v. Norand Corp.,*

*89 F.3d 807, 810 (Fed.Cir.1996)* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).*

**\*3** However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H .B. Fuller Co., 940 F.2d 631, 634 (Fed.Cir.1991), cert. denied, 112 S.Ct. 658 (1991).* Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Teletronics Pacing Sys., Inc. v. Ventritex, Inc., 982 F.2d 1520, 1526 (Fed.Cir .1992)* (citations omitted).

In the patent context, the Federal Circuit has developed a two-part test for determining whether the declaratory judgment action is justiciable: (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken by the declaratory judgment plaintiff with the intent to conduct such activity. *See Goodyear Tire & Rubber Co. v. Releasomers Inc., 824 F.2d 953, 955 (Fed.Cir.1987)* (citations omitted). In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc., 742 F.2d 1388, 1399 (Fed.Cir.1984).*

Here, neither party disputes that the second element has been satisfied. Thus, the court's determination turns on whether Positec USA has a reasonable apprehension of suit. Positec USA, therefore, must be able to demonstrate that it has a reasonable apprehension of imminent suit. *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)* (this requirement of imminence reflects the mandate in Article III of the U.S. Constitution that the injury in fact be "concrete," and "actual or imminent, not conjectural or hypothetical"); *see Teva Pharms. v. Pfizer, Inc., 395 F.3d 1324, 1333 (Fed.Cir.2005); E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp., 383 F.Supp.2d 642, 647 (D.Del.2005).*

In the present case, Positec USA asserts that it had a reasonable apprehension of an imminent patent infringement suit when it filed this declaratory judgment action, based on Milwaukee's explicit and unambiguous threats to institute litigation against the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

manufacturer and importer of the WORX Saw. More particularly, Positec USA points to the December 15, 2005 letter from Milwaukee to Positec China, its sister company, which states that Milwaukee "will be forced to commence an infringement action to enforce its intellectual property rights and to stop your company's infringement," if Positec China has not ceased infringing activities by December 29, 2005. (D.I. 11, Ex. 7 at 2.) In the letter, Milwaukee also inquires as to whether Positec China is the manufacturer of the WORX Saw and, if Positec China is not the manufacturer, "insist[s] that [Positec China] provide to [it] *immediately* the name, address and contact information of the manufacturer and of the importer, if these parties are different, so that Milwaukee can enforce its intellectual property rights against such parties." (*Id.* at 2-3) (emphasis in original). Milwaukee's letter further "insist[s] that Positec China provide it "a full and complete accounting of any infringing circular saws or power tools manufactured, *sold,* or used in Germany, in the United Kingdom, or *in the U.S.*" (*Id.* at 2) (emphasis added).

**\*4** After having read and considered Milwaukee's December 15, 2005 letter, the court concludes that it contains an explicit and direct threat of a patent infringement suit against Positec China. [FN1] However, the question remains as to whether the letter constitutes an explicit threat of infringement against Positec USA. Positec USA maintains that the letter does. As support, Positec USA offers the following evidence: (1) the letter does not speak to only the manufacturer of the WORX Saw, but also the importer and seller of the saw in the United States; (2) Positec China is the sister corporation of Positec USA; and (3) Positec USA is the only company of the Positec Group that imports and cells the WORX Saw in the United States.

> FN1. Milwaukee contends in its reply brief that its January 17, 2006 letter to Positec China regarding the patents-in-suit evidences an intention to address patent issues directly with Positec China, the manufacturer of the saw. According to Milwaukee, the letter "explains that its prior correspondence, including the December 15, 2005 letter, was intended to 'initiate a dialogue in the hopes of reaching an amicable global business resolution.' " (D.I. 14, at 10; D.I. 15, Ex. 9 at 1.) The letter discusses the present case, and states that Milwaukee "has no intention of litigating its referenced patents against Positec USA or

any other customer, distributor or sales representative of Positec China at this time." (*Id.*) The letter also states that Milwaukee hopes to avoid litigation entirely by communicating directly with Positec China. (*Id.*) The court finds that Milwaukee's attempt, after the commencement of this lawsuit, to backpedal and "explain" the real intention of its prior letters belies its assertion that it did not threaten litigation against Positec USA.

Conversely, Milwaukee contends that the December 15, 2005 letter was addressed to only the manufacturer of the saw and, therefore, Milwaukee has not threatened to sue importers of the saw. Milwaukee refers the court to the following line in the letter for support: "If your company does not manufacture the WORX Circular Saw ... we insist that you provide to us immediately the name, address and contact information of the manufacturer and of the importer, if these parties are different, so that Milwaukee can enforce its intellectual property rights against such parties." (D.I. 14, at 4 .) Milwaukee contends that the above-cited language "clearly indicates that [its] intention was simply to ascertain whether Positec China manufactures the WORX Circular Saw, in order to make certain that [it] was communicating with the proper party." (*Id.*)

After having considered the parties' positions, the court concludes that Positec USA's argument is more persuasive for several reasons. First, while Milwaukee contends that its December 15, 2005 letter was not meant to threaten importers of the WORX Saw, the actual words of the letter tell a different story. Contrary to Milwaukee's position, the letter directly implicates importers of the saw, even though it does not directly name any, by insisting that Positec China provide Milwaukee with contact information of the manufacturer and importer, so that it could enforce its intellectual property rights as to both of them. In addition, the letter requests an accounting of any "infringing circular saws ... manufactured, sold or used ... in the U.S." (D.I. 11, Ex. 7 at 2.) This request begs the question: why would Milwaukee ask for information regarding importers, sales, and use in the United States if it only desired to sue the manufacturer of the saws. Given the foregoing, the court cannot conclude that Milwaukee's actions were directed only to the manufacturer of the saws.

Furthermore, courts have held indirect charges of patent infringement sufficient to support a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 2726728 (D.Del.)
(Cite as: 2006 WL 2726728 (D.Del.))

declaratory judgment action challenging the validity of a patent. *Volkswagen of America v. Engelhard Minerals & Chemicals Corp.,* 401 F.Supp. 1210 (S.D.N.Y.1975); *see Lex Computer & Management Corp. v. CBS Inc.,* 684 F.Supp. 811 (S.D.N.Y.1988). In the *Volkswagen* case, Volkswagen's United States subsidiary, Volkswagen of America ("VWA"), filed a declaratory judgment action of non-infringement against a company holding patents directed to catalytic converters. *Volkswagen,* 401 F.Supp. at 1212-13. The defendant moved to dismiss for lack of subject matter jurisdiction and argued that VWA's European parent, and not VWA, was threatened with an infringement suit. *Id.* at 1213. The court denied the motion to dismiss, noting that "[i]n patent cases, a justiciable controversy has been found to exist where a patentee has 'charged' a company with infringement, either directly or indirectly, provided that company has already begun to produce and sell the allegedly infringing device, or made substantial preparations to do so." *Id.* (quoting *Muller v. Olin Mathieson Chem. Corp.,* 404 F.2d 501, 504 (2d Cir.1968)). The court further noted that the "charge of infringement" requirement is to be liberally construed. *Volkswagen,* 401 F.Supp. at 1213. Finally, the court held that "[i]ndirect, as well as direct charges of infringement may be sufficient to support a declaratory judgment action challenging the validity of a patent," and that "any infringement charge against [VWA's parent] with respect to cars imported into the United States creates a very significant risk of suit for VWA, the wholly-owned subsidiary ... and the sole importer and distributor of Volkswagens in the United States." *Id.* at 1214.

**\*5** The facts of the present case are strikingly similar to those in *Volkswagen.* Here, Positec USA is a sister company to Positec China, and the sole importer of the WORX Saw in the United States. (See D.I. 13 ¶¶ 3-4.) Therefore, any infringement charge against Positec China with respect to WORX Saws imported into the United States creates a very significant risk of suit for Positec USA. Given these facts, the court concludes that Positec USA has demonstrated a reasonable apprehension of an infringement suit by Milwaukee, based upon Milwaukee's indirect threat of infringement in its December 15, 2005 letter. [FN2] Accordingly, the court will exercise its discretion to hear this declaratory judgment action and deny Milwaukee's motion to dismiss.

FN2. Milwaukee cites *R & P Pools, Inc. v. The New Kayak Pool Corp.,* Case No. 01-CV0051E(M), 2001 U.S. Dist. LEXIS 1505, at *1-2 (W.D.N.Y. Feb. 14, 2001), as

supporting dismissal of this action for lack of subject matter jurisdiction. In *R & P Pools,* the district court dismissed a declaratory judgment action brought by a retailer, and based on a cease and desist letter sent from the patentee to a supplier of the retailer. *Id.* at *2. The court concluded that the plaintiff was attempting to assert the right of the supplier to bring the declaratory action, because the plaintiff believed that the supplier would not do so. *Id.* at *5. This court concludes that *R & P Pools* is distinguishable from the present case. First, *R & P Pools* is distinguishable because, in that case, the court noted that the plaintiff "d[id] not state that it fears that [the] defendant will bring an infringement suit against it." *Id.* In addition, the plaintiff even stated that the defendant had never asserted that its products infringe the patents-in-suit. *Id.* Here, in contrast, Positec USA alleges that it had a fear of an imminent suit when it filed its complaint based on Milwaukee's threats in its December 15, 2005 letter. Positec USA also alleges that Milwaukee asserted that its product, the WORX Saw, infringes the patents-in-suit. Further, in *R & P Pools,* the only relationship between the plaintiff and the third party was that of supplier and retailer. In the present case, Positec USA is a sister company of Positec China, and its only importer and seller of the WORX Saw in the United States. For these reasons, the court finds *Volkswagen,* and not *R & P Pools,* more on point with the facts of this case.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss (D.I.9) is DENIED.

Slip Copy, 2006 WL 2726728 (D.Del.)

### Motions, Pleadings and Filings (Back to top)

• 2006 WL 3427194 (Trial Pleading) First Amended Complaint for Declaratory Judgment (Oct. 2, 2006)Original Image of this Document (PDF)

• 2006 WL 819700 (Trial Motion, Memorandum and Affidavit) Milwaukee Electric Tool Corporation's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 2726728 (D.Del.)
**(Cite as: 2006 WL 2726728 (D.Del.))**


Reply in Support of its Motion to Dismiss for Lack of
Subject Matter Jurisdiction Pursuant to Federal Rule
of Civil Procedure 12(b)(1) (Feb. 7, 2006)Original
Image of this Document (PDF)

• 1:05cv00890 (Docket) (Dec. 27, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6G



**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
SIRIUS SATELLITE RESEARCH INC., Plaintiff,
v.
ACACIA RESEARCH CORPORATION and Acacia
Global Acquisition Corp., Defendants.
**No. 05 Civ. 7495(PAC).**

Jan. 30, 2006.

*OPINION & ORDER*

CROTTY, J.

*\*1* Plaintiff Sirius Satellite Radio Inc. ("Plaintiff" or "Sirius") commenced this action on August 24, 2005, seeking a declaratory judgment that a patent owned by defendants Acacia Research Corporation and Acacia Global Acquisition Corp. (collectively, "Defendant" or "Acacia") is invalid or, in the alternative, that Sirius is not infringing the patent. Acacia now moves to dismiss the Complaint, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, [FN1] on the grounds that the pre-action communications between the parties, which form the basis of plaintiff's complaint, do not create an actual controversy. The Court agrees with Acacia; finds that it lacks subject matter to entertain this action; and, accordingly, dismisses the complaint.

> FN1. Acacia bases its Federal Rule 12(b)(6) argument on the same failure to create an actual controversy as the Federal Rule 12(b)(1) argument. Since the existence of an actual controversy speaks to the subject matter jurisdiction of the Court, the proper motion would be a motion to dismiss pursuant to Federal Rule 12(b)(1). Therefore, the Court will treat Acacia's motion solely as a motion to dismiss pursuant to Federal Rule 12(b)(1) for lack of subject matter jurisdiction.

FACTS

Sirius is a corporation providing digital satellite radio service throughout the United States. (Compl.¶ 4.) Acacia is a corporation in the business of purchasing patents from third parties and licensing or enforcing them. (*Id.* ¶ 5.)

On November 5, 1991, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 5,063,610 (the "610 Patent") to the inventor, David Alwadish. (*Id.* ¶ 7.) The 610 Patent covers a system for broadcasting material together with related program information, such as the name of the song or its artist. (*Id.*) Alwadish sold the 610 Patent to Global Patent Holdings, Inc., which in turn sold it to Acacia in January 2005. (*Id.* ¶ 8.)

Acacia immediately began enforcing, and attempting to license, the 610 patent. By letter dated March 30, 2005, Robert Berman, the Chief Operating Officer and General Counsel of Acacia, wrote to Sirius, alleging that the 610 Patent "covers a service being offered by Sirius." (Caplan Decl., Ex. A.) In the letter, Acacia urged Sirius to consult outside patent counsel to determine if its service infringed the 610 Patent, expressed its desire to resolve the matter "amicably without the need for excessive legal costs," and communicated its interest in negotiating an exclusive license. [FN2] (*Id.*) Mr. Berman made himself and the company engineers available for consultation and advised that he would follow up in thirty days if he did not hear from a Sirius representative in the interim. (*Id.*)

> FN2. The exact language reads:
> I would expect that you will send this matter to outside patent counsel for review. We will make our engineers and attorneys available to you via telephone, and are also available to meet in person with you and your counsel to answer any questions and provide any additional material you may need. As before, our goal is to resolve this matter amicably without the need for excessive legal costs.
> If you act quickly, we are also prepared to discuss an exclusive license for Sirius ...
> .... I will contact you in approximately 30 days to check on the status of this matter and discuss next steps.
> (*Id.*)

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2006 WL 238999 (S.D.N.Y.)
**(Cite as: 2006 WL 238999 (S.D.N.Y.))**

Sirius immediately retained outside counsel to review the matter. [FN3] (Caplan Decl. ¶ ¶ 1-3 & Exs. C-G, L.) Sirius's attorney, Mr. Jonathan D. Caplan, attempted to investigate Acacia's allegations, but discovered that filewrapper-the record of proceedings before the USPTO resulting in the issuance of the 610 Patent-had disappeared. [FN4] (Id. ¶¶ 4-5.) Unable to fully investigate the potential infringement without the filewrapper, Sirius refused to commence license negotiations with Acacia. (Id.)

> FN3. Sirius retained Mr. Jonathan Caplan, Esq., of Kramer Levin Naftalis & Frankel LLP, immediately upon receipt of the March 30, 2005 letter. (See Caplan Decl. ¶ ¶ 1-3.) All subsequent communication between Sirius and Acacia went through Mr. Caplan, rather than through Sirius's in-house counsel, business executives, or patent specialists. (Id., Ex. C-G, L.) Acacia, on the other hand, continued to handle the matter in house, through its General Counsel. (Id.)

> FN4. Thorough investigation revealed that the USPTO had lost the filewrapper, neither the inventor nor his patent attorney had retained a file, and Acacia was not given a file when it obtained the patent from Global Patent Holdings. (Caplan Decl., Ex. G.)

In an effort to facilitate license negotiations, Acacia made the inventor and his attorney available to Sirius. (Id., ¶ 6 & Exs. C-D.) Acacia limited the scope of questioning, however, to issues of patent prosecution (i.e., office actions, meetings with examiners, changes to claims, and all other proceedings directly related to the grant of the patent by the USPTO), not "general discovery." (Id., Ex. D, at 1.) After interviewing both the investor and his patent prosecution attorney, Sirius still refused to enter license negotiations. (Id. Ex. C.)

**\*2** Acacia continued to press the matter. On June 17, 2005, Mr. Berman wrote another letter to Sirius stating that it expected a "substantive response to [its] infringement allegations and license request within [a] two week period." (Id.) Two weeks came and went without a definitive answer; however, Acacia took no action that would suggest an impending infringement suit. Instead, Acacia continued to push for license negotiations. (Id., Exs. E & G.) For example, on August 4, 2005, Acacia faxed Sirius the one document it was able to locate from the filewrapper. (Id., Ex. E) Rather than spur

negotiations, after reviewing this document-a May 30, 1991 letter discussing the allowability of the Alwadish patent's main claim 1 in view of another pre-existing patent-Sirius concluded that it could not be infringing the 610 patent and therefore would not negotiate a license. (Id., Exs. F & L.)

Sirius communicated its position to Acacia on August 15, 2005. (Id., Ex. F.) In the letter, Sirius expressly declared: "Sirius does not, and cannot infringe the Alwadish patent ... Therefore, Sirius considers this matter closed-the Alwadish patent does not apply to Sirius." (Id.) Acacia responded the same day. (Id., Ex. G.) In its response letter, Acacia challenged Sirius's interpretation of the 1991 letter, suggesting that the 1991 letter "cut the heart out of Sirius's defense," and therefore strengthens Acacia's case, and urging further discussions between the two companies, "so that [Acacia's] engineers can explain to [Sirius] how [they] believe Sirius is infringing the Alwadish patent, and [Sirius] can in turn, explain how [it] is not." [FN5] (Id.)

> FN5. The letter actually states:
> I understand your frustration in that the [1991] letter ... seems to cut the heart out of Sirius' defense. Your contention is that the patent was invalid and should not have been issued over [the pre-existing patent]. As indicated by the letter, this argument was rejected by the examiner, for the reasons indicated.
> ...
> We believe that the [1991] letter makes our case even stronger. If "closed" means that Sirius is no longer interested in amicably resolving this matter, please confirm that to me. Otherwise, I suggest that we have at least one more call so that my engineers can explain to you how we believe Sirius is infringing the Alwadish patent, and you can in turn, explain how they are not.
> (Id.)

Sirius was not persuaded. In an August 24, 2005 conference call, Mr. Caplan made clear that because Sirius was not infringing the 610 patent, it was not interested in discussing the patent further or entertaining license negotiations. (Id. ¶ 15.) Mr. Berman responded that Acacia understood Sirius's position and Acacia would "act accordingly." (Id.) The same day, Sirius filed this declaratory judgment action. (Compl.¶ 1.)

## DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. Federal Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A district court must dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(1) when it lacks the statutory or constitutional power to adjudicate it. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). As the party "seeking to invoke the subject matter jurisdiction of the district court," plaintiff bears the burden of proving jurisdiction. *Scela v. City Univ. of New York,* 76 F.3d 37, 40 (2d Cir.1996); *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996). Thus, the Court must "refrain from 'drawing from the pleadings inferences favorable to the party asserting [jurisdiction]," ' *Takeda Chem. Indus., Ltd. v.. Watson Pharm., Inc.,* 329 F.Supp.2d 394, 402 (S.D.N.Y.2004) (quoting *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003)), and may "refer to evidence outside the pleadings." *Luckett v. Bure,* 290 F.3d 493, 496-96 (2d Cir.2002).

B. Subject Matter Jurisdiction Under the Declaratory Judgment Act

**\*3** Through the Declaratory Judgment Act, 28 U.S.C. § § 2201 and 2202, a litigant may file an action in federal court seeking a "declar[ation] of its rights and other legal relations." 28 U.S.C. § 2201. This declaration has the effect of a final judgment, and may be used by the prevailing party to stave off future litigation. *Id* . Since federal courts may not issue advisory opinions, however, a litigant may seek a declaratory judgment only where an "actual controversy" exists. *Id.* "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree." *Dataline, Inc. v. MCI Worldcom Network Servs.,* Inc., No. 00 Civ. 1578, 2001 WL 102336, at \*2 (S.D.N.Y. Feb. 6, 2001). "In general, the presence of an 'actual controversy' within the meaning of the statute depends on 'whether the facts alleged, under all the circumstances, show ... a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." ' *Gen-Probe Inc. v. Vysis, Inc.,* 359 F.3d 1376, 1379 (Fed.Cir.2004) (quoting *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed.Cir.1996), and *Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941)).

The conduct required to create an "actual controversy" differs according to the subject matter of the action. In the patent context, the Federal Circuit follows a two-part test, which focuses on the conduct of both the patentee and the putative

infringer, to determine if a declaratory judgment plaintiff has an "actual controversy." First, there must be "an explicit threat or other action by the patentee, which creates a *reasonable apprehension* on the part of the declaratory judgment plaintiff that it will face an infringement suit." *Gen-Probe,* 359 F.3d at 1380 (emphasis added) (quoting *BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993)). "Reasonableness" is judged by an objective standard, based on the conduct of the patent holder, not the subjective feelings of the potential infringer. *Cygnus Therapeutics Systems v. ALZA Corp.,* 92 F.3d 1153, 1160 (Fed.Cir.1996). The burden falls on the declaratory judgment plaintiff to prove, by a preponderance of the evidence, that its apprehension of suit was reasonable. *Id.* at 1159.

Second, there must be a "present activity which could constitute an infringement or concrete steps taken with the intent to conduct such activity." *Id.* The parties do not dispute that Sirius satisfies this second prong, as Sirius currently offers the allegedly infringing service in the marketplace. (Caplan Decl., Ex. A.) This case thus turns on whether, based on Acacia's conduct and communications prior to the filing of this action, Sirius had a reasonable apprehension of imminent infringement litigation.

*1. Reasonable Apprehension Created by an Express Charge of Infringement*

**\*4** To create a reasonable apprehension, the patentee "must signal an intention to file suit claiming infringement." *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1326 (Fed.Cir.1998). The Federal Circuit has held that when a patentee makes an explicit threat of an infringement suit or an express charge of infringement, there is always an actual controversy. *See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1998). The declaratory judgment plaintiff need not make any additional showing in order to file a declaratory judgment action. *Id.* ("If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more.").

Sirius argues that Acacia's March 30, 2005 letter amounts to an express charge of infringement. The Court does not agree; and a fair reading of the letter does not support a conclusion that there was an express threat. [FN6] It is well settled that neither the offer of a patent license nor language in a letter stating that the declaratory judgment plaintiff's

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2006 WL 238999 (S.D.N.Y.)
(Cite as: 2006 WL 238999 (S.D.N.Y.))

product or service is "covered by" or "falls within" defendant's patent amounts to an "express charge" of infringement. *See Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisia,* 57 F.3d 1051, 1053 (Fed.Cir.1995); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885 (Fed.Cir.1992). More explicit language is required before a court will find an express charge or threat. *See, e.g., Elecs. for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1344 (Fed.Cir.2005) (finding express threat where the patentee stated that it would drive the alleged infringer out of business and sue all its customers, warned that "bad things are going to happen," and even identified specific attorneys and law firms in support of his litigation threats). Acacia's March 30, 2005 letter does not expressly charge infringement of the 610 patent or threaten infringement litigation, it merely expresses a belief that Sirius might be infringing the patent and invites discussions between the companies and their patent experts to resolve the matter. The letter was carefully crafted to promote licensing negotiations between the parties, using the same "covered by" language that the Federal Circuit has previously deemed permissible. This language is not sufficient to create an actual controversy.

> FN6. The purpose of the March 30, 2005 letter was to initiate negotiations for a patent license--a goal which is to be encouraged. If every suggestion of patent coverage and request to enter license negotiations were deemed to be a "threat" sufficient to justify a declaratory judgment, there would be far fewer patent license negotiations and far more litigation. Its character is not changed by Exhibit B, which presents a detailed claims analysis. Had Exhibit B not been included with Exhibit A, Sirius could have stated, correctly, that it would not respond until it saw the patent holder's claims analysis. Thus, Exhibit B does not provide evidence of a threat, rather, it supports the request to enter into license negotiations.

*2. Reasonable Apprehension by a Totality of the Circumstances*

In the alternative, Sirius argues that Acacia's conduct, when viewed as a whole, created a reasonable apprehension of imminent litigation, and therefore created an actual controversy. The Federal Circuit is mindful of the risk that requiring an "explicit threat" could promote manipulation by "patentee[s] who use careful phrases in order to avoid explicit threats, thus denying recourse to the courts

while damages accrue." *Phillips Plastics,* 57 F.3d at 1053. Therefore, a court may find an "actual controversy" in the absence of an express charge of infringement or threat of litigation, if the totality of the circumstances create a reasonable apprehension-- based on an objective test-- that the patentee intended to bring an infringement suit. *Arrowhead,* 846 F.2d at 736; *Shell Oil,* 970 F.2d 888.

**\*5** While the "totality of the circumstances" test is a fact-specific inquiry, the Federal Circuit has identified certain factors that make a declaratory judgment plaintiff's apprehension of litigation presumptively reasonable: (1) where the allegations of infringement come from outside litigation counsel, rather than from the patentee's in-house counsel or business executives; (2) where the patentee warned the declaratory judgment plaintiff's customers of the potential infringement; (3) where the patentee has enforced the same patent or technology against other companies in prior litigation; or (4) where the patentee gave the declaratory judgment plaintiff an unfairly short period of time to respond to the infringement allegations before taking other action. *See, e.g., Arrowhead,* 846 F.2d at 737-38 (finding actual controversy where all four factors present, and noting that contact of infringer's customers and prior litigation were especially strong evidence of the patentee's willingness and desire to sue); *see also Kos Pharm.,* 242 F.Supp.2d at 315-16 (finding actual controversy where patentee had filed three prior lawsuits against the plaintiff to enforce similar patents); *Cargill, Inc. v. Sears Petroleum & Transp. Corp.,* No. 02 Civ. 1395, 2002 WL 31426308, at *4 (S.D.N.Y. Oct. 28, 2002) (finding reasonable apprehension of imminent litigation where letters came from patentee's outside litigation counsel, patentee told plaintiff's distributors of the patent dispute, and patentee's lawyers gave plaintiff only 10 days to respond before advising their client of its legal options); *Consac Indus., Inc. v. Nutramax Labs, Inc.,* No. 97 Civ. 1155, 1998 WL 229255, at *3-4 (E.D.N.Y. Mar. 31, 1998) (finding reasonable apprehension where letters came from patentee's attorneys and patentee had previously filed three infringement actions to enforce the patent). Conduct that would not create a reasonable apprehension of an infringement action in isolation may create a reasonable apprehension when coupled with other activities. *See Teva Pharm. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1333 (Fed.Cir.2005).

Sirius argues that a number of these presumptively threatening factors are present in this case. First, Sirius points to Acacia's recommendation in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 5
Not Reported in F.Supp.2d, 2006 WL 238999 (S.D.N.Y.)
**(Cite as: 2006 WL 238999 (S.D.N.Y.))**

March 30, 2005 letter that Sirius "send this matter to outside patent counsel for review." Sirius argues that this reference to outside counsel created a reasonable apprehension of imminent litigation. In making this argument, however, Sirius misconstrues the case law. In all of the cases finding a reasonable apprehension of litigation based on the involvement of outside counsel, the Court focused on the patentee's decision to refer the case to its own outside counsel. *See, e.g., Cargill,* 2002 WL 31426308, at *4 (finding reasonable apprehension where correspondence came from patentee's attorneys); *Consac Indus.,* 1998 WL 229255, at *4 (same); *see also Dataline, Inc. v. MCI Worldcom Network Servs., Inc.,* No. 00 Civ. 1578, 2001 WL 102336, at *4 (S.D.N.Y. Feb. 6, 2001) (finding no reasonable apprehension of litigation where initial letter came from in-house executive). In this case, on the other hand, all correspondence came from Acacia's Chief Operating Officer and General Counsel, an in-house executive. Acacia did not involve outside litigation counsel until after Sirius filed this declaratory judgment action. There is no indication that Sirius's reference to "outside patent counsel" signaled an intent to litigate. The more reasonable interpretation is that Acacia believed that Sirius could benefit from outside review of the patent before entering license negotiations.

*6 Second, Sirius points to Acacia's history of defending its patents through infringement litigation. The Federal Circuit has expressly held, however, that the fact that a patentee has aggressively asserted its patent rights against other alleged infringers is not sufficient to create a reasonable apprehension of imminent litigation. *See Teva,* 395 F.3d at 1333 (finding that history of infringement litigation unrelated to subject patent did not create reasonable apprehension of imminent litigation); *Gen-Probe,* 359 F.3d at 1381, 1382 (finding no reasonable apprehension of imminent litigation even though parties had a history of litigation over other patents). Only where the patentee has "demonstrated a readiness and inclination to sue [plaintiff] over its patents" by filing previous infringement actions to enforce the same technology is an apprehension of imminent litigation reasonable. *Kos Pharm., Inc. v. Barr Labs.,* 242 F.Supp.2d 311, (S.D.N.Y.2003) (finding reasonable apprehension where patentee had filed three prior lawsuits against plaintiff to enforce similar patents); *see Arrowhead,* 846 F.2d at 738 (finding reasonable apprehension where, in addition to other factors, the patentee had previously sued another company for infringement of the same patent); *Consac Indus., Inc. v. Nutramax Labs, Inc.,* No. 97 Civ. 1155, 1998 WL 229255, at *3 (E.D.N.Y.

Mar. 31, 1998) (finding reasonable apprehension where, in addition to the fact that the patentee had already referred the matter to outside litigation counsel, the patentee had previously filed three infringement actions against other companies to enforce the same technology).

Third, Sirius contends that Acacia's desire to "act quickly" created a reasonable apprehension of imminent litigation. To support this contention, Sirius points to Mr. Berman's March 30, 2005 letter, in which he "provided a 30-day period for response," and his June 17, 2005 e-mail, in which he "provided a '2 week' time limit for Sirius' response to Acacia's infringement charges." (Pl.'s Mem. of Law in Opp'n 15, 16.) Sirius urges the Court to find that this language is identical to the language found by other courts to create a reasonable apprehension of litigation. (*Id.* at 16.) Despite Sirius's urgings, however, its cases do not support the conclusion it urges. Acacia's actual conduct falls well short of "deadlines" imposed by other patent holders. In Sirius's cases, the patentee strongly suggested litigation if the alleged infringer did not respond within a reasonably short period of time. *See Arrowhead,* 846 F.2d at 737 (demanding, within 20 days, a confirmation that all unauthorized practices were discontinued, and threatening that the patentee "had in the past not hesitated to protect its patent rights whenever appropriate"); *Cargill,* 2002 WL 3146308, at *1 (advising, in letter sent by patentee's outside litigation counsel, that if alleged infringer did not respond within ten days the authors would "advise [their] client of their legal options"); *Comtec Info. Sys., Inc. v. Monarch Marking Sys., Inc.,* 962 F.Supp. 15, 17 (D.R.I.1997) (finding reasonable apprehension of imminent litigation where patentee threatened, in third letter from outside counsel, that if the alleged infringer did not act promptly, the patentee "will have no choice but to proceed accordingly").

*7 No similar language is present in this case. In the March 30, 2005 letter, Mr. Berman states that he "will contact [Sirius] in approximately 30 days to check on the status of this matter and discuss next steps." (Caplan Decl., Ex. A.) Mr. Berman did not threaten legal action at the end of the 30- day period. Instead, he suggests that if he has not heard by then, he will call Sirius. No reasonable observer would find this statement to create an apprehension of immediate litigation. Similarly, in the June 17, 2005 e-mail, Mr. Berman requested that Sirius respond to Acacia's infringement allegations within two weeks. Again, Mr. Berman did not threaten legal action if it did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 6
Not Reported in F.Supp.2d, 2006 WL 238999 (S.D.N.Y.)
**(Cite as: 2006 WL 238999 (S.D.N.Y.))**

hear from Sirius at the end of the two-week period. Significantly, even though the parties had not entered license negotiations by the end of the two-week period mentioned in the e-mail, Acacia did not file, or even threaten, an infringement action. This course of events hardly suggests that Acacia intended to sue Sirius in the near future.

Fourth, Sirius contends that Acacia's choice of words in its communications created a reasonable apprehension of imminent litigation. Specifically, Sirius points to Acacia's reference in the March 30, 2005 letter to "excessive legal costs" and in subsequent correspondence to "contentions," "infringement allegations," "Sirius' defense" and the strength of Acacia's "case," "terms which are universally understood to refer to litigation." (Pl.'s Mem. of Law in Opp'n 16.) The Court is not persuaded by this argument; a reasonable observer would not find Acacia's use of these terms, when read in context, forewarned litigation. Instead, a contextual reading confirms that Acacia was merely "jawboning" in anticipation of license negotiations. Acacia's goal of was a license, not a lawsuit. Taking a position in license negotiations is commercially acceptable behavior and does not create a reasonable apprehension of imminent litigation. *See Cygnus, 92 F.3d at 1160; Shell Oil, 970 F.2d at 889.*

Looking at the totality of the circumstances, the Court finds that Acacia's conduct prior to the filing of this declaratory judgment action did not create a reasonable apprehension of litigation. Acacia did not involve outside patent counsel, threaten Sirius's customers with infringement if it continued using Sirius's service, sue other alleged infringers to enforce the 610 patent, or use language that would suggest imminent litigation. To the contrary, Acacia repeatedly signaled an intent to avoid litigation in favor of discussions between the parties. Admittedly, Acacia pressed for license negotiations, but "the reasonable apprehension of suit test requires more than the nervous statement of mind of a possible infringer; it requires that the objective circumstances support such an apprehension" *Cygnus, 92 F.3d at 1160* (internal quotation marks omitted). The Court finds no such circumstances in this case. Acacia's mere attempts to license the 610 patent to Sirius, however persistent, did not create a reasonable apprehension of litigation sufficient to invoke the jurisdiction of this Court under the Declaratory Judgment Act.

CONCLUSION
**\*8** The Court finds that Acacia's conduct prior to the

filing of this declaratory judgment action did not create a reasonable apprehension of imminent litigation. Since no actual controversy existed, the Court does not have subject matter to entertain this action pursuant to the Declaratory Judgment Act. Accordingly, Acacia's motion to dismiss the complaint for lack of subject matter jurisdiction is GRANTED. The Clerk of Court is directed to enter judgment and close out this case.

SO ORDERED

Not Reported in F.Supp.2d, 2006 WL 238999 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3280894 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Oct. 31, 2005)

• 1:05cv07495 (Docket) (Aug. 24, 2005)

• 2005 WL 3280890 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R.CIV.P. 12 (b) (1) and 12(b)(6) (2005)

• 2005 WL 3280892 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R.CIV.P. 12 (b) (1) and 12(b)(6) (2005)

• 2005 WL 3654917 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(B)(1) for Lack of Subject Matter Jurisdiction (2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6H



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
SMITHKLINE BEECH AM CORPORATION &
BEECH AM GROUP, p.l.c. Plaintiffs
v.
ZENITH GOLDLINE PHARMACEUTICALS, INC.
Defendant
**No. CIV.A.00-CV-1393.**

June 28, 2000.

Arthur Makadon, Jamie B. Bischoff, Ballard, Spahr, Andrews and Ingersoll, Sally A. Steffen, Ballard, Spahr, Andrews & Ingersoll, LLP, Phila, for Smithkline Beecham Corporation, Beecham Group, P.L.C. , Plaintiffs.

Roy H. Wepner, Lerner, David, Littenberg, Krumholz and Mentlik, William L. Mentlik, Lerner, David, Lettenberg, Etal, Westfield, NJ, Wendi S. Meltzer, Hoyle, Morris & Kerr, Phila, for Zenith Goldline Pharmaceuticals, Inc., Defendants.

MEMORANDUM & ORDER

KAUFFMAN, J.

**\*1** This action involves the alleged infringement of patents for  paroxetine hydrochloride. Plaintiffs SmithKline Beecham Corporation and Beecham Group, P.L.C.(collectively "SB") have sued Defendant Zenith Goldline Pharmaceuticals ("Zenith") for patent infringement. Zenith filed a counterclaim and SB filed a Motion to Dismiss the counterclaim pursuant to Fed.R.Civ.P. 12(b)(1). For the following reasons, the Motion will be denied.

I. FACTUAL BACKGROUND

 On March 16, 2000, SB filed its Complaint claiming that Zenith is infringing three SB patents: 4,721,723 ("the '723 patent"), 5,900,423 ("the '423 patent") and 5,872,132 ("the '132 patent") on paroxetine hydrochloride, the active ingredient in SB's anti-depressant drug Paxil. SB also owns a fourth patent, 5,789,449 ("the '449 patent") that involves paroxetine

hydrochloride, but has made no claim against Zenith with regard to that patent.

 On April 13, 2000, Zenith filed an Answer, Affirmative Defenses, and Counterclaim arguing that the '449 patent is invalid and seeking a declaratory judgment that it is not infringing the '449 patent and an order that SB remove the '449 patent from the Food and Drug Administration's ("FDA") Approved Drug Products with Therapeutic Equivalents Evaluations (the "Orange Book").  [FN1]  SB has moved to dismiss Zenith's counterclaim pursuant to Fed.R.Civ.P. 12(b)(1), arguing that the Court lacks subject matter jurisdiction because Zenith's counterclaim does not involve a present case or controversy.

> FN1. The Secretary of Health and Human Services is responsible for maintaining a list, commonly known as the "Orange Book," of "the official and proprietary name of each [new] drug which has been approved for safety and effectiveness...." 21 U.S.C. § 355(6)(A)(i)(I). The list is to be revised every thirty days. Id. § 355(6)(A)(ii). Included in this list is the patent information supplied by a drug manufacturer when filing a New Drug Application ("NDA"). Id. § 355(6)(A)(iii). In filing an NDA, "[t]he applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." Id. § 355(b)(1). If the patent information was unavailable or not required at the time the applicant originally filed its application, it is required to furnish the information prior to approval of the application or, if already approved, within thirty days of when the patent was issued. Id. § 355(b)(1) & (c)(2).

II. ANALYSIS

 Zenith bears the burden of proof that subject matter jurisdiction does in fact exist. *Poling v. K. Hovanian Enterprises,* No. Civ. 99-431, 2000 WL 688485, * 10

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2000 WL 963165 (E.D.Pa.)
**(Cite as: 2000 WL 963165 (E.D.Pa.))**

(D.N.J. May 24, 2000). SB argues that this Court lacks subject matter jurisdiction over Zenith's counterclaim for declaratory judgment because there is no justiciable case or controversy between Zenith and SB concerning the '449 patent. SB contends that because it did not raise any issues regarding the '449 patent in its Complaint, no controversy over the patent exists. In response, Zenith argues that the '449 patent is so closely related to the patents genuinely at issue in this case that its counterclaim is correctly before this Court.

 The Declaratory Judgment Act provides that [i]n a case of actual controversy within its jurisdiction ..., any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration ..." 28 U.S.C. § 22001. The actual controversy requirement precludes a declaration about the validity of a patent unless the defendant has an objectively reasonable apprehension that it will face an infringement suit. *Mobil Oil Corporation v. Advanced Environmental Recycling Technologies, Inc.,* 826 F.Supp. 112, 114 (D.Del.1993) (citing *International Medical Prosthetics Research Assoc. v. Gore Enterprise Holdings, Inc.,* 787 F.2d 572, 575 (Fed.Cir.1986). The objective test focusses on whether the patent holder's conduct "rose to a level sufficient to indicate an intent to enforce its patent." *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir.1992). [FN2] When no express charges of infringement on a patent have been made, this Court considers the totality of the circumstances when making this objective determination. *Id.*

> FN2. The Federal Circuit has elaborated on the problem with drawing the line when assessing a case or controversy.
> No patent owner with any sense would open negotiations by assuring his opposite party that he does not intend to enforce his patent rights under any circumstances ... The two part test for declaratory judgment jurisdiction is designed to police the sometimes subtle line between cases in which the parties have adverse interests and cases in which those adverse interests have ripened into a dispute that may properly be deemed a controversy. The test for finding a "controversy" for jurisdictional purposes is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling. The need to look to substance rather than form is especially important in

this area, because in many instances ... the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction. In the end, the question is whether the relationship between the parties can be considered a "controversy," and that inquiry does not turn on whether the parties have used particular "magic words" in communicating with each other.
*EMC Corp. v. Norand Corp,* 89 F.3d 807, 811-812 (Fed.Cir.1996).

 **\*2** The totality of the circumstances in this case clearly reveals that Zenith is justified in its "reasonable apprehension" that it one day will face an infringement suit regarding the '449 patent. As Zenith points out, this action is the third in a series brought by SB over the past year in its attempts to enforce its paroxetine hydrochloride patents against a variety of defendants. [FN3] The similarities between the '449 patent and those that SB seeks now to enforce in the instant suit against Zenith cannot be ignored. [FN4] The Court notes the SB has not filed a covenant not to sue Zenith on the '449 patent. Nor has there been a final determination of noninfringement. *See Mobil Oil Corporation v. Advanced Environmental Recycling Technologies, Inc.,* 826 F.Supp. 112, 114 (D.Del.1993). Based on the vigor that SB has displayed with respect to protecting its paroxetine hydrochloride patents, it is not unforeseeable that it would similarly choose to sue Zenith for infringement of the '449 patent. Accordingly, SB's Motion to Dismiss Zenith's counterclaim for declaratory judgement of noninfringement will be denied.

> FN3. This Court currently has jurisdiction over the two other lawsuits filed in this district by SB to enforce its paroxetine hydrochloride patents. *See* Civil Action Nos. 99-2926 and 99-4304.

> FN4. The '732 patent claims a form of paroxetine hydrochloride hemihydrate, which is used in treatment as an anti-depressant. (Ex. A. to Cplt.) The '132 and '423 patents each claim a particular form of paroxetine hydrochloride anhydrate, also used in treatment "for depression and other disorders for which administration of selective serotonin reuptake inhibitors are indicated." (Ex. B, C. to Cplt.) The '449 patent claims a form of paroxetine

Not Reported in F.Supp.2d, 2000 WL 963165 (E.D.Pa.)
**(Cite as: 2000 WL 963165 (E.D.Pa.))**

hydrochloride to be used in treatment of "various psychiatric disorders and psychiatric symptoms with a class of pharmaceutical compounds called serotonin re-uptake blocking agents." (Ex. A. to Pl. Opp.)

An Order follows.

### ORDER

 AND NOW, this 27th day of June, 2000, upon consideration of Counterclaim Defendants' Motion to Dismiss the Counterclaim against them pursuant to Fed.R.Civ.P. 12(b)(1), and Counterclaim Plaintiff's Opposition thereto, it is ORDERED that the Motion is DENIED.

 Not Reported in F.Supp.2d, 2000 WL 963165 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:00cv01393 (Docket) (Mar. 16, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 7

# Rembrandt Litigation Against Cable Service Providers*



* As of February 9, 2007