IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COXCOM, INC., <br><br> Plaintiff, <br><br> vs. <br><br> REMBRANDT TECHNOLOGIES, L.P., <br><br> Defendant. | Civil Action No. 06-721-GMS |

**PLAINTIFF COXCOM, INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff CoxCom, Inc. ("CoxCom") hereby files this Notice of Supplemental Authority in support of this declaratory judgment action against Defendant Rembrandt Technologies, L.P. ("Rembrandt"). On Monday, March 26, 2007, in *Sandisk Corp. v. STMicroelectronics*, --- F.3d ----, 2007 WL 881008, No. 05-1300 (Fed. Cir. March 26, 2007) (Ex. A), the Federal Circuit ruled that the Supreme Court's *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764 (2007) decision overruled the Federal Circuit's "reasonable apprehension of suit" test for determining whether a case or controversy exists under Article III. "The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test." *Sandisk Corp.*, 2007 WL 881008 at *7.

CoxCom respectfully requests that this Court consider this authority when making its determination regarding its jurisdiction in this action.

1

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ *Leslie A. Polizoti*

_____
Rodger D. Smith II (#3778)
Leslie A. Polizoti (#4299)
1201 N. Market Street
PO Box 1347
Wilmington, DE  19897-1347
(302) 658-9200
lpolizoti@mnat.com
*Attorneys for Plaintiff CoxCom, Inc.*

OF COUNSEL:
Mitchell G. Stockwell
R. Scott Griffin
KILPATRICK STOCKTON LLP
1100 Peachtree Street, N.E., Suite 2800
Atlanta, GA  30309
(404) 815-6500

Tonya R. Deem
KILPATRICK STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400
(336) 607-7485

Dated:  March 29, 2007

780422

CERTIFICATE OF SERVICE

I, Leslie A. Polizoti, hereby certify that on March 29, 2007, I caused to be electronically filed **PLAINTIFF COXCOM, INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY** with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Kevin M. Baird
> James M. Lennon
> WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

and that on March 29, 2007, I caused copies to be served upon the following in the manner indicated:

**By Email and Hand**

> Kevin M. Baird
> James M. Lennon
> WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
> 222 Delaware Avenue, Suite 1500
> Wilmington, DE  19801

> */s/ Leslie A. Polizoti*
> Leslie A. Polizoti (#4299)
> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> (302) 658-9200

# EXHIBIT A

2007 WL 881008                                                                                                                    Page 1
--- F.3d ----, 2007 WL 881008 (Fed.Cir.(Cal.))
**(Cite as: 2007 WL 881008 (Fed.Cir.(Cal.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Federal Circuit.
**SANDISK** CORPORATION, Plaintiff-Appellant,
v.
STMICROELECTRONICS, INC., Defendant-Appellee,
and
STMicroelectronics NV, Defendant.
**No. 05-1300.**

March 26, 2007.

Appealed from United States District Court for the Northern District of California, Judge Jeremy Fogel.

Michael A. Ladra, Wilson Sonsini Goodrich & Rosati, of Palo Alto, California, argued for plaintiff-appellant. With him on the brief were James C. Yoon and Julie M. Holloway.

Edward V. Anderson, Sidley Austin Brown & Wood, LLP, of San Francisco, California, argued for defendant-appellee. With him on the brief were Russell L. Johnson, Georgia K. Van Zanten, Philip W. Woo, Matthew L. McCarthy, Peter Suen; and Kathi A. Cover, of Washington, DC.

Before BRYSON, LINN, and DYK, Circuit Judges.

LINN, Circuit Judge.

*1 SanDisk Corporation ("SanDisk") appeals from a decision of the U.S. District Court for the Northern District of California granting STMicroelectronics' ("ST's") motion to dismiss SanDisk's second through twenty-ninth claims relating to declaratory judgment of noninfringement and invalidity for failure to present an actual controversy. *See SanDisk Corp. v. STMicroelectronics, Inc.,* No. 04-CV-04379 (N.D.Cal. Jan. 20, 2005). Because the district court erred in dismissing the declaratory judgment claims for lack of subject matter jurisdiction, we vacate the judgment and remand the case to the district court.

I. BACKGROUND
SanDisk is in the flash memory storage market and owns several patents related to flash memory storage products. ST, traditionally in the market of semiconductor integrated circuits, more recently entered the flash memory market and has a sizeable portfolio of patents related to flash memory storage products. On April 16, 2004, ST's vice president of intellectual property and licensing, Lisa Jorgenson ("Jorgenson"), sent a letter to SanDisk's chief executive officer requesting a meeting to discuss a cross-license agreement. The letter listed eight patents owned by ST that Jorgenson believed "may be of interest" to SanDisk. *SanDisk,* slip op. at 2; Letter from Jorgenson to SanDisk (Apr. 16, 2004). On April 28, 2004, SanDisk responded that it would need time to review the listed patents and would be in touch in several weeks to discuss the possibility of meeting in June.

On July 12, 2004, having heard nothing further from SanDisk, Jorgenson sent a letter to SanDisk reiterating her request to meet in July to discuss a cross-license agreement and listing four additional ST patents that "may also be of interest" to SanDisk. *SanDisk,* slip op. at 2; Letter from Jorgenson to SanDisk (July 12, 2004). On July 21, 2004, SanDisk's chief intellectual property counsel and senior director, E. Earle Thompson ("Thompson"), responded to ST's letter by informing Jorgenson of his "understanding that both sides wish to continue ... friendly discussions" such as those between the business representatives in May and June. *SanDisk,* slip op. at 2-3; Letter from Thompson to Jorgenson (July 21, 2004). The discussions of May and June that Thompson referred to were discussions among managers and vice presidents of SanDisk and ST at business meetings held on May 18, 2004, and June 9, 2004, to explore the possibility of ST's selling flash memory products to SanDisk. The business meetings were unrelated to any patents. Thompson also requested that Jorgenson join the next business meeting on August 5, 2005. On July 27, 2004, Jorgenson replied, again urging a meeting with Thompson, noting that it was "best to separate the business discussions from the patent license discussions." *SanDisk,* slip op. at 3; Letter from Jorgenson to Thompson (July 27, 2004).

On August 5, 2004, when the business representatives next met, SanDisk presented an analysis of three of its patents and orally offered ST a license. ST declined to present an analysis of any of its patents, stating instead that any patent and licensing issues should be discussed in a separate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meeting with Jorgenson. Later that same day, Thompson wrote a letter to Jorgenson objecting to separating business and intellectual property issues and stating that "[i]t has been SanDisk's hope and desire to enter into a mutually beneficial discussion without the rattling of sabers." *SanDisk,* slip op. at 4; Letter from Thompson to Jorgenson (Aug. 5, 2004). On August 11, 2004, Jorgenson replied, stating that it was her understanding that the parties were going to have a licensing/intellectual property meeting later that month "to discuss the possibility for a patent cross-license." Letter from Jorgenson to Thompson (Aug. 11, 2004). She said that SanDisk should come to that meeting prepared to present an analysis of the three SanDisk patents it identified during the August 5th business meeting, as well as "any infringement analyses of an ST device or need for ST to have a license to these patents." *Id.* She also said that ST would be prepared at that meeting to discuss the twelve patents identified in her prior letters. In closing, Jorgenson said that ST was "look [ing] forward to open and frank discussions with SanDisk concerning fair and reasonable terms for a broad cross-license agreement." *Id.*

*2 On August 27, 2004, the licensing meeting was held. Jorgenson, two ST licensing attorneys, and three technical experts retained by ST to perform the infringement analyses of SanDisk's products, attended on behalf of ST. Thompson and an engineer attended on behalf of SanDisk. At the meeting, Jorgenson requested that the parties' discussions be treated as "settlement discussions" under Federal Rule of Evidence 408. [FN1] *SanDisk,* slip op. at 5. ST then presented a slide show which compared statistics regarding SanDisk's and ST's patent portfolios, revenue, and research and development expenses, and listed SanDisk's various "unlicensed activities." *Id.* This slide show was followed by a four- to five-hour presentation by ST's technical experts, during which they identified and discussed the specific claims of each patent and alleged that they were infringed by SanDisk. According to Thompson, the presentation by ST's technical experts included "mapp[ing] the elements of each of the allegedly infringed claims to the aspects of the accused SanDisk products alleged to practice the elements." *Id.* Thompson declares that "the experts liberally referred to SanDisk's (alleged) infringement of [ST's] products." *Id.,* slip op. at 5-6. SanDisk's engineer then made a presentation, describing several of SanDisk's patents and analyzing how a semiconductor chip product sold by ST infringes. *Id.,* slip op. at 6.

FN1. To avoid the risk of a declaratory judgment action, ST could have sought SanDisk's agreement to the terms of a suitable confidentiality agreement. The record before us reflects that the parties did not enter into such an agreement. Rather, ST sought to condition its open licensing discussions and the infringement study on adherence to Federal Rule of Evidence 408. That rule expressly relates to evidence of efforts toward compromising or attempting to compromise a claim in litigation and does not prevent SanDisk from relying on the licensing discussions and infringement study to support its claims. *See* Fed.R.Evid. 408. Furthermore, ST's presentation was made outside the context of litigation, and there is nothing on the record to indicate that it could be properly considered an "offer" to settle a claim which was then in dispute. *See, e.g., Deere & Co. v. Int'l Harvester Co., 710 F.2d 1551, 1556-57 (Fed.Cir.1983).*

At the end of the meeting, Jorgenson handed Thompson a packet of materials containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing how elements of ST's patent claims cover SanDisk's products. According to SanDisk, Jorgenson indicated (in words to this effect):

I know that this is material that would allow SanDisk to DJ [ST] on. We have had some internal discussions on whether I should be giving you a copy of these materials in light of that fact. But I have decided that I will go ahead and give you these materials.

*Id.* Jorgenson further told Thompson that "ST has absolutely no plan whatsoever to sue SanDisk." *Id.* Thompson responded to Jorgenson that "SanDisk is not going to sue you on Monday" and that another meeting might be appropriate. *Id.*

On September 1, 2004, Jorgenson wrote to Thompson, enclosing copies of ST's general slide presentation from the August meeting and also enclosing a hard copy booklet containing each of the engineering reports "for each claim on all products where ST demonstrated coverage by the 14 ST patents to-date [sic]." *Id.;* Letter from Jorgenson to Thompson (Sept. 1, 2004). Jorgenson requested that SanDisk provide ST with a copy of SanDisk's presentation and information about the three SanDisk patents presented. On September 8, 2004, Thompson replied by e-mail, confirming receipt of the package

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from ST, attaching a copy of SanDisk's presentation, indicating it was his "personal feeling ... that we have got to trust one another during these negotiations," and seeking a non-disclosure agreement. *SanDisk,* slip op. at 6-7; E-mail from Thompson to Jorgenson (Sept. 8, 2004). Thompson also wrote "I still owe you the rates quoted." *Id.*

**\*3** On September 15, 2004, Thompson again corresponded with Jorgenson, this time by letter, enclosing a confidential version of SanDisk's cross licensing offer, which noted that the offer would expire on September 27, 2004. *SanDisk,* slip op. at 7; Letter from Thompson to Jorgenson (Sept. 15, 2004). Jorgenson destroyed this confidential offer and did not retain a copy, and, on September 16, 2004, sent Thompson an e-mail requesting that a non-confidential version be sent for ST's consideration. *SanDisk,* slip op. at 7; E-mail from Jorgenson to Thompson (Sept. 16, 2004). SanDisk refused to send a non-confidential version. Instead, on September 27, 2004, Thompson offered to send another confidential version, or to communicate the offer orally. E-mail from Thompson to Jorgenson (Sept. 27, 2004). Thompson also indicated that SanDisk did not need additional information regarding ST's patents because SanDisk was "quite comfortable with its position" and that it was "time to let our business people talk and see if a peaceful resolution is possible." *Id.* On September 28, 2004, Jorgenson repeated her request for a written non-confidential version of SanDisk's licensing offer. *SanDisk,* slip op. at 7-8; E-mail from Jorgenson to Thompson (Sept. 28, 2004). The following day, Thompson e-mailed Jorgenson another confidential version of SanDisk's offer. *SanDisk,* slip op. at 8.

On October 15, 2004, after several further e-mails and phone calls between the business representatives trying to establish another meeting, SanDisk filed the instant lawsuit. SanDisk alleged infringement of one of its patents and sought a declaratory judgment of noninfringement and invalidity of the fourteen ST patents that had been discussed during the cross licensing negotiations. On December 3, 2004, ST filed a motion to dismiss SanDisk's declaratory judgment claims for lack of subject matter jurisdiction, maintaining that there was no actual controversy at the time SanDisk filed its complaint.

The district court granted ST's motion to dismiss, holding that no actual controversy existed for purposes of the Declaratory Judgment Act because SanDisk did not have an objectively reasonable apprehension of suit, even though it may have subjectively believed that ST would bring an infringement suit. *See id.,* slip op. at 14. The district court reasoned that "SanDisk has presented no evidence that ST threatened it with litigation at any time during the parties' negotiations, nor has SanDisk shown other conduct by ST rising to a level sufficient to indicate an intent on the part of ST to initiate an infringement action." *Id.* The district court found that the studied and determined infringement analyses that ST presented to SanDisk did not constitute the requisite "express charges [of infringement] carrying with them the threat of enforcement." *Id.,* slip op. at 14-15. The district court also found that the totality of the circumstances did not evince an actual controversy because ST told SanDisk that it did not intend to sue SanDisk for infringement. *Id.,* slip op. at 15-16. In a footnote, the court indicated that, as an alternative basis for its ruling, even if it did have jurisdiction, it would exercise its discretion and decline to hear the case. *Id.,* slip op. at 17 n. 30.

**\*4** SanDisk appealed the dismissal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2000).

II. DISCUSSION
A. Standard of Review

For purposes of Article III, this court reviews a dismissal of a patent claim for lack of an actual controversy upon a particular set of facts as a question of law subject to plenary appellate review. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed.Cir.1988)*. This court reviews the underlying factual findings for clear error. *Gen-Probe Inc. v. Vysis, Inc., 359 F.3d 1376, 1379 (Fed.Cir.2004)*.

B. Analysis

SanDisk argues that the district court erred as a matter of law by requiring an express accusation of patent infringement coupled with an explicit threat of judicial enforcement to support declaratory judgment jurisdiction, and that, under the correct legal standard articulated by this court in *Arrowhead, 846 F.2d at 736,* the facts of this case illustrate that SanDisk's apprehension of an infringement suit was objectively reasonable. SanDisk asserts that the infringement analysis presented by ST and its experts at the August 27, 2004 licensing meeting constituted an allegation of infringement and that the totality of the circumstances shows that ST's conduct gave rise to an actual case or controversy. SanDisk further points out that negotiations regarding licensing had ceased by the time SanDisk filed its claims for declaratory judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ST counters that the district court applied the correct legal standard and argues that SanDisk ignores the line of cases that have followed and interpreted *Arrowhead*. ST asserts that the cases following *Arrowhead* reveal that the bare mention of infringement, particularly during license negotiations, is not sufficient to meet the standard set forth in *Arrowhead*. ST asserts that its conduct at the August 27, 2004 licensing meeting was to strengthen its position during licensing negotiations and that, under the totality of the circumstances, SanDisk has not shown that ST's conduct gave rise to declaratory judgment jurisdiction. Moreover, ST argues that the district court did not abuse its discretion when it concluded, as an alternative basis for its ruling, that it would exercise discretion to decline to decide SanDisk's claims.

1. Case or Controversy

The first question we address is whether the facts alleged in this case show that there is a case or controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

The Declaratory Judgment Act provides, in relevant part, that
> [i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The "actual controversy" requirement of the Declaratory Judgment Act is rooted in Article III of the Constitution, which provides for federal jurisdiction over only "cases and controversies." Thus, our jurisdiction extends only to matters that are Article III cases or controversies.

*5 The Supreme Court, in the context of a patent license dispute, recently examined Article III's case or controversy requirement as it relates to the Declaratory Judgment Act. See *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764 (2007). In *MedImmune,* the Supreme Court considered "whether Article III's limitation of federal courts' jurisdiction to 'Cases' and 'Controversies,' reflected in the 'actual controversy' requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), requires a patent licensee to terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed." *Id.* at 767.

The Supreme Court began its analysis
> with the recognition that, where threatened action by government is concerned, [the Court] do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat--for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*Id.* at 772. The Supreme Court quoted its earlier decision in *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941), where the Court stated that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 127 S.Ct. at 771. The Supreme Court emphasized that Article III requires that the dispute at issue be " 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *Id.* (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240-41 (1937)). The Supreme Court stated that, when faced with a genuine threat of enforcement that the government will penalize a certain private action, Article III "d[oes] not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action." *Id.* at 772 (citations omitted). As the Supreme Court noted, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.* (quotation marks omitted). The Supreme Court clarified that, although a declaratory judgment plaintiff may eliminate an "imminent threat of harm by simply not doing what he claimed the right to do[,] ... [t]hat did not preclude subject-matter jurisdiction [where] the threat-eliminating behavior was effectively coerced." *Id.* "The dilemma posed by that coercion--putting the challenger to the choice between abandoning his rights or risking prosecution-- is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* at 773 (internal quotation marks omitted).

*6 The Supreme Court then applied these principles to the facts of the case and remarked that "the requirements of [a] case or controversy are met where payment of a claim is demanded as of right

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Id.* (internal quotation marks omitted). The Supreme Court held that "[t]he rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business, before seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 775.

With regard to patent disputes, prior to *MedImmune*, this court articulated a two-part test that first considers whether conduct by the patentee creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and second examines whether conduct by the declaratory judgment plaintiff amounts to infringing activity or demonstrates concrete steps taken with the intent to conduct such activity. *See Arrowhead, 846 F.2d at 736.* The Supreme Court, in *MedImmune*, addressed the "reasonable apprehension of suit" aspect of this court's two-part test and concluded that it conflicts with *Aetna Life Insurance* and *Maryland Casualty,* and is in tension with *Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 98 (1993).* See *MedImmune,* 127 S.Ct. at 774 n. 11.

In *Aetna Life Insurance,* an insurer sought a declaratory judgment that the insured was not relieved of his duty to continue to pay insurance premiums and that, since the insured had stopped making the payments, the insurance policy had lapsed. In that case, the Supreme Court first upheld the constitutionality of the federal Declaratory Judgment Act. 300 U.S. at 240-41. The Supreme Court then held that, although the insured party gave no indication that he would file suit, *id. at 239,* the case nevertheless presented a controversy under Article III because the parties had taken adverse positions with regard to their obligations, each side presenting a concrete claim of a specific right--the insured claiming that he had become disabled and therefore was relieved of making insurance premium payments and the insurer claiming that the insured was not disabled and that the failure to make payments caused the policy to lapse, *id. at 244.* Similarly, in *Maryland Casualty,* the declaratory judgment plaintiff, an insurance company which had agreed to indemnify and defend the insured against actions brought by third parties against the insured, sought a declaration that it had no duty to defend or to indemnify the insured. 312 U.S. at 272. In that case, the insured could not have sued the declaratory judgment plaintiff without first obtaining a judgment against the third party and the underlying action against the third party "[a]pparently ... ha[d] not proceeded to judgment." *Id. at 271.* Nevertheless, the Supreme Court held that "[i]t is clear that there is an actual controversy between petitioner and the insured" since the insured was in the process of seeking a judgment and had a statutory right to proceed against the declaratory judgment plaintiff if such judgment were obtained and not satisfied. *Id. at 274.* Finally, in *Cardinal Chemical,* the Supreme Court held that this court's affirmance of a judgment of noninfringement does not necessarily moot a declaratory judgment counterclaim of patent invalidity. 508 U.S. at 98. The Supreme Court's rationale for holding that the declaratory judgment action can proceed consistent with Article III was that a contrary result would create the potential for relitigation or uncertainty with regard to the validity of patents and would be contrary to *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313 (1971).

*7 The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test. [FN2] The Court first noted that "the continuation of royalty payments makes what would otherwise be an imminent threat at least remote, if not nonexistent.... Petitioner's own acts, in other words, eliminate the imminent threat of harm." *MedImmune,* 127 S.Ct. at 772. The Court nonetheless concluded that declaratory judgment jurisdiction existed relying in particular on its earlier decision in *Altvater v. Freeman,* 319 U.S. 359 (1943). There, the patentee brought suit to enjoin patent infringement, and the accused infringer filed declaratory judgment counterclaims of invalidity. The district court found that there was no infringement and that the patent was invalid. *Id. at 362.* The appellate court affirmed the finding of noninfringement but vacated the finding of invalidity as moot. *Id.* The Supreme Court held that the declaratory judgment counterclaims were not mooted by the finding of noninfringement. *Id.* at 365- 66. In finding declaratory judgment jurisdiction in *MedImmune,* the Court specifically addressed and rejected our reasonable apprehension test:

> FN2. In this case, we address only the first prong of this court's two-part test. There is no dispute that the second prong is met. We therefore leave to another day the effect of *MedImmune,* if any, on the second prong.

[e]ven if *Altvater* could be distinguished as an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"injunction" case, it would still contradict the Federal Circuit's "reasonable apprehension of suit" test (or, in its evolved form, the "reasonable apprehension of imminent suit" test, Teva Pharm. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1333 (2005)). A licensee who pays royalties under compulsion of an injunction has no more apprehension of imminent harm than a licensee who pays royalties for fear of treble damages and an injunction fatal to his business. The reasonable-apprehension-of-suit test also conflicts with our decisions in Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941), where jurisdiction obtained even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured; and Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239 (1937), where jurisdiction obtained even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit. It is also in tension with Cardinal Chemical Co. v. Morton Int'l, Inc., 508 U.S. 83, 98 (1993), which held that appellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity. MedImmune, 127 S.Ct. at 774 n. 11.

The Supreme Court in MedImmune addressed declaratory judgment jurisdiction in the context of a signed license. In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee. But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. We need not define the outer boundaries of declaratory judgment jurisdiction, which will depend on the application of the principles of declaratory judgment jurisdiction to the facts and circumstances of each case. We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights. See id. Contra Cygnus Therapeutics Sys. v. ALZA Corp., 92 F.3d 1153 (Fed.Cir.1996) (holding that declaratory judgment jurisdiction was not supported where the "patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity").

*8 Our holding is consistent with decisions of other courts in various cases unrelated to patent licensing. See, e.g., Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1085 (9th Cir.2000) (finding declaratory judgment jurisdiction based on trademark owner's cease and desist letter despite the fact that trademark owner offered to waive all trademark infringement and related claims); GNB Battery Tech., Inc. v. Gould, Inc., 65 F.3d 615, 620 (7th Cir.1995) (finding declaratory judgment jurisdiction where declaratory judgment plaintiff filed action in anticipation of potential action by the defendant based on new legislation although the defendant had not indicated whether or when it may act); Kunkel v. Cont'l Cas. Co., 866 F.2d 1269, 1274 (10th Cir.1989) (affirming exercise of declaratory judgment jurisdiction over suit seeking declaratory judgment for determination of value of insurance coverage even though existence of coverage remained dependent upon the outcome of a collateral action and noting that "[t]he contingent nature of the right or obligation in controversy will not bar a litigant from seeking declaratory relief when the circumstances reveal a need for present adjudication"); see also IMS Health, Inc. v. Vality Tech. Inc., 59 F.Supp.2d 454 (E.D.Pa.1999) (holding that requirements for declaratory judgment jurisdiction were satisfied where copyright holder had not indicated it was going to file suit but had taken positions and made demands such that the declaratory judgment plaintiff justifiably believed that copyright holder might take such action in the future and noting that "[i]t is quite possible for two parties to simultaneously consider nonlitigious settlement of a dispute, while at the same time maintaining an awareness that either settlement is improbable or that litigation is equally likely"); N. Shore Gas Co. v. Salomon, Inc., 896 F.Supp. 786, 789-90 (N.D.Ill.1995) (finding declaratory judgment jurisdiction where plaintiff, "rather than wait an indefinite time to be sued," filed suit after the settlement discussions came to an impasse); J. Lyons & Co. Ltd. v. Republic of Tea, Inc., 892 F.Supp. 486 (S.D.N.Y.1995) (dismissing trademark holder's later-filed infringement action in favor of previously filed declaratory judgment actions where declaratory judgment plaintiffs had received cease and desist

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

letters and no settlement appeared agreeable, despite the fact that trademark holder did not give actual notice of litigation); Kmart Corp. v. Key Indus., Inc., 877 F.Supp. 1048, 1055 (E.D.Mich.1994) (holding that ongoing settlement negotiations did not require dismissal of declaratory judgment action where the evidence indicated that the trademark holder would accept no settlement short of total capitulation); Agridyne Tech., Inc. v. W.R. Grace & Co., 863 F.Supp. 1522 (D.Utah 1994) (refusing to dismiss declaratory judgment action where plaintiff justifiably believed that further settlement negotiations would be fruitless).

*9 Under the facts alleged in this case, SanDisk has established an Article III case or controversy that gives rise to declaratory judgment jurisdiction. ST sought a right to a royalty under its patents based on specific, identified activity by SanDisk. For example, at the August 27, 2004 licensing meeting, ST presented, as part of the "license negotiations," a thorough infringement analysis presented by seasoned litigation experts, detailing that one or more claims of its patents read on one or more of SanDisk's identified products. At that meeting, ST presented SanDisk with a detailed presentation which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents. During discussions, the experts liberally referred to SanDisk's present, ongoing infringement of ST's patents and the need for SanDisk to license those patents. ST also gave SanDisk a packet of materials, over 300 pages in length, containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing a detailed infringement analysis of SanDisk's products. ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted the right to a royalty based on this determination. SanDisk, on the other hand, maintained that it could proceed in its conduct without the payment of royalties to ST. These facts evince that the conditions of creating "a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" were fulfilled. Md. Cas., 312 U.S. at 273. SanDisk need not "bet the farm," so to speak, and risk a suit for infringement by cutting off licensing discussions [FN3] and continuing in the identified activity before seeking a declaration of its legal rights. See MedImmune, 127 S.Ct. at 774 n. 11. Contra Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed.Cir.1995) ("When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down.").

> FN3. Although the district court found that licensing negotiations had not been terminated, we note that SanDisk in fact declined to participate in further negotiations, effectively bringing them to an end. Regardless, however, a party to licensing negotiations is of course within its rights to terminate negotiations when it appears that they will be unproductive.

2. Promise Not to Sue

We next address whether Jorgenson's direct and unequivocal statement that "ST has absolutely no plan whatsoever to sue SanDisk" eliminates any actual controversy and renders SanDisk's declaratory judgment claims moot.

We decline to hold that Jorgenson's statement that ST would not sue SanDisk eliminates the justiciable controversy created by ST's actions, because ST has engaged in a course of conduct that shows a preparedness and willingness to enforce its patent rights despite Jorgenson's statement. Having approached SanDisk, having made a studied and considered determination of infringement by SanDisk, having communicated that determination to SanDisk, and then saying that it does not intend to sue, ST is engaging in the kinds of "extra-judicial patent enforcement with scare-the-customer-and-run tactics" that the Declaratory Judgment Act was intended to obviate. Arrowhead, 846 F.2d at 735. ST's statement that it does not intend to sue does not moot the actual controversy created by its acts. See Md. Cas., 312 U.S. at 273 (jurisdiction obtained even though the defendant could not have sued the declaratory judgment plaintiff).

3. District Court's Discretion

*10 Although the district court is given the discretion, in declaratory judgment actions, to dismiss the case, there are boundaries to that discretion. See Wilton v. Seven Falls Co., 515 U.S. 277, 289 (1995). "When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." Genentech v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed.Cir.1993). Furthermore, the exercise of discretion must be supported by a sound basis for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

refusing to adjudicate an actual controversy. *See Elecs. for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1345 (Fed.Cir.2005); *Capo, Inc. v. Dioptics Med. Prod., Inc.,* 387 F.3d 1352, 1357 (Fed.Cir.2004).

In this case, the district court noted, without explanation in a footnote, that "[a]s an alternative basis for its ruling, the Court concludes that even if it had subject matter jurisdiction over the instant claims, it would exercise its discretion and decline to decide them." *SanDisk,* slip op. at 17 n. 30. That decision, however, was made in the context of our "reasonable apprehension" precedent without the benefit of the Supreme Court's views in *MedImmune.* Given the change reflected in *MedImmune* and our holding in this case, we discern little basis for the district court's refusal to hear the case and expect that in the absence of additional facts, the case will be entertained on the merits on remand.

CONCLUSION

For the above reasons, we conclude that the dismissal was improperly granted. The dismissal is vacated, and the case is remanded for further proceedings consistent with this opinion.

*VACATED and REMANDED*
COSTS
Costs are awarded to SanDisk.

Opinion concurring in the result filed by Circuit Judge BRYSON.

BRYSON, Circuit Judge, concurring in the result.

Under our law, as things stood before the Supreme Court's decision in *MedImmune,* the district court's order in this case was correct. ST, the patentee, had offered a license to SanDisk, but had not threatened suit and had sought to continue licensing negotiations. Although ST had made a detailed showing as to why it believed SanDisk's products were within the scope of its patent rights, there is nothing exceptional in that. In the typical case, we would expect competent patent counsel who offers a license to another party to be prepared to demonstrate why such a license is required. By the time the suit was brought, ST had done nothing to give SanDisk cause to be in reasonable apprehension of suit, and in fact ST had expressly stated that it did not intend to sue SanDisk. In short, ST was simply availing itself of the safe haven our cases had created for patentees to offer licenses without opening themselves up to expensive litigation. *See, e.g., Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1054 (Fed.Cir.1995); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir.1992).

*11 The decision in *MedImmune* dealt with a narrow issue: whether a declaratory judgment action can be brought by a patent licensee without terminating the licensing agreement. Footnote 11 of the *MedImmune* opinion, however, went further and criticized this court's "reasonable apprehension of suit" test for declaratory judgment jurisdiction. I agree with the court that the footnote calls our case law into question and would appear to make declaratory judgments more readily available to parties who are approached by patentees seeking to license their patents. In particular, the reasoning of the *MedImmune* footnote seems to require us to hold that the district court in this case had jurisdiction to entertain SanDisk's declaratory judgment action. For that reason I concur in the judgment of the court in this case reversing the jurisdictional dismissal of the complaint.

I think it is important, however, to point out the implications of the footnote in *MedImmune* as applied here, because the implications are broader than one might suppose from reading the court's opinion in this case. While noting that it is not necessary to define the outer boundaries of declaratory judgment jurisdiction, the court holds that "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license," the party may bring a declaratory judgment action. Applying that principle, the court concludes that in this case, where "ST sought a right to a royalty under its patents based on specific, identified activity by SanDisk," an Article III case or controversy has arisen.

In practical application, the new test will not be confined to cases with facts similar to this one. If a patentee offers a license for a fee, the offer typically will be accompanied by a suggestion that the other party's conduct is within the scope of the patentee's patent rights, or it will be apparent that the patentee believes that to be the case. Offers to license a patent are not requests for gratuitous contributions to the patentee; the rationale underlying a license offer is the patentee's express or implied suggestion that the other party's current or planned conduct falls within the scope of the patent. Therefore, it would appear that under the court's standard virtually any invitation to take a paid license relating to the prospective licensee's activities would give rise to an Article III

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case or controversy if the prospective licensee elects to assert that its conduct does not fall within the scope of the patent. Indeed, as the court makes clear, even a representation by the patentee that it does not propose to file suit against the prospective licensee will not suffice to avoid the risk that the patentee will face a declaratory judgment action. And if there is any uncertainty on that score, all the prospective licensee has to do in order to dispel any doubt is to inquire of the patentee whether the patentee believes its activities are within the scope of the patent. If the patentee says "no," it will have made a damaging admission that will make it very hard ever to litigate the issue, and thus will effectively end its licensing efforts. If it says "yes" or equivocates, it will have satisfied the court's test and will have set itself up for a declaratory judgment lawsuit.

*12 For these reasons, I see nothing about the particular facts surrounding this licensing negotiation in this case that triggers SanDisk's right to bring a declaratory judgment action under the new standard. The court emphasizes that ST made a "detailed presentation [to SanDisk] which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents." The court summarizes ST's presentation by stating that "ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted a right to a royalty based on this determination" and that SanDisk "maintained that it could proceed in its conduct without the payment of royalties to ST." Those facts, the court concludes, evinced a sufficient controversy to entitle SanDisk to institute its declaratory judgment suit.

But what is the significance of those facts? The court's legal test does not suggest that the case would come out differently if ST had been less forthcoming about why it believed SanDisk should take a license, or even if ST had simply contacted SanDisk, provided copies of its patents, and suggested that SanDisk consider taking a license. I doubt the court would hold that there was no controversy in that setting, as long as SanDisk was prepared to assert that it believed its products were not within the scope of ST's valid patent rights. If SanDisk's lawyers had any question about whether this court would permit them to seek a declaratory judgment under those circumstances, they could readily resolve that question by sending a "put up or shut up" response to ST's licensing offer--asking ST to state expressly whether it regarded SanDisk's products to be within the scope of ST's patents and to identify with particularity how SanDisk's products read on particular claims of those patents. Any response by ST would either end its licensing efforts or expose it to a declaratory judgment action. [FN1]

> FN1. The court suggests that ST could have avoided the risk of a declaratory judgment action by obtaining a suitable confidentiality agreement. The problem with that suggestion is that it would normally work only when it was not needed--only a party that was not interested in bringing a declaratory judgment action would enter into such an agreement. A party that contemplates bringing a declaratory judgment action or at least keeping that option open would have no incentive to enter into such an agreement.

In sum, the rule adopted by the court in this case will effect a sweeping change in our law regarding declaratory judgment jurisdiction. Despite the references in the court's opinion to the particular facts of this case, I see no practical stopping point short of allowing declaratory judgment actions in virtually any case in which the recipient of an invitation to take a patent license elects to dispute the need for a license and then to sue the patentee. Although I have reservations about the wisdom of embarking on such a course, I agree with the court that a fair reading of footnote 11 of the Supreme Court's opinion in *MedImmune* compels that result, and I therefore concur in the judgment reversing the district court's dismissal order in this case. [FN2]

> FN2. Although I agree that the judgment must be reversed, I take issue with the scope of the remand insofar as it applies to the district court's exercise of its discretion to decline to entertain this action as a discretionary matter. I would allow the district court to reconsider that issue based on all the circumstances, not just "additional facts" not previously before the district court, as the terms of this court's remand seem to require. Thus, for example, the fact that the parties are engaged in a parallel infringement action in another district court is an important factor in the district court's decision on whether to allow SanDisk's declaratory suit to proceed at this time. *See Intermedics Infusaid, Inc. v. Regents of Univ. of Minn.,* 804 F.2d 129 (Fed.Cir.1986) (pending action in another jurisdiction is sufficient ground on which to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 881008                                                                                                    Page 10
--- F.3d ----, 2007 WL 881008 (Fed.Cir.(Cal.))
**(Cite as: 2007 WL 881008 (Fed.Cir.(Cal.)))**

stay declaratory suit). The district court should be free on remand to consider that factor in determining how to exercise its discretion, even though the pendency of that parallel action is not an "additional fact" that was not before the court at the time of its earlier decision.

--- F.3d ----, 2007 WL 881008 (Fed.Cir.(Cal.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.